## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> INSULET CORPORATION, DUANE DESISTO, PATRICK J. SULLIVAN, ALLISON DORVAL, and BRIAN ROBERTS, <br><br> Defendants. | Civ. A. No. 1:15-cv-12345 <br><br> **CLASS ACTION** <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> **ECF CASE** |

Plaintiff Arkansas Teacher Retirement System ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (a) regulatory filings made by Insulet Corporation ("Insulet" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by the Company; (c) analyst reports concerning Insulet; and (d) other public information regarding the Company.

## INTRODUCTION

1.     This securities fraud class action is brought on behalf of purchasers of Insulet's publicly traded securities from May 7, 2013 to April 30, 2015, inclusive (the "Class Period"). The claims asserted herein are alleged against Insulet and certain of the Company's current and former senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     Insulet, headquartered in Billerica, Massachusetts, is a manufacturer of insulin infusion pumps that are used to treat people with diabetes.  In contrast with traditional insulin pumps, the Company's pumps are tubeless, are worn on the body for three days in-a-row, and are controlled by a handheld, wireless device known as a personal diabetes manager.  In 2013, Insulet began selling a new, and purportedly improved version of its insulin infusion system, known as the OmniPod Eros ("OmniPod") which is more than one-third smaller and one-quarter lighter than the original version while ostensibly maintaining the same features and operating capabilities.

3.     The Class Period starts on May 7, 2013, the first trading day after Insulet's former CEO Duane DeSisto touted the Company's launch of its new OmniPod system, stating that customers' initial feedback was excellent, that the Company transitioned all of its new customers to the new OmniPod, and that Insulet's growth was surging in both the U.S. and overseas as result.  Insulet and its executives made similar statements to investors, including statements regarding how many new patients were using the new OmniPod, throughout the Class Period.

4.     These statements were false and misleading.  In truth, Insulet was encountering significant manufacturing and quality issues with its new OmniPod and was experiencing major setbacks converting its customers over to the new device, which caused growth to plummet.  To conceal the declining growth, Insulet engaged in a variety of deceptive tactics, including manipulating the way it reported the number of "new patient starts," a critical metric for analysts and investors.

5.     On January 7, 2015, the Company announced a major leadership overhaul, replacing much of the senior management team and appointed six new executives from outside of the Company.  Also on January 7, Insulet announced that it experienced delays in the

shipments of its non-insulin drug delivery products and was forced to significantly reduce guidance for its fourth quarter of 2014, as well as for the full-year.  On this news, the price of Insulet stock dropped from $44.53 per share to $40.52 per share, or approximately 9%.

6.      Just one week later, on January 14, 2015, the Company presented at a JPMorgan Healthcare Conference.   During that conference, CEO Patrick Sullivan stated that analysts' expectations of Insulet's performance in 2015 are "a tad bit high," and that earnings for the first quarter of 2015 were expected to be flat sequentially over the fourth quarter of 2014.

7.      Immediately after that conference, CEO Sullivan held a breakout session during which he admitted that Insulet's new OmniPod system was experiencing serious problems, that the Company's growth in the U.S. had been precipitously declining rather than increasing, and that Insulet changed the way it was reporting OmniPod sales outside of the U.S. in order to conceal the declining growth.  Specifically, the Company's management changed the way it reported Insulet's "new patient starts" from being just a U.S. metric to a global metric, and the Company had counted sales of OmniPod to its international distributor (Ypsomed Distribution AG or ("Ypsomed")) that Ypsomed could not reasonably sell.  These tactics had the effect of artificially inflating the level of the Company's growth.

8.      In response to Defendant Sullivan's admissions in the breakout session with analysts, an analyst at William Blair & Company wrote in a research report that "[m]anagement disclosures have been incomplete, at best . . . misleading investors as to the underlying health of the core OmniPod business."   On this news, the price of the Company's stock declined from $38.50 per share to $31.86 per share, or approximately 17%.

9.      Then, on April 30, 2015, Insulet reported results for its first quarter of 2015. During the Company's earnings conference call, CEO Sullivan announced disappointing revenue

of just $61 million compared to Insulet's prior guidance of $67-$69 million.  The Company blamed its results on the fact that Ypsomed was forced to destock a significant amount of the excess inventory it purchased from Insulet in prior quarters.  The Company also disclosed that it generated only $39.2 million from its U.S. OmniPod business, approximately 4% less than the Company generated over the prior year.  On this news, the price of the Company's stock dropped from $29.85 per share to $26.97 per share, or almost 10%.  The disclosures regarding Insulet's misconduct caused investors in the Company's securities to suffer significant losses.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.P.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Insulet maintains its executive offices in this District and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

12.     Plaintiff Arkansas Teacher Retirement System ("Plaintiff") is a public pension fund based in Little Rock, Arkansas that provides retirement benefits to Arkansas' public school and education employees.  As of March 31, 2014, Plaintiff managed over $14 billion in assets.

Plaintiff purchased Insulet securities on the NASDAQ stock market ("NASDAQ") during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

13.     Defendant Insulet is incorporated in Delaware and maintains its principal executive offices at 600 Technology Park Drive, Suite 200, Billerica, Massachusetts, 01821. Insulet's primary business is the development, manufacture, and sale of its proprietary OmniPod Insulin Management System.  The Company generates nearly all of its revenue from sales of its OmniPod System and other diabetes related products, such as blood glucose testing supplies, traditional insulin pumps, pump supplies, and pharmaceuticals to customers and third-party distributors who resell the products to patients with diabetes.  The Company's common stock trades on NASDAQ, which is an efficient market, under ticker symbol "PODD."  As of April 28, 2015, there were approximately 56.75 million shares of Insulet stock outstanding.

14.     Defendant Duane DeSisto ("DeSisto"), was, at all relevant times, Chief Executive Officer ("CEO"), President, and a Director of Insulet until September 16, 2014.

15.     Defendant Patrick J. Sullivan ("Sullivan"), is the CEO, President, and a Director of Insulet.  Sullivan replaced DeSisto in those roles on September 16, 2014.

16.     Defendant Brian Roberts ("Roberts") was, at all relevant times, Insulet's Chief Financial Officer ("CFO") until November 6, 2014

17.     Defendant Allison Dorval ("Dorval"), is the Company's CFO.  She was appointed to that position on November 6, 2014.  Prior to her appointment as CFO, Dorval served as Insulet's Controller from 2010 to 2014.

18.     Defendants Desisto, Sullivan, Dorval, and Roberts are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their

positions with Insulet, possessed the power and authority to control the contents of Insulet's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.   Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## **BACKGROUND**

19.     Insulet's primary business is the development, manufacture and sale of its proprietary insulin management system known as OmniPod.  OmniPod is as an insulin infusion system for people with insulin-dependent diabetes that is worn anywhere on the body for approximately three days at a time and allows patients to receive their insulin without any injections.  After three days, the person attaches a new OmniPod, purchased from the Company, to their body.

20.     Because diabetes is a chronic, life-threatening disease for which there is no known cure, the number of new customers that purchase Insulet's OmniPod system is an extremely important financial metric for investors and analysts.   Once a person becomes an Insulet customer and adopts the OmniPod system, it is reasonable to assume that that person will be a customer, and will provide a recurring stream of revenue to the Company, for years. Indeed, nearly 90% of Insulet's clients that purchase an OmniPod continue to order and use the

product.  More specifically, the number of new patients that Insulet is able to add in the U.S. (as opposed to internationally) is of critical importance because those new patients generate high margins of approximately 60% for the Company, as opposed to margins of just 20% from new patients based internationally.

21.     Insulet began selling OmniPod in the U.S. in 2005, mainly by selling the product directly to consumers or through distribution partners.  In January 2010, the Company entered into an exclusive distribution agreement with Ypsomed to sell OmniPod in Europe through 2018. Under that distribution agreement, the Company supplies OmniPod to Ypsomed, but Ypsomed is ultimately responsible for the sale to the customer.  In 2013, Insulet began selling a new and purportedly improved OmniPod system, named Eros, which maintains all of the features of the original OmniPod, but is significantly smaller and lighter.   Once the new product was introduced, all of the Company's customers that used the original OmniPod system began to be transitioned to the new version, and Insulet's entire customer base has since been transitioned to Eros.

**DEFENDANTS DEFRAUD INVESTORS**

22.     The Class Period starts on May 7, 2013.  May 7 is the first trading day after the Company held its earnings conference call for the first quarter of 2013 during which former CEO DeSisto touted Insulet's launch of its new OmniPod system.  According to DeSisto, "we transitioned all new customer starts to the new OmniPod, and the initial feedback has been excellent. . . . While the launch is in its early days, we were thrilled by the number of doors that seem to be opening in endocrinologist practices across the country."

23.     Further, according to DeSisto, new referrals and shipments of the new OmniPod increased by more than 40% since March 1 as compared to the prior year, and in April, these

metrics were up by more than 50% over the prior year.  Defendant DeSisto also represented that the Company was seeing increased demand in Europe as well, given that "Ypsomed continues to accelerate the rate of patient additions."

24.     Similarly, former CFO Brian Roberts told investors that international sales "was probably more than triple what that number was" over the prior year, and that "Ypsomed has done a great job of accelerating demand."  While the Company disclosed that it experienced a component issue with its new OmniPod that resulted in lower than expected planned production, DeSisto downplayed the issue and told investors that the Company "remain[s] confident that nearly all customers will be transitioned by the end of the third quarter."

25.     The statements set forth in ¶22-¶24, were materially false and misleading.  In truth, the Company's rollout of its new OmniPod was experiencing serious setbacks due to significant manufacturing and quality problems of its new OmniPod system and was ill-equipped to convert its existing customer base over to the new system.  As a result, the Company was unable to build enough inventory of the new OmniPod and customers were growing frustrated, which was causing a sharp decline in new patient starts.  At the same time, Insulet was inflating its level of international sales through Ypsomed given that the Company's distribution agreement with Ypsomed required Ypsomed to purchase substantially more product than it could sell.

26.     On May 7, 2013, the price of the Company's stock opened at $25.84 per share— up from the closing price of $24.87 the prior day.  Over the course of the May 7 trading day, Insulet stock reached an intraday high of $29.00 per share before closing at $28.57 per share. The $25.83 per share intraday low at which Insulet stock traded on May 7 was the lowest price at which the Company's stock traded during the Class Period.

27.     On November 7, 2013, the Company held its third quarter 2013 earnings conference call.  On that call defendant DeSisto touted that "OmniPod continues to receive an extremely enthusiastic response in the market place.  Demand for the OmniPod continues to exceed our expectations with new patient starts more than 40% higher than a year ago, with no signs of this growth slowing in Q4."  DeSisto also represented to investors that "[i]nternational demand for the new OmniPod also continues to be strong. . . . since the beginning of the year, diabetes revenues have increased by more than 100% as compared to the prior year."

28.     Further, according former CEO DeSisto, the Company had nearly finished transitioning its existing customer base to the new OmniPod system, characterizing the effort as "nothing short of moving a mountain."   Former CFO Roberts also continued to dismiss investors' concerns regarding product problems, explaining that "[w]e went through customer service bumps and bruises.  We think the patient base is happy with the product and things are going great."

29.     The statements set forth in ¶27-¶28 were materially false and misleading.   In truth, the Company was having problems transitioning its existing client base over to the new OmniPod and Insulet's growth was declining as a result.   Further, Defendant DeSisto's false assurances to investors regarding the success of the new OmniPod launch concealed the true extent of the product problems and kept the price of Insulet securities artificially inflated.

30.     On February 27, 2014, the Company held its earnings conference call for the fourth quarter of 2013 during which former CEO DeSisto heralded 2013 as a "monumental year for Insulet," emphasizing that "[w]e finished the year with new patient additions growing at a rate north of 40% year-over-year."   Further, according to DeSisto, "we have also been thrilled with the performance in the OmniPod international. . . . Ypsomed's customer base more than

doubled in 2013." Indeed, DeSisto told investors that Ypsomed was not having any problems meeting the minimum purchase requirements under its contract with Insulet, and that Ypsomed's business would double yet again in 2014.

31.     The statements set forth in ¶30 were materially false and misleading. In truth, Ypsomed was having significant problems meeting the minimum purchase requirements under its contract with the Company, and Ypsomed satisfied its contractual obligations to Insulet only by purchasing more product than it was able to sell. Additionally, defendant DeSisto's statements regarding Insulet's ostensibly tremendous growth were materially false and misleading because DeSisto concealed that the Company was experiencing severe problems rolling-out Insulet's new OmniPod infusion system, which would cause growth to decline.

32.     On May 7, 2014, Insulet held its 1Q 2014 earnings conference call. On that call, former CEO DeSisto disclosed that the Company added approximately 20% new patients over the prior year, and was on track to grow at a rate of at least 25% during all of 2014. DeSisto also explained that "Ypsomed reported an increase of 117% year-over-year in their diabetes direct business."

33.     The statements set forth in ¶32 were materially false and misleading. As investors would learn towards the end of the Class Period, the Company changed its reporting from prior quarters and included both U.S. and non-U.S. patients in the 20% new patient additions disclosed by DeSisto on May 7. Insulet intentionally made this shift in order to conceal a staggering decline in U.S. new patient additions that resulted from Insulet's botched roll-out of its new OmniPod system. The Company did not tell investors that the 20% growth in new patients included both U.S. and international patients.

34.     On August 7, 2014, the Company held its earnings conference call for the second quarter of 2014.   During that call, former CEO DeSisto announced that new patient starts increased at a rate of just 20% year-over-year because of a changes to reimbursement policies made by a significant managed care plan.   At the same time, defendant DeSisto assured investors that it would be able to resolve the issues with the managed care provider in the coming months, that the Company was "backlogging" all new patient starts, and that the Company was very excited about its prospects for the second half of 2014.

35.     The statements set forth in ¶34 were materially false and misleading.   Similar to the prior quarter, Insulet failed to inform investors that the reported 20% growth in new patient starts included non-U.S. growth in new patients.   This deception led investors to believe that the metric represented just new U.S. customers.   For example, according to an analyst report issued by Canaccord Genuity on August 7, "US new patient adds were solid, +20% Y/Y, and in-line with our estimate despite the disruption."

36.     On September 16, 2014, Insulet's then-CEO DeSisto abruptly resigned after 13 years at the Company, to be replaced by Patrick Sullivan.

37.     On November 5, 2014, the Company held its earnings conference call for its third quarter of 2014.   On that call, former CFO Roberts stated that the Company saw "probably somewhere in the 15% to 20% range, overall new patient starts year over year."   Further, according to Roberts, the trajectory of new patient starts "still seems very solid here as we're a month and a few days into the fourth quarter.   So I think everybody's feeling good about that."

38.     The statements set forth in ¶37 were materially false and misleading.   Again, in contrast with prior quarters, the Company included both U.S. and non-U.S. patient growth in its reported "15 to 20% … overall new patient starts" without informing investors that this metric

was no longer limited to U.S. patients, as it had been in the past.  Additionally, Roberts knew that the trajectory of new patient starts was anything but "solid" or something "feel[] good about."

39.     Also on November 5, the Company announced that defendant Roberts would resign from his position as CFO, effective November 6, to be replaced by Allison Dorval.

40.     On January 7, 2015, the Company announced a major leadership overhaul, replacing much of the senior management team—including the Chief Commercial Officer, Vice President of Sales, Vice President of Marketing, Vice President of Managed Care, Vice President of Customer Care, and Vice President of International—and appointed six new executives from outside of the Company.

41.     Also on January 7, Insulet announced that it experienced delays in the shipments of its non-insulin drug delivery products.  As a result, the Company reduced guidance for its fourth quarter of 2014 from $76-$81 million to $71-$73 million, and cut full-year guidance for 2014 from $292-$297 million to $287-$289 million.  On this news, the price of Insulet stock dropped from $44.53 per share to $40.52 per share, or approximately 9%.

42.     Then, on January 14, 2015, the Company presented at the JPMorgan Healthcare Conference.  During that conference, CEO Sullivan stated that analysts' expectations of Insulet's performance in 2015 are "a tad bit high," and that earnings for the first quarter of 2015 were expected to be flat sequentially over the fourth quarter of 2014 with a 10%-15% decrease in the core OmniPod business.

43.     Immediately after that conference, CEO Sullivan held a breakout session during which he admitted to analysts that Insulet's new OmniPod system was experiencing serious problems, that the Company's growth in the U.S. had been precipitously declining rather than

increasing, and that Insulet changed the way it was reporting OmniPod sales outside of the U.S. in order to conceal the declining growth. Specifically, following the FDA's approval of Eros in December 2012—the second generation of Insulet's flagship OmniPod system—Insulet immediately began experiencing manufacturing problems with Eros.

44.     But rather than starting with a limited market release, Insulet opted for a full launch for the product and promised to "upgrade" its entire customer base in short order. This strategy backfired because Insulet was unable to build inventory and had difficulty processing the large amount of paperwork required to convert its existing customer base. Customers were, as a result, frustrated, and the Company lost momentum. Further, according to CEO Sullivan, as the Eros launch progressed, Insulet learned of serous quality issues with the product, causing many physicians to stop prescribing Eros by the fourth quarter of 2013, leading to a sharp decline in new patient starts for the first quarter in 2014.

45.     Rather than reveal the problems and the slowing growth to investors, Insulet's management intentionally concealed the issues by switching the way it calculated and reported "new patient starts" from being just a U.S. metric to a global metric. This shift was not disclosed to investors or analysts prior to January 15, 2015, leading investors to believe that the Company's reported new patient starts reflected only new U.S. patients.

46.     Indeed, while Defendants previously reported to investors that Insulet's new patient starts increased by approximately 20% year-over-year in 2014, Sullivan disclosed that the Company's new patient starts in the U.S. actually decreased by 9% year-over-year. The 20% year-over-year increase included 57% growth from Ypsomed patient starts—new patients which investors were not told had been included in the 20% growth number. In fact, as of the end of 2014, 23% of Insulet's patients, or about 17,500 of its 75,000 were outside of the U.S. This is

well-above what analysts and investors had been told through the prior limited disclosures by the Company and the fact that Insulet had not previously broken out its revenues or patient base by geography.

47.     Not only did Insulet deliberately inflate the number of its new patient starts by including sales to international customers, but it was also inflating its level of international sales. Specifically, under the Company's distribution agreement with Ypsomed, Ypsomed was required to purchase a minimum of $100 million of product from Insulet from 2010-2015.  Yet, through year-end 2012, Insulet's sales to Ypsomed were less than $40 million.  The gap in the agreement required Ypsomed to purchase substantially more product than it otherwise needed or could sell. While the distribution agreement between Insulet and Ypsomed is publicly available, Ypsomed's annual minimum purchase requirements are redacted and the Company's prior management never revealed to investors that Ypsomed was purchasing product it could not sell, simply to meet contractual obligations.  Indeed, the spread between Ypsomed's actual sales to customers in Europe and Insulet's sales to Ypsomed has yet to be disclosed.  Also obfuscating the true level of Insulet's growth is the fact that some of the Company's U.S. distributors, who questioned Insulet's ability to consistently supply Eros, and Ypsomed placed huge orders for Eros in 4Q13 and 1Q2014 in order to build an inventory buffer.  It is unknown from public information how many of these OmniPod systems the third-party distributors actually sold to customers.

48.     According to an analyst report issued by William Blair & Company in the wake of the Healthcare Conference:

> [m]anagement disclosures have been incomplete, at best.  The ways in which the company discussed revenue targets, patient starts, and crucially, the components of guidance shifted over the course of 2014, misleading investors as to the underlying health of the core OmniPod business.  We now know that U.S. patient starts were down 9% in 2014 from 2013 an international starts

were far larger than we modeled.  Ironically, our model reflects the
correct 75,000 total patient base at year end 2014, but the domestic
market has been weaker than we understood.  (emphasis added).

49.     Similarly, JPMorgan wrote in an analyst report that "the mishandling of the Eros

launch did more damage than anyone appreciated," that Insulet has a "credibility issue," and

investors are awaiting "increased transparency."  On this news, the price of the Company's stock

declined from $38.50 per share to $31.86 per share, or approximately 17%.

50.     On February 26, 2015, Insulet announced earnings for its fourth quarter of 2014.

On the earnings conference call, the Company and its new management team finally heeded

investors' calls for increased transparency and for the first time publicly reported revenue for

both its U.S. and International OmniPod franchise.  Specifically, the Company disclosed that in

2014, OmniPod generated $173 million in the U.S. and $50 million internationally.  Insulet also

reiterated that approximately 75% of its 75,000 patients as of the end of 2014 were in the U.S.

51.     While CEO Sullivan acknowledged Ypsomed's significant destocking, he

attempted to attribute it solely to the fact that Ypsomed was simply reducing its "safety stock of

inventory" given Insulet's improved production capacity.   In light of this destocking, CFO

Dorval announced 1Q 2015 guidance of between $67-$69 million.  Nevertheless, CEO Sullivan

represented to investors that the Company expected the destocking "to be finished this quarter

and [Ypsomed would be] back to normal ordering patterns. . . in quarters two, three and four."

52.     On March 30, 2015, Allison Dorval—the Company's CFO for just four months—

resigned effective May 4, 2015 to be replaced by Michael Levitz.

53.     Finally, on April 30, 2015, Insulet reported results for its first quarter of 2015.

During the Company's earnings conference call, CEO Sullivan announced disappointing revenue

of just $61 million compared to Insulet's prior guidance of $67-$69 million because Ypsomed

was continuing to destock a significant amount (approximately $4 million) of the excess inventory it purchased in prior quarters.  While Insulet did announce that it improved its level of new patient starts, the Company also disclosed that it generated only $39.2 million from its U.S. OmniPod business, approximately 4% less than the Company generated over the prior year.  On this news, the price of the Company's stock dropped from $29.85 per share to $26.97 per share, or almost 10%.

## LOSS CAUSATION

54.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Insulet securities and operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on January 7, 2015, January 14, 2015, and April 30, 2015, the price of Insulet securities fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of Insulet securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

55.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the securities of Insulet during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Insulet and their families and affiliates.

56.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits

to the parties and the Court.  As of April 28, 2015, there were approximately 56.75 million shares of Insulet stock outstanding, owned by hundreds or thousands of investors.

57.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

A.    Whether Defendants violated the Exchange Act;

B.    Whether Defendants omitted and/or misrepresented material facts;

C.    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

D.    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

E.    Whether the price of Insulet securities was artificially inflated;

F.    Whether Defendants' conduct caused the members of the Class to sustain damages; and

G.    The extent of damage sustained by Class members and the appropriate measure of damages.

58.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

59.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

60.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

61.    Insulet's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.  Indeed, those warnings were themselves misleading because they presented as potential risks conditions that already existed or were known to be imminent when the warnings were made.

62.    Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Insulet who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

63.    At all relevant times, the market for Insulet's securities was an efficient market for the following reasons, among others:

A.    Insulet stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

B.      As a regulated issuer, Insulet filed periodic public reports with the SEC and NASDAQ;

C.      Insulet regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D.      Insulet was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

64.     As a result of the foregoing, the market for Insulet securities promptly digested current information regarding Insulet from all publicly available sources and reflected such information in the price of Insulet securities.   Under these circumstances, all purchasers of Insulet securities during the Class Period suffered similar injury through their purchase of Insulet securities at artificially inflated prices and the presumption of reliance applies.

65.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding problems with the OmniPod launch and the Company's declining growth—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might

19

have considered them important in making investment decisions.  Given the importance of the

Company's OmniPod business, as set forth above, that requirement is satisfied here.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

66.     Plaintiff repeats and realleges each and every allegation contained above as if

fully set forth herein.

67.     During the Class Period, Defendants carried out a plan, scheme, and course of

conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and

other members of the Class to purchase Insulet securities at artificially inflated prices.

68.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made

untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

maintain artificially high market prices for Insulet securities in violation of Section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder.

69.     Defendants, individually and in concert, directly and indirectly, by the use, means

or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct to conceal adverse material information about the Company's

financial well-being, operations, and prospects.

70.     During the Class Period, Defendants made the false statements specified above,

which they knew or recklessly disregarded to be false or misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

71.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Insulet's true condition from the investing public and to support the artificially inflated prices of the Company's securities.

72.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Insulet securities.  Plaintiff and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for Insulet securities had been artificially inflated by Defendants' fraudulent course of conduct.

73.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

74.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

75.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

76.     The Individual Defendants acted as controlling persons of Insulet within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-

day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Insulet, the Individual Defendants had the power and ability to control the actions of Insulet and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.      Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: June 16, 2015

*/s/ Glen DeValerio*

Glen DeValerio (BBO #122010)
Leslie R. Stern (BBO #631201)
**BERMAN DEVALERIO**
One Liberty Square
Boston, MA  02109
Telephone: (617) 542-8300
Facsimile:  (617) 542-1194
gdevalerio@bermandevalerio.com
lstern@bermandevalerio.com

*Local Counsel for Plaintiff Arkansas Teacher
Retirement System*

**BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP**
Avi Josefson (*pro hac vice* motion to be filed)
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
avi@blbglaw.com

*Counsel   for   Plaintiff   Arkansas   Teacher
Retirement System*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, George Hopkins, on behalf of Arkansas Teacher Retirement System ("Arkansas Teacher"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Executive Director of Arkansas Teacher.  I have reviewed the complaint and authorize its filing.

2. Arkansas Teacher did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Arkansas Teacher is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. Arkansas Teacher fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4. Arkansas Teacher's transactions in the Insulet Corporation securities that are the subject of this action are set forth in the chart attached hereto.

5. Arkansas Teacher has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*Weber v. Groupon, Inc.*, No. 12-cv-10235 (N.D. Ill.)
*In re Spectrum Pharmaceuticals, Inc.*, Securities Litigation, No. 13-cv-433 (D. Nev.)
*Anderson v. Spirit AeroSystems Holdings, Inc.*, No. 13-cv-2261 (D. Kan.)
*In re Vocera Communications, Inc. Securities Litigation*, No. 13-cv-3567 (N.D. Cal.)
*In re Francesca's Holdings Corporation Securities Litigation*,
No. 13-cv-6882 (S.D.N.Y.)
*Arkansas Teacher Retirement System v. Bankrate Inc.*, No. 13-cv-7183 (S.D.N.Y.)
*In re Quality Systems, Inc. Securities Litigation*, No. 13-cv-1818 (C.D. Cal.)
*In re DFC Global Corp. Securities Litigation*, No. 13-cv-6731 (E.D. Pa.)
*Hatamian v. Advanced Micro Devices, Inc.*, No. 14-cv-226 (N.D. Cal.)
*Rossy v. Merge Healthcare Inc.*, No. 14-cv-318 (N.D. Ill.)
*State-Boston Retirement System v. Infoblox, Inc.*, No. 14-cv-2500 (N.D. Cal.)
*In re The Bancorp, Inc. Securities Litigation*, No. 14-cv-952 (D. Del.)
*In re CommVault Systems, Inc. Securities Litigation*, No. 14-cv-5628 (D.N.J.)
*Haan v. Five Below, Inc.*, No. 15-cv-94 (E.D. Pa.)
*In re Virtus Investment Partners, Inc., Securities Litigation*, No. 15-cv-1249 (S.D.N.Y.)

6. Arkansas Teacher has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motions for lead plaintiff or was not appointed lead plaintiff:

   *Freedman v. St. Jude Medical, Inc.,* No. 12-cv-3070 (D. Minn.)
   *Construction Workers Pension Trust Fund - Lake County and Vicinity v. Navistar International Corp.,* No. 13-cv-2111 (N.D. Ill.)
   *Mazzaferro v. Aruba Networks, Inc.,* No. 13-cv-2342 (N.D. Cal.)
   *Pio v. General Motors Company,* No. 14-cv-11191 (E.D. Mich.)
   *Jahm v. Bankrate, Inc.,* No. 14-cv-81323 (S.D. Fla.)

7. Arkansas Teacher has served as a representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Arkansas Teacher Retirement System v. DFC Global Corp.,* No. 14-cv-1705 (E.D. Pa.)

8. Arkansas Teacher will not accept any payment for serving as a representative party on behalf of the Class beyond Arkansas Teacher's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 12 day of June 2015.

George Hopkins
Executive Director
*Arkansas Teacher Retirement System*

**Arkansas Teacher Retirement System**
**Transactions in Insulet Corporation**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 5/10/2013 | 3,748 | 29.2061 |
| Purchase | 11/12/2013 | 9,285 | 35.7757 |
| Purchase | 11/21/2013 | 600 | 34.9300 |
| Purchase | 12/23/2013 | 5,956 | 37.7316 |
| Purchase | 12/31/2013 | 2,963 | 37.3624 |
| Purchase | 5/8/2014 | 17,501 | 32.7596 |
| Purchase | 6/6/2014 | 900 | 36.8400 |
| Purchase | 11/6/2014 | 4,492 | 41.9417 |
| Purchase | 1/8/2015 | 22,651 | 40.8820 |
| Purchase | 1/15/2015 | 9,491 | 30.0627 |
| Purchase | 1/15/2015 | 41,467 | 30.9671 |
| Purchase | 1/15/2015 | 15,161 | 32.7205 |
| | | | |
| Sale | 7/1/2013 | (4,662) | 31.5084 |
| Sale | 10/11/2013 | (5,195) | 35.1918 |
| Sale | 12/5/2013 | (600) | 36.3600 |
| Sale | 1/30/2014 | (8,710) | 43.4263 |
| Sale | 6/17/2014 | (900) | 37.4830 |
| Sale | 10/31/2014 | (4,433) | 43.2508 |
| Sale | 11/3/2014 | (5,106) | 42.0844 |
| Sale | 11/4/2014 | (9,973) | 41.1735 |
| Sale | 11/4/2014 | (5,488) | 40.9373 |
| Sale | 11/5/2014 | (3,699) | 41.0060 |
| Sale | 4/15/2015 | (12,439) | 30.2386 |