UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, THE CITY OF BRISTOL PENSION FUND, and THE CITY OF OMAHA POLICE AND FIRE RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>INSULET CORPORATION, DUANE DESISTO, ALLISON DORVAL, BRIAN ROBERTS, and CHARLES LIAMOS,<br><br>Defendants. | Civil Action No. 15-12345-MLW<br><br>**ORAL ARGUMENT REQUESTED** |

**REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

Deborah S. Birnbach (BBO # 628243)
Caroline H. Bullerjahn (BBO # 657241)
Katherine G. McKenney (BBO # 660621)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: 617.570.1000
Fax: 617.523.1231
dbirnbach@goodwinlaw.com
cbullerjahn@goodwinlaw.com
kmckenney@goodwinlaw.com

*Counsel for Defendants*

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** ...................................................................................1

**ARGUMENT**........................................................................................................**4**

I.   THE AC DOES NOT ALLEGE FACTS GIVING RISE TO A STRONG
INFERENCE OF SCIENTER .......................................................................4

    A.  The AC Lacks Any Allegation About Defendants' States Of Mind. ................................. 4

    B.  Plaintiffs Fail To Address Defendants' Non-Fraudulent Competing Inferences,
Which Outweigh The AC's Weak Inferences Of Scienter. .............................. 7

    C.  The Opposition Confirms That The AC Fails To Allege That Trading By DeSisto
Or Liamos Was Unusual Or Suspicious. ........................................... 9

    D.  The "Magnitude Of The Fraud," "Core Operations" And "Corporate Scienter"
Doctrines Cannot Compensate For The Lack Of Scienter................................. 11

II.  PLAINTIFFS FAIL TO PLEAD ANY ACTIONABLE MISSTATEMENTS .....................14

    A.  Plaintiffs Have Failed To Allege Any Statement Was False When Made. ...................... 14

    B.  Plaintiffs Ignore That Defendants' Forward-Looking Statements All Pertain To
Future Expectations And Operations. .............................................. 16

    C.  Defendants' Statements Of Corporate Puffery Are Non-Actionable. ............................ 17

III. DEFENDANTS HAD NO DUTY TO DISCLOSE ................................................18

IV. PLAINTIFFS DO NOT ADEQUATELY ALLEGE LOSS CAUSATION...........................19

**CONCLUSION** ....................................................................................................**20**

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*A123 Sys., Inc. Sec. Litig.*,
 930 F. Supp. 2d 278 (D. Mass. 2013) ..............................................................13, 19

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
 512 F.3d 46 (1st Cir. 2012) ..........................................................................7, 20

*In re Advanta Corp. Sec. Litig.*,
 180 F.3d 525 (3d Cir. 1999)........................................................................10, 16

*Aldridge v. A.T. Cross Corp.*,
 284 F. 3d 72 (1st Cir. 2002)..............................................................................13

*In re Ariad Pharma. Sec. Litig.*,
 98 F. Supp. 3d 147 (D. Mass. 2015) ...................................................................10

*In re Biogen, Inc. Sec. Litig.*,
 2016 WL 3542538 (D. Mass. June 23, 2016) .......................................................13

*Bond Opp. Fund II, LLC v. Heffernan*,
 340 F. Supp. 2d 146 (D.R.I. 2004)......................................................................18

*In re Boston Sci. Corp. Sec. Litig.*,
 708 F. Supp. 2d 110 (D. Mass. 2010) ..................................................................14

*In re Boston Tech., Inc. Sec. Litig.*,
 8 F. Supp. 2d 43 (D. Mass. 1998) .......................................................................19

*Brennan v. Zafgen, Inc.*,
 2016 WL 4203413, ---F. Supp. 3d--- (D. Mass. Aug. 9, 2016) .................................. *passim*

*Brumbaugh v. Wave Sys. Corp.*,
 416 F. Supp. 2d 239 (D. Mass. 2006) ..................................................................11

*In re Cabletron Sys. Inc.*,
 311 F.3d 11 (1st Cir. 2002)................................................................................14

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*,
 632 F.3d 751 (1st Cir. 2011) .......................................................................5, 9, 16

*Cody v. Conformis, Inc.*,
 2016 WL 4132204, ---F. Supp. 3d--- (D. Mass. Aug. 3, 2016) ................................. *passim*

*Collier v. ModusLink Global Solutions, Inc.*,
    9 F. Supp. 3d 61 (D. Mass. 2014) .........................................................................13

*Coyne v. Metabolix, Inc.*,
    943 F. Supp. 2d 259 (D. Mass. 2013) ....................................................................19

*Fire & Police Pension Assoc. of Colo. v. Abiomed, Inc.*,
    778 F.3d 228 (1st Cir. 2015) ..................................................................................20

*Fitzer v. Sec. Dynamics Tech., Inc.*,
    119 F. Supp. 2d 12 (D. Mass. 2009) ......................................................................17

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................................................................10

*In re Genzyme Corp.*,
    2012 WL 1076124 (D. Mass. Mar. 30, 2012) ...............................................15, 18

*In re Gilead Sci. Sec. Litig.*,
    536 F. 3d 1049 (9th Cir. 2008) ..............................................................................16

*Gissin v. Endres*,
    739 F. Supp. 2d 488 (S.D.N.Y. 2010)....................................................................17

*Hall v. The Children's Place Retail Stores*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008)................................................................. 8-9

*In re Harman Int'l Indus.*,
    791 F.3d 90 (D.C. Cir. 2015) .................................................................................18

*Hill v. Gozani*,
    638 F.3d 40 (1st Cir. 2011)....................................................................................12

*Hutchison v. Deutsche Bank Sec., Inc.*,
    647 F. 3d 479 (2d Cir. 2011)..................................................................................16

*Isham v. Perini Corp.*,
    665 F. Supp. 2d 28 (D. Mass. 2009) ...............................................................11, 14

*La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*,
    622 F.3d 471 (6th Cir. 2010) ...................................................................................4

*Ley* v. *Visteon Corp.*,
    543 F.3d 801 (6th Cir. 2008) ...................................................................................6

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d. Cir. 2011)..................................................................................16

*Local No. 8 IBEW Ret. Plan & Trust v. Vertex Pharms., Inc.*,
   2016 WL 5682548, ---F.3d--- (1st Cir. Oct. 3, 2016) ...................................................... 1, 4, 11

*In re Lucent Tech.*,
   217 F. Supp. 2d 529 (D.N.J. 2002) ......................................................................................... 18

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) ......................... 10

*Malin v. XL Capital Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007), *aff'd*, 312 F. App'x. 400 (2d Cir. 2009) ...................... 8

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
   716 F.3d 229 (1st Cir. 2013) ............................................................................................... 19, 20

*Miss. Pub. Emps. Ret. Sys. v. Boston Sci. Corp.*,
   523 F. 3d 75 (1st Cir. 2008) ................................................................................................... 5, 6

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
   537 F.3d 35 (1st Cir. 2008) .................................................................................................... 6, 16

*In re Novatel Wireless Sec. Litig.*,
   2011 WL 5873113 (S.D. Cal. Nov. 23, 2011) ......................................................................... 10

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ................................................................................................. 19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   135 S. Ct. 1318 (2015) ............................................................................................................. 16

*In re Par Pharma. Sec. Litig.*,
   2009 WL 3234273 (D.N.J. Sept. 30, 2009) .............................................................................. 9

*In re Parametric*,
   300 F.Supp. 2d 206 (D. Mass. 2001) ............................................................................. *passim*

*In re Peritus Software Svcs., Inc.*,
   52 F. Supp. 2d 211 (D. Mass. 1999) ....................................................................................... 11

*Rehm v. Eagle Fin. Corp.*,
   954 F. Supp. 1246 (N.D. Ill. 1997) ......................................................................................... 12

*In re Rhodia S.A. Sec. Litig.*,
   531 F. Supp. 2d 527 (S.D.N.Y. 2007) ..................................................................................... 20

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
   351 F. Supp. 2d 334 (D. Md. 2004) ........................................................................................ 12

*S.E.C. v. Mozilo*,
    2010 WL 3656068 (C.D. Cal. Sept. 16, 2010) ....................................................................10

*In re Scottish Re Group Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007).........................................................................................9

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996)....................................................................................................18

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
    707 F.3d 95 (1st Cir. 2013).......................................................................................................19

*In re Sonus Networks, Inc. Sec. Litig.*,
    2006 WL 1308165 (D. Mass. May 10, 2006) ..........................................................................14

*Steiner v. Unitrode Corp.*,
    834 F. Supp. 40 (D. Mass. 1993) ...........................................................................................5, 7

*In re Stone & Webster, Inc. Sec. Litig.*,
    424 F.3d 24 (1st Cir. 2005).......................................................................................................14

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015).......................................................................................................19

*Suna v. Bailey Corp.*,
    107 F.3d 64 (1st Cir. 1997).......................................................................................................17

*Tellabs, Inc. v. Makor Issues & Rights*,
    551 U.S. 308 (2007)...................................................................................................................7

*Wilensky v. Digital Equip. Corp.*,
    903 F. Supp. 173 (D. Mass. 1995), *rev'd in part on other grounds sub nom.*
    *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194 (1st Cir. 1996) ..................................................19

*In re Xcelera.com Sec. Litig.*,
    2002 WL 745835 (D. Mass. Mar. 8, 2002)............................................................................11

**Statutes**

Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ........................................................ *passim*

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 *et seq.* .................................. *passim*

**Other Authorities**

Federal Rule of Civil Procedure 8(a) ............................................................................................19

Federal Rule of Civil Procedure 9(b)............................................................................................19

SEC Rule 10b5-1, 17 C.F.R. 240.10b5-1 .................................................................................3, 10

SEC Regulation S-K, Item 303, 17 C.F.R. § 229.303 ......................................................... 3, 18-19

## PRELIMINARY STATEMENT

Plaintiffs repackage the AC's allegations in their Opposition without disputing that those allegations lack a single specific fact *known* by Defendants at the time the alleged misstatements were made that gives rise to *any* inference—let alone the requisite strong inference—of fraudulent intent.[1]  The AC lacks any of the "hallmarks of scienter" without which courts of this Circuit routinely dismiss securities fraud claims at the pleading stage, including, most recently, in *Local No. 8 IBEW Ret. Plan & Trust v. Vertex Pharms., Inc.*, 2016 WL 5682548, ---F.3d--- (1st Cir. Oct. 3, 2016) (affirming dismissal for lack of scienter), *Brennan v. Zafgen, Inc.*, 2016 WL 4203413, ---F. Supp. 3d--- (D. Mass. Aug. 9, 2016) (dismissing Section 10(b) claims for lack of scienter), and *Cody v. Conformis, Inc.*, 2016 WL 4132204, ---F. Supp. 3d--- (D. Mass. Aug. 3, 2016) (same).  Like the plaintiffs in *Vertex*, *Zafgen* and *Conformis*, Plaintiffs allege *zero* facts from CWs, conversations, documents, or emails to suggest that Defendants knew that the everyday manufacturing issues and customer complaints that Insulet experienced as part of the roll-out of its new product, Eros, rendered any statement materially misleading when made, or that Defendants believed anything was materially misleading about the way the Company reported new patient start data; *zero* facts to suggest that Defendants ignored or rejected advice to disclose those issues or to report U.S. and international new patient start data separately; and *zero* facts to suggest that there was even so much as an internal discussion or debate about disclosure of these issues.  The CWs—who Plaintiffs concede had no direct contact with any of the Individual Defendants (Opp. at 30)— allege no such facts.

Insulet's lower-than-forecasted revenue for Q4 2014 and Q1 2015 prompted this lawsuit. Those revenues were attributable in part to disclosed supply constraints and distributors'

---

[1] This reply memorandum refers to the Memorandum of Law in Support of Defendants' Motion to Dismiss as "Opening Brief" or "Br." and to Plaintiffs' Opposition as the "Opposition" or "Opp."

subsequent reduction of their built-up cushion of inventory as Insulet's manufacturing capacity increased.  AC ¶¶ 71, 73-74, 96.  Plaintiffs do not challenge the accuracy of Defendants' financial reporting or disclosed, stable customer attrition rates.  Instead, Plaintiffs attempt to manufacture a connection between vague, unquantified statements by former lower-level employees—most of whom left by early 2014 and whose jobs consisted primarily of dealing with quality issues and customer complaints—and lower-than-expected revenues a year later.

But, as the Opposition confirms, Plaintiffs fail to allege that the Individual Defendants were even aware of the alleged quality issues described by the CWs causing any material impact on future financial results at the time of the alleged misstatements.  While Plaintiffs rely heavily upon analysts' characterizations of remarks made in January 2015 by Insulet's then new CEO, Patrick Sullivan (Opp. at  7-8), those reports do not suggest that distributors reduced their inventory or that overall customer demand dropped due to quality concerns.  AC ¶¶ 73-74, 76, 79-80, 83.  To the contrary, and consistent with the Company's disclosures, analysts explained that distributors reduced their inventory once they became "more comfortable with [Insulet's] ability to supply the market."  AC ¶ 74.  The analyst reports also do not attribute the 9% decline in U.S. new patient starts announced at the end of 2014 to the allegedly concealed quality problems in 2013.  AC ¶¶ 79-80, 83.  That two analysts were allegedly surprised to learn how new patient start data had been reported by Insulet on a global basis (Opp. at 14, 29) does not support an inference of scienter—particularly considering the Company's express refusal to provide a breakdown of U.S. versus international patient data to analysts.  AC ¶ 130.

The Opposition also fails to address meaningfully Defendants' more cogent and compelling non-fraudulent inferences drawn from Plaintiffs' own allegations and the documents on which they rely, and which the Court must balance against Plaintiffs' fraudulent inferences.

Br. at 18-21; § I.B, *infra.*  The story of a difficult new product roll-out and supply constraints leading distributors to stock up spare inventory and order less as supply became normalized is far more compelling than Plaintiffs' theory that Defendants schemed to mislead investors by omitting day-to-day customer service or quality concerns that Plaintiffs cannot tie to even one distributor sale, much less to a material impact on the future financial results Plaintiffs claim revealed the "truth."  The Opposition also underscores that Plaintiffs fail to meet their burden to allege that sales of Insulet stock by DeSisto and Liamos, all indisputably pursuant to 10b5-1 plans, were suspicious in timing or amount.  Plaintiffs' telling reliance on the "magnitude of the fraud," "core operations" and "corporate scienter" doctrines likewise fails, as these doctrines are either inapplicable here or courts have rejected them as independent bases for scienter.

The AC should be dismissed with prejudice on scienter grounds alone, but it also must be dismissed with prejudice for the following independent reasons:

- **No materially misleading statements or omissions.**  The Opposition fails to refute that none of the more than 150 statements at issue was false when made.  Plaintiffs' attempts to circumvent the PSLRA's safe harbor by characterizing the Company's statements as present facts ignores the plain language of the full statements, which predict *future* expectations, demand, growth, or operations.  Plaintiffs also fail to address the cases cited in the Opening Brief in which courts have dismissed Section 10(b) claims premised on immaterial puffery statements precisely like those at issue here.

- **No duty to disclose.**  As the Opposition confirms, the AC fails to allege that the Company was experiencing anything more than day-to-day manufacturing issues and customer complaints to be expected in a new product roll-out.  To impose a burden on public companies to disclose such information would only serve to bury investors in immaterial information.  Moreover, there is no duty to denigrate your own products.  No disclosure was required under Item 303, as the AC fails to allege sufficient facts that Defendants were aware, prior to January 2015, of any "trend" that would materially impact the Company's financials.  Moreover, an Item 303 violation does not give rise to a private right of action and does not "automatically" state a Section 10(b) claim.

- **No loss causation.**  Plaintiffs fail to allege particularized facts that connect the alleged corrective disclosures—later quarters' financial results—to the alleged quality issues.  The January 2015 analyst reports on which Plaintiffs rely attribute distributors' reduction of on-hand inventory to supply returning to sufficient levels.  The later disclosures revealed nothing that was not already previously disclosed to and known by the market.

## ARGUMENT

## I.   THE AC DOES NOT ALLEGE FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER

Plaintiffs' theory of scienter is that although Defendants disclosed manufacturing problems during the Eros launch, they did not disclose the purported severity of those problems, which Plaintiffs speculate ultimately led to alleged decreased patient demand and distributors' reduction of their on-hand inventory.  Opp. at 1, 4-6.  This theory hinges on contrasting Mr. DeSisto's 2013 statements about the launch with (i) analysts' opinions of Mr. Sullivan's January 2015 comments (*id.* at 2-3, 7-8, 11-12, 18-19);[2] (ii) a post-class period FDA warning letter issued two years later (and immediately disclosed by the Company) regarding a handful of non-conforming lots that are not even alleged to have any connection to or impact on the lower-than-expected revenue announced in Q4 2015 and Q1 2015—a classic example of fraud by hindsight that fails to show that the Defendants knew, at the time the alleged misstatements were made, about these lots; and (iii) statements attributed to CWs who Plaintiffs concede had no direct contact with Mr. DeSisto or any of the other Individual Defendants (*id.* at 30).[3]  Each basis for scienter fails, on its own or together, to support a strong inference of scienter, for several reasons.

### A.   The AC Lacks Any Allegation About Defendants' States Of Mind.

Plaintiffs have failed to allege facts regarding any Individual Defendant's state of mind, as they must to state a securities fraud claim.  *Vertex*, 2016 WL 5682548, at *3 (scienter is "a mental state embracing intent to deceive, manipulate, or defraud"); *see also* Br. at 9-10.  Even if there were additional, undisclosed quality issues in 2013 and 2014, which Defendants do not

---

[2] The subjective opinions of a third party, such as a financial analyst, about a company's statements do not support any scienter inference.  *See La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 484-85 (6th Cir. 2010) (third party's complaint against defendant shows only what the third party believes—it "does not support an inference that [the defendant] engaged in fraud").

[3] *See Conformis*, 2016 WL 4132204, at *10 (no scienter where the CWs did not interact with the defendants).

concede, "[t]he dispute here is not about whether the facts alleged support the inference that the defendants knew of certain undisclosed facts during the class period…. [T]he question here is whether there is a *strong* inference that the defendants' failure to disclose certain facts was a result of *wrongful intent*, or scienter, even assuming defendants knew of those facts." *City of Dearborn Heights v. Waters Corp.*, 632 F.3d 751, 753 (1st Cir. 2011) (emphasis added).

Further, Defendants' knowledge "must be analyzed at the time that they made the allegedly misleading disclosures, not in hindsight" of analyst reports, Mr. Sullivan's January 2015 statements, or an FDA letter issued two years after the Eros launch. *Zafgen*, 2016 WL 4203413, at \*16.[4] "Compelling evidence of scienter generally includes 'clear allegations of admissions, internal records or witnessed discussions' that suggest that defendants were 'aware that they were withholding vital information or at least were warned by others that this was so' when they made the misleading statements." *Id.* at \*15. Here, there is no allegation of any fact—no admissions, no internal documents or emails, or discussions witnessed by or with the CWs—that would suggest that Defendants chose not to disclose quality issues "with an intent to defraud investors." *Id.* at \*16; *see also Conformis*, 2016 WL 4132204, at \*10 (complaint alleged

---

[4] Plaintiffs reliance (Opp. at 30-31) on the factually distinguishable *Steiner v. Unitrode Corp.*, 834 F. Supp. 40 (D. Mass. 1993) and *Boston Sci. Corp. Miss. Pub. Emps. Ret. Sys. v. Boston Sci. Corp.*, 523 F. 3d 75 (1st Cir. 2008) to argue that this is not a "fraud by hindsight" case is misplaced. In *Steiner*, the defendants disclosed quality control problems and a resulting $19.9 million annual net loss, and then later assured investors that those same quality control problems were fully resolved and that they had "made certain that every procedure, every manual and every piece of equipment is in compliance." 834 F. Supp. at 44-45. Applying pre-PSLRA standards, the Court held that it was not "fraud by hindsight" because the case "proffered a more substantial factual predicate for alleging fraudulent intent." *Id.* There is no such "substantial factual predicate" here, particularly under the applicable heightened PSLRA pleading standards. In *Boston Sci. Corp.*, the Company had allegedly received 30-40 adverse reports from doctors in Europe (and later additional adverse reports from U.S. doctors) reporting that a balloon within the stent failed to deflate after insertion. 523 F.3d at 79-80. The Company expressly disclosed that this problem was due to the "unfamiliarity of doctors" with the product. *Id.* Plaintiffs alleged that the Company did not correct those statements after learning that the non-deflation problem was due to a manufacturing defect and changing its manufacturing to address the balloon defect. *Id.* When the Company ultimately recalled the stent due to the known balloon defect, its own disclosures acknowledged that it had been "monitoring, analyzing, and investigating the problem" and made the manufacturing change "as a result of its investigation." *Id.* at 90. The Court thus concluded: "defendants' own statements can be read to say that they implemented the manufacturing change *in response to* adverse reports, not independent of them." *Id.*

"no facts bearing on the mindset of the top executives of the company").

The same is true for allegations regarding new patient start data.  None of the CWs addresses the Company's reporting of new patient start data.  AC ¶¶ 35-37, 39-41, 43, 45.  There is no allegation reflecting internal discussions regarding how new patient start data would be reported or why the reporting allegedly changed.  Plaintiffs again rely entirely upon analysts' interpretations of Mr. Sullivan's 2015 statements and offer no factual basis to support a strong inference that prior management deliberately combined U.S. and international data to conceal a decline in new U.S. patients.  Opp. at 13; *cf. Conformis*, 2016 WL 4132204, at *10 (rejecting "speculat[ion] as to what [defendants] might have known or thought").[5]

Plaintiffs fail to rehabilitate their CW allegations or respond meaningfully to Defendants' arguments regarding their insufficiency.  While Plaintiffs complain that Defendants are inappropriately putting their CW allegations "under a microscope" (Opp. at 30), that is precisely what is required in this Circuit.  *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 51 (1st Cir. 2008) ("[T]here must be a *hard look* at [confidential witness] allegations to evaluate their worth.") (emphasis added).  A "hard look" at the CW allegations here reveals that the limited direct knowledge that the CWs purport to possess has no bearing upon Defendants' scienter (*see* Br. at 12-15),[6] particularly where Plaintiffs concede the CWs had no contact with the Individual Defendants (*see* Opp. at 30).  Individually and collectively, the CW allegations at most indicate mismanagement, not securities fraud.  Br. at 18-19.

---

[5] Plaintiffs' reliance on SOX certifications, Opp. at 23 n.17, is inapplicable to the new patient start data, as such data is not included in the Company's  financial statements reported in SEC filings.  Regardless, merely signing a SOX certification, without more, is not a basis for scienter.  *See Ley* v. *Visteon Corp.*, 543 F.3d 801, 812 (6th Cir. 2008) (SOX certification is insufficient to support scienter absent facts that defendants had reason to know of "red flags").

[6] One CW's vague statement that customer complaints were "well documented on email" does not support a strong inference of scienter absent allegations regarding the content of the purported email. Regardless, customer complaints do not automatically give rise to scienter, and Plaintiffs distort *Boston Sci. Corp.* (Opp. at 19 n.11), which did not hold that defendants in a "highly regulated industry . . . constantly monitor" complaints.  Rather, the quoted sentence stated that it could be inferred that the defendant "constantly monitors reports of *patient injury and death* …." 523 F. 3d at 91 (emphasis added).

**B.      Plaintiffs Fail To Address Defendants' Non-Fraudulent Competing Inferences, Which Outweigh The AC's Weak Inferences Of Scienter.**

Plaintiffs misconstrue, fail to address, or attempt to dismiss as "factual dispute[s]" (Opp. at 27-29) the non-fraudulent and far more plausible competing inferences advanced by Defendants. *See* Br. at 18-21.  Competing inferences drawn from the actual disclosures on which the AC relies, when contrasted with Plaintiffs' entirely speculative assertions, are not factual disputes, and the Court must weigh them at the motion to dismiss stage.  *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 328 (2007); *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 66 (1st Cir. 2012) (holding that competing, non-fraudulent inferences drawn from defendant's disclosures outweighed inferences of scienter); *Zafgen*, 2016 WL 4203413, at *21 (holding that "defendants' other disclosures during the class period" supported a more compelling, non-fraudulent inference).[7]  The following non-fraudulent inferences outweigh inferences of scienter:

- **The allegedly undisclosed manufacturing problems were expected, routine, and typical for a manufacturer of a disposable medical device**, particularly during a new product launch. There are no facts alleged to suggest that any of the Defendants believed, at the time the alleged misstatements were made, that the problems were anything more than expected  "minor hiccups," as Defendants disclosed.[8]  AC ¶ 113; Br. at 18-19.  Plaintiffs' fraud-by-adjective approach of merely alleging that problems were "severe," "pervasive," and "persistent" based on the limited perspectives of a handful of former employees whose jobs were to address quality concerns or handle customer complaints fails to overcome this competing inference, particularly in light of the AC's failure to tie any of these purported quality problems to a material impact on the Company's financial results.

- **As disclosed, the build-up of inventory by Insulet's distributors was the result of Insulet's disclosed supply constraints**, which, once remedied by the installation of a fourth production line in early 2015, caused the distributors to "right size" their inventory.  Br. at 5-8, 19-20; AC ¶ 73.  Plaintiffs fail to address that Defendants disclosed that distributors planned to build up inventory in 2014 (Br. at 5-6, 19) and

[7] The only case Plaintiffs cite in response to Defendants' non-fraudulent inferences is *Steiner*.  Opp. at 27-28. *Steiner*, however, pre-dates both the PSLRA and *Tellabs*.  834 F. Supp. at 43.  *Steiner* is also readily distinguishable. *See* n.4, *supra*.
[8] Plaintiffs' attempt to plead scienter via allegations about non-defendant Insulet employees (Opp. at 25-26) fails for the same reasons as their allegations with respect to the Individual Defendants.  *See Conformis*, 2016 WL 4132204, at *10 (no corporate scienter notwithstanding allegations regarding non-defendant senior vice president).

7

fail to address that Insulet disclosed, *in advance of* its quarterly SEC filings, that its Q4 2014 revenue would fall below its prior guidance due in part to U.S. distributors' inventory downsizing, and that its Q1 2015 revenue would decline from Q4 2014 principally related to Ypsomed's inventory downsizing. Br. at 7-8, 19-20, Ex. R at 19; AC ¶¶ 71, 73, 89. Such early disclosure undermines any inference of scienter. *Zafgen*, 2016 WL 4203413 at *21 (finding defendant's "prompt" disclosure of adverse events rendered theory of fraudulent failure to disclose "unpersuasive").

- **Defendants did not intentionally conceal U.S. new patient starts from investors, and the combined data are consistent with the disclosed expansion of the international business.** Rather than "secretly" change its reporting (Opp. at 7), the Company openly disclosed that it would not report U.S. and international patient data separately (*see* AC ¶ 130; Br. Ex. N at 15) and that the growth of its international business outpaced its U.S. growth (*see* Br. at 6-7, 23-24). That two analysts claimed, retrospectively, to have misunderstood how Insulet reported new patient data (Opp. at 14, 29) fails to support a strong inference of scienter. *See* n.2, *supra*; AC ¶ 130. Moreover, Plaintiffs do not dispute that the Company accurately disclosed customer attrition rates throughout the class period, or that those rates remained stable, which further undermines any inference that Defendants "deliberately misled investors . . . by changing the way Insulet reported 'new patient starts,'" (Opp. at 2) and renders any allegedly misleading new patient data immaterial. Br. at 7, 23-24.

- **The purported 9% decline in U.S. new patient starts was attributable to unrelated, disclosed events, rather than allegedly undisclosed quality problems.** Plaintiffs attempt to link Mr. Sullivan's retrospective January 2015 statement that, in late 2013, some physicians "pulled back" on Eros prescriptions to the overall 9% decline in U.S. new patient starts that the Company disclosed *over a year later* in January 2015. *See* Opp. at 19. Plaintiffs fail to address, however, the more plausible and disclosed explanations for the decline, including (i) a temporary denial of coverage by an insurer for Eros over several quarters in 2014 that affected new patient starts (Br. at 21 n.22) and (ii) Mr. Sullivan's Q1 2015 statements regarding changes made to Insulet's sales strategy, which, once implemented, resulted in an immediate uptick in new patient starts.[9] Plaintiffs' speculation that the "management housecleaning" was the result of fraud (Opp. at 3, 23-24), as opposed to the Company's decision to change its business strategy, is pure speculation.[10]

---

[9] *See* Br. Ex. S at 4 ("During the quarter, we made great progress building out a world-class marketing and sales organization under the leadership of Shacey Petrovic, who joined us in February. Shacey has rapidly added sales executives to her team, dramatically improved our sales and customer training functions, has already begun to deliver significant improvements. *We are very excited to report that our new patient starts in the first quarter reached an all-time record high for any first quarter in the history of the company*, up double-digits versus Q1 of 2014 . . . . *We are very excited about the early returns from our U.S. commercial team*.") (emphasis added).

[10] Plaintiffs' only scienter allegation regarding Ms. Dorval is that she resigned. Opp. at 24 n.18. Resignations, without more, cannot support a strong inference of scienter. Br. at 25 n.21. In each of the out-of-circuit cases cited by Plaintiffs (Opp. at 23-24), the resignations either did not support a strong inference of scienter or were accompanied by egregious allegations directly tying defendants to knowledge of the false nature of the company's statements. *See Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 162-63 (D. Conn. 2007), *aff'd*, 312 F. App'x. 400 (2d Cir. 2009) (resignations did not support a strong inference of scienter); *Hall v. The Children's Place Retail*

Unlike Defendants, whose non-fraudulent inferences are based on the very disclosures on which the AC relies, Plaintiffs' Opposition asks the Court to find a strong inference of scienter with speculation and hindsight—after two quarters of "disappointing" revenue (AC ¶ 15)—based upon the theory that Defendants intentionally concealed the extent and severity of quality problems during the Eros roll-out and the impact that those problems ultimately *would have* on future customer demand. Plaintiffs' theories simply make no sense, particularly given that the Company openly disclosed manufacturing and supply problems it was experiencing during the Eros roll-out.  *E.g.*, AC ¶¶ 5, 7.

Any inferences of scienter are further weakened in the context of the questionable materiality of the allegedly undisclosed quality issues.  "If it is questionable whether a fact is material or its materiality is marginal, that tends to undercut the argument that defendants acted with the requisite intent or extreme recklessness in not disclosing the fact."  *Zafgen*, 2016 WL 4203413, at *20 (quoting *Waters*, 632 F.3d at 757).  Here, Plaintiffs fail to allege any facts linking the alleged quality issues described by the CWs (most of whom left Insulet by early 2014, *see* Br. Ex. B) to (1) the alleged 9% decline in U.S. new patient starts in 2014; (2) distributors' build-up and subsequent "right-siz[ing]" of inventory; or (3) any material financial impact, as Plaintiffs do not dispute that the revenue reported by the Company throughout the class period was accurate.  *See, e.g.*, AC ¶¶ 35-37, 39-41, 43, 45.

## C.    The Opposition Confirms That The AC Fails To Allege That Trading By DeSisto Or Liamos Was Unusual Or Suspicious.

The Opposition confirms that Plaintiffs have failed to meet their burden of pleading with particularity that the alleged insider sales of DeSisto and Liamos were unusual or suspicious in timing or amount.  While Plaintiffs resort to characterizing Defendants' arguments as a "factual

---

*Stores*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (scienter based on resignations in combination with allegations including stock option backdating and financial restatements); *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 393-95 & n.176 (S.D.N.Y. 2007) (resignations in combination with facts of defendants' knowledge of the falsity of their statements); *In re Par Pharma. Sec. Litig.*, 2009 WL 3234273, at *9-10 (D.N.J. Sept. 30, 2009) (resignations together with insider trading and defendants' receipt of reports contradicting disclosures).

dispute," they do not dispute that all of DeSisto's and Liamos' stock sales during the class period

were made pursuant to Rule 10b5-1 trading plans (Opp. at 25; Br. at 15 & n.17) and fail to

address the cases holding that trades made pursuant to 10b5-1 plans are "not suspicious" and,

thus, fail to give rise to an inference of scienter.[11]   While Plaintiffs focus on the fact that Liamos

entered into his trading plan during the class period (Opp. at 25), in the only case they cite, *In re*

*Ariad Pharma. Sec. Litig.*, 98 F. Supp. 3d 147, 165 (D. Mass. 2015), the court dismissed Section

10(b) claims where it was "unable to glean a strong inference of scienter" from the insider

trading allegations, even where the defendants enacted trading plans within the class period.[12]

Plaintiffs also do not—and cannot—dispute that DeSisto's trading followed the same

pattern as his pre-class period trades, typically selling 20,000 shares on the first trading day of

the month (Br. at 16, Ex. I; AC ¶ 183), and Liamos' class period stock sales likewise occurred

once a month (or, in a few instances, on two consecutive trading days in a month) and, for the

last eight months of the class period, were for the same exact amount (Br. at 16, Ex. J; AC

¶ 181).  Moreover, all of DeSisto's and nearly all of Liamos' stock sales were accompanied by

an exercise of stock options in equal number, further undermining any inference of scienter.  Br.

Ex. I, Ex J.[13]  Courts within this District routinely dismiss insider trading-based Section 10(b)

---

[11] *See* Br. at 15.  The out-of-circuit cases that Plaintiffs cite (Opp. at 25 n.21) for the proposition that use of a 10b5-1 plan raises factual questions are procedurally and factually distinguishable.  *See In re Novatel Wireless Sec. Litig.*, 2011 WL 5873113, at *20 (S.D. Cal. Nov. 23, 2011) (dispute over compliance with trading plan presented triable issue of fact at summary judgment stage); *S.E.C. v. Mozilo*, 2010 WL 3656068, at *20 (C.D. Cal. Sept. 16, 2010) (triable issues of fact as to Rule 10b5-1 affirmative defense based upon defendant's frequent amendments to his trading plan during class period).  *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010),  is contrary to the Second Circuit's decision in *Lululemon*, *infra* at n.12.

[12] Plaintiffs also do not dispute that, as Defendants pointed out (Br. at 15-16 n.18), the AC contains no allegations that Liamos entered into his trading plan "strategically . . . to capitalize on insider knowledge."  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 585 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (no inference of scienter where "no facts that even remotely suggest[ed] that [defendant] entered into the Plan 'strategically' so as to capitalize on insider knowledge of the company's allegedly undisclosed quality control issues").

[13] Courts analyzing insider trading allegations have disregarded sales of stock accompanying the exercise of stock options.  *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 541 (3d Cir. 1999) (no scienter based on class period stock sales, reasoning, "[a] large number of today's corporate executives are compensated in terms of stock and stock options. It follows then that these individuals will trade those securities in the normal course of events").

claims for lack of scienter—at the motion to dismiss stage—based on the same arguments

advanced by Defendants here.  *See* Br. at 15-17 (citing cases); *Vertex*, 2016 WL 5682548, at \*6-

8 (affirming dismissal of complaint alleging $32 million in stock sales); *Zafgen*, 2016 WL

4203413, at \*18-19 (rejecting insider trading allegations as a basis for scienter); *Isham v. Perini*

*Corp.*, 665 F. Supp. 2d 28, 36, 38 (D. Mass. 2009) (dismissing complaint alleging defendant's

sale of 100% of his stock during class period).[14]

### D.   The "Magnitude Of The Fraud," "Core Operations" And "Corporate Scienter" Doctrines Cannot Compensate For The Lack Of Scienter.

In the absence of any specific facts reflecting Defendants' state of mind to commit fraud,

Plaintiffs tellingly resort to several doctrines that are either inapplicable here or that courts in the

First Circuit have rejected as independent bases for scienter.  Although Plaintiffs try to argue that

their allegations, "holistically," give rise to a strong inference of scienter (Opp. at 24), the AC

fails to allege *any specific facts* that Defendants knew information that contradicted their public

statements at the time they were made or any conceivable benefit to the Individual Defendants.

Plaintiffs rely heavily upon the claimed "magnitude" of the alleged quality and customer

complaint problems with the Eros, arguing that their conclusory assertion of the "pervasiveness"

of such problems supports a strong inference of scienter.  Opp. at 18-20.  But "pervasive," and

"severe" are merely Plaintiffs' own characterizations, untethered from any facts that convey

actual magnitude.  The unquantified assertions of a handful of former quality assurance, sales,

and customer service employees—whose jobs were to field quality and customer issues all day,

---

[14] While the court in *In re Xcelera.com Sec. Litig.*, 2002 WL 745835 at \*6 (D. Mass. Mar. 8, 2002), cited by Plaintiffs (Opp. at 25), declined to consider the small percentage of stock allegedly sold by the defendants, the very case on which the *Xcelera* court relied held—at the motion to dismiss stage—that the fact that defendants retained large percentages of their holdings in the company "suggests that the sales were not unusual or motivated by a desire to capitalize on knowledge of inflated stock values." *In re Peritus Software Svcs., Inc.*, 52 F. Supp. 2d 211, 225 (D. Mass. 1999). *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 253-54 (D. Mass. 2006) is factually distinguishable because the insider trading allegations in that case were merely "ancillary" to strong factual allegations of defendants' motives that are absent here.

every day—are insufficient to establish the Company-wide "pervasiveness" of the problems they purport to describe. *See* Br. at 12-15, Ex. B; *see also Hill v. Gozani*, 638 F.3d 40, 63-65 (1st Cir. 2011) (affirming dismissal of Section 10(b) claims alleging defendants' failure to disclose "pervasive problems" in the absence of specific allegations).

In any event, Plaintiffs fail to tie these pejorative allegations to any material impact on the Company, or to the alleged 9% decline in U.S. new patient starts *more than a year later* or distributors' reduction of inventory in light of the Company's newly increased manufacturing capacity. They do not allege that a single lot shipped by Insulet was ever returned or canceled by customers due to the needle mechanism failures, leaking pods, or defective alarm issues the CWs purport to describe, much less any quantifiable material amount, or that Insulet redesigned the Eros to correct any purported "design flaw" (Opp. at 5), to support the claimed "magnitude" of any such issues.[15] In Plaintiffs' primary case, *In re Parametric*, the Court dismissed Section 10(b) claims because the plaintiffs' "equivocal" allegations of a decline in sales did not "justify the inference" that "results would be significantly, *i.e.*, *materially*, below the lower end of [analysts' revenue] range." 300 F. Supp. 2d 206, 216 (D. Mass. 2001). Insulet's two quarters of missed financial forecasts, followed by a quarter in which revenues exceeded forecasts (Br. at 8), are inconsistent with "massive" or "pervasive" problems that allegedly impacted results.[16]

Plaintiffs also fail to rebut Defendants' argument that the "core operations" doctrine has

---

[15] Plaintiffs' gross mischaracterization of their own AC provides their argument that "pervasive Eros product defects affect[ed] 32% of the units made," (Opp. at 19) based on a single CW's purported statement that, "[W]e were letting [lots] go at 68%" quality level. AC ¶ 40(c). This paragraph says *nothing* about the overall amount of product shipped, period, and instead talks about the non-conforming rate for defects of varying severity within a lot. It is woefully insufficient to give rise to any inference of scienter. It refers to a single lot that "went down to 68%," and fails to identify a period of time or to quantify how many lots were supposedly shipped, and also ignores that lots may be non-conforming for many reasons other than the alleged undisclosed quality issues.

[16] Plaintiffs also ignore that, despite lower-than-forecasted Q4 2014 revenue, Insulet experienced positive revenue growth in 2014. Br. at 7 n.6. The additional cases Plaintiffs cite (Opp. at 18) state that magnitude of the fraud is not an independent basis for scienter and is applicable only in extreme and quantifiable circumstances. *See In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 376-77 (D. Md. 2004) (interim CFO admitted massive fraud); *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) (magnitude of *measurable* accounting errors).

been widely rejected by courts in this Circuit.  Br. at 17 n.20.  Plaintiffs acknowledge that courts

are "hesitant" to apply the doctrine in the absence of "other *significant* evidence of a defendant's

intent or recklessness" or an alleged "plus factor."  Opp. at 22 (citing *In re Biogen, Inc. Sec.*

*Litig.*, 2016 WL 3542538, at \*37 (D. Mass. June 23, 2016) (emphasis added)).  As the court

noted in *A123 Sys., Inc. Sec. Litig.*, 930 F. Supp. 2d 278, 285 (D. Mass. 2013), the only case in

the First Circuit imputing knowledge to defendants based on a "core product" theory was

"buttressed by a 'plus factor'"—an email acknowledging the alleged fraudulent practice.[17]  There

is no such "plus factor" alleged here.[18]  Plaintiffs point to a mere two allegations as supposed

"plus factors" (Opp. at 22):  DeSisto's and Liamos' alleged "role in authorizing defective

product shipments," based on vague statements of a handful of CWs who are not even alleged to

have had any direct communications with DeSisto or Liamos[19]; and DeSisto's and Liamos' stock

sales, which fail to give rise to any inference of scienter.  *See supra* at 6, 9-11; Br. at 15-17.

Finally, due to the absence of sufficient allegations against the Individual Defendants,

Plaintiffs resort to the "corporate scienter" doctrine, arguing that certain other Insulet executives'

(not named as defendants) knowledge of customer complaints during the Eros launch combined

with the making of the alleged misstatements by the Individual Defendants supports a strong

inference of scienter.  Opp. at 25-26.  Although the First Circuit has not addressed the issue of

---

[17] The other First Circuit case that Plaintiffs cite (Opp. at 21), *Aldridge v. A.T. Cross Corp.*, did not find scienter based on the core operations doctrine.  284 F. 3d 72, 84 (1st Cir. 2002).  Plaintiffs' other cases (Opp. at 21 n.14) from outside the First Circuit are distinguishable based on their buttressing allegations, emphasizing the importance of specific factual allegations supporting contemporaneous knowledge of wrongdoing that are lacking here.

[18] Contrary to Plaintiffs' assertion (Opp. at 22 n.16), Defendants have never argued that a "smoking gun" is required to plead a strong inference of scienter.  Rather, Defendants have argued that the "core operations" doctrine cannot salvage claims that lack any of the "hallmarks of fraud" required in this Circuit.  *See Conformis*, 2016 WL 4132204, at \*10.  For instance, in *Collier v. ModusLink Global Solutions, Inc.* (cited at Opp. 22 n.16), the complaint alleged, among other facts, that the defendants made statements directly to confidential witnesses, who were their direct reports, about attempting to conceal rebates from clients.  9 F. Supp. 3d 61, 72 (D. Mass. 2014).

[19] The AC does not allege that Dorval or Roberts had any role in, or knowledge of, any alleged shipment of defective product or quality assurance generally.  As to DeSisto and Liamos, CW allegations regarding these issues (*see* Opp. at 20-21) at most indicate non-actionable mismanagement of the quality assurance process.  Br. at 18-19.

13

whether the corporate scienter doctrine remains viable post-PSLRA, several other circuits have

concluded it does not. *See In re Boston Sci. Corp. Sec. Litig.*, 708 F. Supp. 2d 110, 127-128 (D.

Mass. 2010) (citing cases). Moreover, several courts within this District have likewise rejected

it. *See*, *e.g.*, *Conformis*, 2016 WL 4132204, at *10 (rejecting allegations regarding non-

defendant Senior VP of Operations because he did not participate in the earnings call during

which the individual defendants made the allegedly misleading statements).[20]

## II.   PLAINTIFFS FAIL TO PLEAD ANY ACTIONABLE MISSTATEMENTS

Given Plaintiffs' failure to allege facts to support a strong inference of scienter, the Court

need not consider Plaintiffs' arguments that they have sufficiently alleged false or misleading

statements by Defendants. Courts in this Circuit regularly grant motions to dismiss based on the

plaintiff's inability to meet the PSLRA's heightened pleading standard for scienter even when

the plaintiff has adequately alleged at least one false or misleading statement. *See, e.g.*, *Zafgen*,

2016 WL 4203413, at *14, *21.[21] Regardless, the Opposition further exposes the deficiencies in

the AC's allegations with respect to falsity.

### A.   Plaintiffs Have Failed To Allege Any Statement Was False When Made.

Exhibit A to the Opening Brief sets forth references to arguments in the brief as to why

*each and every* one of the more than 150 alleged misstatements and omissions in the AC are not

false. Plaintiffs neglected to address the vast majority of those arguments. Instead, the

---

[20] *Accord Isham*, 665 F. Supp. 2d at 36 (refusing to find inference of scienter for a VP of Operations who had not "participated in making, or had any knowledge of, the statements . . . that are the basis of Plaintiffs' allegations of fraud" and rejecting "generic allegation of 'institutional knowledge'"). The cases cited by Plaintiffs (Opp. at 26) fail to support the application of the "corporate scienter" doctrine here. *In re Cabletron Sys. Inc.* questioned the post-PSLRA viability of the "group pleading doctrine," but sustained 10(b) claims because the plaintiffs sufficiently alleged scienter with respect to the individual defendants. 311 F.3d 11, 40-41 (1st Cir. 2002). *In re Sonus Networks, Inc. Sec. Litig.* found that the complaint sufficiently alleged the company's scienter based upon the controller's alleged scheme to overstate reported revenue. 2006 WL 1308165, at *22 (D. Mass. May 10, 2006). *In re Stone & Webster, Inc. Sec. Litig.* is an outlier that involved a bankrupt defendant. 424 F.3d 24 (1st Cir. 2005).

[21] Plaintiffs do not even attempt to argue scienter with respect to their Neighborhood Diabetes allegations, which they mention only once in a footnote in the Opposition. *See* Opp. at 14 n.7. In addition to lack of scienter, the Neighborhood Diabetes-based claims fail for the reasons set forth in Defendants' Opening Brief. Br. at 28 n.34.

Opposition attempts to juxtapose Defendants' statements early in the 2013 Eros launch regarding the resolution of a particular manufacturing issue with later, general statements regarding customer satisfaction, manufacturing capacity, compliance with manufacturing specifications, and navigating through the Eros launch.  Opp. at 10-11.[22]  These later, general statements, however, are unrelated to the purported quality issues described by the CWs, and no facts alleged in the AC connect them to the decline in U.S. new patient starts in 2014, and certainly not to the less favorable Q4 2014 and Q1 2015 financial results.  Br. at 22-23.

Plaintiffs again point to the post-class period FDA warning letter and statements made by Mr. Sullivan in August 2015 regarding the letter and a subsequent, voluntary recall of a small number of lots.  There is no factual basis in the AC for Plaintiffs' speculation that Defendants *knew* the lots referenced in the FDA letter were out of compliance *at the time of the alleged misstatements*.  Far from admitting "product defect issues" known to and concealed by Defendants at the time of the alleged misstatements, as Plaintiffs claim (Opp. at 11; AC ¶ 100), Mr. Sullivan's August 2015 statement—which Plaintiffs tellingly omit from their block quotation—included that "the lots were manufactured in compliance with our standard operating procedures and met the final acceptance criteria in place *at the time*," but did not meet more stringent standards implemented later.  Br. Ex. T at 4.[23]

With respect to the alleged decline in new patient starts and the alleged change in how the

---

[22] For example, Mr. DeSisto's statement that Insulet's manufacturing operations were on "solid footing" entering 2014 was made in reference to a 50% increase in manufacturing capacity in the fourth quarter of 2013 (Br. Ex. N at 4), and his statement that Insulet had "navigated through all aspects of the launch" was simply a reference to the completion of the roll-out to new customers and the conversion of existing customers (*id.* at 7).  Plaintiffs have not alleged that statements regarding increased manufacturing capacity or the completion of the launch were false.

[23] For the first time in their Opposition, Plaintiffs allege that the FDA letter supports the materiality of the quality issues Defendants allegedly omitted to disclose, arguing that "violations of regulatory significance" in an FDA warning letter are automatically deemed "material" for Section 10(b) purposes.  Opp. at 19.  Courts that have addressed this precise issue have reached the opposite conclusion.  *In re Genzyme Corp.*, 2012 WL 1076124, at *10 (D. Mass. Mar. 30, 2012) ("It simply cannot be that every critical comment by a regulatory agency . . . has to be seen as material for securities law reporting purposes, especially in an industry . . . where there is constant and close supervision by the FDA…. Although the language sounds ominous, it really is rather boilerplate.").

Company reported new patient start data to investors, Plaintiffs concede that Defendants'

financial reporting was accurate throughout the class period and fail to address the steady (and

slightly decreasing) customer attrition rate—facts which undercut their contention that a

reasonable investor would have found the more granular U.S. versus international new patient

start information sufficiently material to alter the "total mix" of information available to them.

Br. at 6-7, 23-24.[24]  The First Circuit has affirmed the dismissal of Section 10(b) claims based on

an alleged failure to disclose a downturn in one market, where another market beat its forecast

and drove overall earnings.  *See Waters Corp.*, 632 F.3d at 760 (no scienter resulting from

company's eventual reporting of downturn in Japanese market given increase in global sales).[25]

**B.      Plaintiffs Ignore That Defendants' Forward-Looking Statements All Pertain
          To Future Expectations And Operations.**

Plaintiffs try to counter Defendants' arguments that at least eighteen of the statements are

forward-looking and protected by the PSLRA's safe harbor by mischaracterizing the alleged

misstatements as statements of present facts and with no legal support.[26]  Opp. at 15-16; Br. at

24-25, Ex. A.  For example, Plaintiffs highlight (Opp. at 15) the statement, "We believe our

manufacturing capacity is sufficient to meet our expected demand for OmniPods," focusing

exclusively on the words "is sufficient," while ignoring that the complete sentence pertains to the

Company's belief regarding its ability to meet "expected"—*i.e.*, *future*—product demand.  In

---

[24] The Second Circuit cases on which Plaintiffs rely are inapposite because they concern 1933 Act claims not subject to heightened pleading requirements.  Opp. at 13 (citing *Hutchison v. Deutsche Bank Sec., Inc.*, 647 F. 3d 479, 488 (2d Cir. 2011) and *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 720 (2d Cir. 2011)).

[25] *See also Advanta*, 180 F.3d at 538-39 (rejecting claim based on allegation that defendant "changed its methodology for computing bankruptcy charge-offs without promptly disclosing this change to the marketplace"). Plaintiffs' reliance (Opp. at 14) on *In re Gilead Sci. Sec. Litig.*, 536 F. 3d 1049, 1052-53 (9th Cir. 2008), is misplaced.  In that case, the allegedly concealed driver of sales was illegal off-label marketing, in stark contrast to the legal—and disclosed—build-up of Insulet's distributors' inventory in light of Insulet's supply constraints.

[26] *N.J. Carpenters* is distinguishable.  In that case, the non-forward-looking alleged misstatement concerned the "current state of the . . . market." *N.J. Carpenters*, 537 F.3d at 46 & n.13.  *Omnicare* (Opp. at 15) concerned 1933 Act Section 11 claims, and did not address the PSLRA's safe harbor provision for forward-looking statements. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015).

other words, the Company was not "making guarantees about the present," but rather was "stating [its] educated guess about what the [present manufacturing capacity] would mean for the Company's future" ability to meet demand. *Gissin v. Endres*, 739 F. Supp. 2d 488, 506 (S.D.N.Y. 2010). Such statements fall squarely within the PSLRA's definition of a safe-harbored, forward-looking statement, which includes "a statement of the plans and objectives of management for future operations," including products, and "any statement of the assumptions underlying or relating to any [such statement]." 15 U.S.C. § 78u-5(i)(1)(B), (D).

## C.     Defendants' Statements Of Corporate Puffery Are Non-Actionable.

Plaintiffs' attempt to rebut the 48 allegedly misleading statements that Defendants identified as immaterial and non-actionable corporate puffery fails. Opp. at 16-17.[27] Plaintiffs fail to even mention—let alone distinguish—any of the cases from this Circuit cited by Defendants in which courts dismissed Section 10(b) claims premised on immaterial puffery statements *exactly* like the statements Plaintiffs challenge here. Br. at 26. The only controlling case that Plaintiffs cite, *Suna v. Bailey Corp.*, affirmed dismissal of the plaintiffs' claims and held that "soft, puffing" statements "generally lack materiality because the market price of a share is not inflated by vague statements predicting growth." 107 F.3d 64, 72 (1st Cir. 1997). Plaintiffs' attempt (Opp. at 16), based on two out-of-circuit cases, to distinguish between descriptions of historical fact and non-actionable puffery is also contrary to cases from this District. *See, e.g.*, *Fitzer v. Sec. Dynamics Tech., Inc.*, 119 F. Supp. 2d 12, 24, 26 (D. Mass. 2009) ("The corporate puffery rule applies to loose optimism about both a company's current

---

[27] Plaintiffs are correct that the Opening Brief addressed four of the 48 separate non-actionable puffery statements alleged in the AC. Rather than seek leave of the Court to submit an opening brief of sufficient length to separately address each of the 154 allegedly misleading statements in the 100-page AC, Defendants thought it was more efficient to address representative statements in the Opening Brief, and to list each alleged misstatement in Exhibit A to the Opening Brief, cross-referencing the applicable legal arguments in the Brief. The arguments made in the Brief regarding the four representative puffery statements apply equally to the remaining 44 puffery statements.

state of affairs and its future prospects.").[28]  The challenged statements are non-actionable

because "no reasonable investor" makes an investment decision based on "rosy affirmation[s]

commonly heard from corporate managers and numbingly familiar to the marketplace," such as

those at issue here.  *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996).

## III.    DEFENDANTS HAD NO DUTY TO DISCLOSE

The disclosure obligation Plaintiffs seek to have this Court impose on Insulet is an undue

burden that courts in this Circuit have rejected so as not to force issuers to "bury the [investors]

in an avalanche of trivial information."  *Parametric*, 300 F. Supp. 2d at 215 n.9.  This is

particularly true for medical device manufacturers like Insulet, which encounter and address

production issues on a day-to-day basis.  *See* Br. Ex. L at 12, Ex. T at 14.  Insulet has no duty to

disparage its own products (Br. at 29 n.35) , and, in any event, Plaintiffs have failed to allege

facts (as opposed to the speculative assertions of CWs) that, *at the time* of the alleged

misstatements, the purported quality issues were believed to be anything more than temporary

"hiccups."  Br. at 18-19.  The consequences intended by Plaintiffs—that Defendants can be

liable for securities fraud because they did not disclose every customer complaint or production

glitch during a new product launch—"would overwhelm the market and would ironically be, in

the end, actually uninformative."  *Genzyme*, 2012 WL 1076124, at *10.

Plaintiffs' argument that Defendants can be liable for securities fraud based upon Item

303 of SEC Regulation S-K is contrary to the weight of authority in the First Circuit.  While the

First Circuit has yet to weigh in on a circuit split as to whether an Item 303 violation can be the

---

[28] The *Bond Opp. Fund II, LLC v. Heffernan*, 340 F. Supp. 2d 146 (D.R.I. 2004), case that Plaintiffs cite makes no mention of puffery arguments.  *In re Harman Int'l Indus.*, 791 F.3d 90 (D.C. Cir. 2015), and *In re Lucent Tech.*, 217 F. Supp. 2d 529, 559 (D.N.J. 2002), are contrary to First Circuit authority (*see* Br. at 26) and in both of those cases, the plaintiffs alleged *specific facts* known to the defendants that directly contradicted their statements.

basis for Section 10(b) liability,[29] the prevailing view in this Circuit is that it cannot. *Wilensky v. Digital Equip. Corp.*, 903 F. Supp. 173, 181 (D. Mass. 1995), *rev'd in part on other grounds sub nom. Shaw*, 82 F.3d 1194 ("With respect to Item 303, courts have repeatedly held that a violation of an exchange rule will not support a private claim.").[30]  Regardless, Plaintiffs have not alleged any facts to show that Defendants were aware of a downward "trend" in U.S. new patients prior to January 2015, let alone that they "reasonably expect[ed]" a "material . . . unfavorable impact" on financial results.  17 C.F.R. § 229.303.

## IV.   PLAINTIFFS DO NOT ADEQUATELY ALLEGE LOSS CAUSATION

In the First Circuit, if the alleged "loss resulted from the disclosure of negative information other than a prior false or misleading statement by the Defendants, then [Plaintiffs] cannot show that Defendants' conduct caused [their] injury and [they have] not pled an adequate claim for securities fraud."  *Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d 259, 273 (D. Mass. 2013).  Plaintiffs ignore this standard, and disregard cases finding that Rule 9(b)'s pleading standards apply to loss causation.[31]  The AC fails to meet *either* Rule 9(b)'s or Rule 8(a)(2)'s standard.

The flaw in Plaintiffs' loss causation theory is that none of the "corrective disclosures" actually "relate to the same subject matter as the alleged misrepresentation," as the First Circuit requires.  Opp. at 33; *CVS*, 716 F.3d at 240.

- January 7, 2015:  The very analyst reports that Plaintiffs point to (Opp. at 34) reflect that the U.S. distributors' reduction of their on-hand inventory was the result of

---

[29] *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) and *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046 (9th Cir. 2014) ("Item 303 does not create a duty to disclose for purposes of Section 10(b)...."). Plaintiffs rely on *Stratte-McClure*, a District of Minnesota case adopting the reasoning of *Stratte-McClure*, and an outdated District of Rhode Island case.  Opp. at 9-10.  The court in *Stratte-McClure* affirmed the grant of defendants' motion to dismiss—despite finding an Item 303 violation—due to the absence of scienter.  776 F.2d at 106-07.

[30] *Accord Silverstrand Invs. v. AMAG Pharm., Inc.*, 707 F.3d 95, 106 n.9 (1st Cir. 2013) ("[Section 10(b)] imposes completely different exigencies than those of Item[] 303...."); *In re Boston Tech., Inc. Sec. Litig.*, 8 F. Supp. 2d 43, 67 (D. Mass. 1998) ("10b–5 liability may [not] arise from a Section 303 violation . . . [because] the regulation does not provide for a private right of action.").

[31] *E.g.*, *id.* at 273-74; *Conformis*, 2016 WL 4132204, at *5; *In re A123 Sys., Inc.*, 930 F. Supp. 2d at 283.  *See Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 239 n.6 (1st Cir. 2013) ("unclear" if Rule 9(b) applies).

supply returning to sufficient levels, *not* alleged reduced customer demand or quality problems that Plaintiffs claimed was concealed. *See, e.g.*, AC ¶ 73 ("entering 4Q14 with supply no longer an issue, several large distributors right-sized their inventory").

- <u>January 15, 2015</u>:  The analyst reports issued on January 16 and 27, 2015 that Plaintiffs cite cannot have caused a stock drop that allegedly occurred on January 14-15, 2015.  The January 15 report did not link the 9% decline in 2014 U.S. new patient starts to the alleged quality issues or customer complaints that Plaintiffs claim Defendants concealed.  *See* AC ¶ 79.

- <u>February 26, 2015</u>:  According to Plaintiffs' own allegations, the market was already aware by January 15, 2015 that U.S. new patient starts were down 9% and that analysts opined that "the underlying business was clearly in worse condition than prior management disclosed." AC ¶¶ 77-87.  Thus, no new, allegedly concealed information was revealed to the market on February 26, 2015.

- <u>March 30, 2015</u>:  Plaintiffs argue that the announcement of Ms. Dorval's departure constitutes a corrective disclosure, relying on *CVS*, in which the company disclosed that an executive's departure "indicated problems with the 'integrated model' that he had built."  716 F.3d at 239.  Plaintiffs allege zero facts that Dorval left for any reason other than to pursue other opportunities.

- <u>April 30, 3015</u>:  Insulet pre-announced on February 26, 2015 that Ypsomed's plans to reduce its inventory would cause Q1 2015 revenue to decline (Br. Ex. R at 19)—nothing was allegedly concealed and then revealed with respect to Ypsomed on April 30.  Disappointing numbers alone do not support loss causation.  Br. at 30.  *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007).

For all of these reasons, Plaintiffs' loss causation allegations fail.

## CONCLUSION

For the foregoing reasons and those set forth in Defendants' Opening Brief, the Court should dismiss the AC in its entirety with prejudice.[32]

Dated: October 17, 2016                      Respectfully submitted,


                                             INSULET CORPORATION, DUANE DESISTO,
                                             ALLISON DORVAL, BRIAN ROBERTS and
                                             CHARLES LIAMOS,

---

[32] Plaintiffs' request for leave to amend (Opp. at 35 & n.30) should be denied.  The First Circuit "discourage[s] th[e] practice of seeking leave to amend after the case has been dismissed." *Fire & Police Pension Assoc. of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 247 (1st Cir. 2015); *ACA*, 512 F.3d at 57-58 (affirming denial of motion for leave to amend and rejecting plaintiffs' "wait and see" strategy); *Zafgen*, 2016 WL 4203413, at *22 (denying request for leave to amend contained in a footnote of opposition to motion to dismiss).

By their attorneys,

/s/ *Deborah S. Birnbach*
Deborah S. Birnbach (BBO # 628243)
Caroline H. Bullerjahn (BBO #657241)
Katherine G. McKenney (BBO # 660621)
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210
Tel.: 617.570.1000
Fax: 617.523.1231
dbirnbach@goodwinlaw.com
cbullerjahn@goodwinlaw.com
kmckenney@goodwinlaw.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 17, 2016.

/s/ *Deborah S. Birnbach*