UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


|  |  |  |
|---|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, | ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | Civil Action No. 15-CV-12345-MLW |
| INSULET CORPORATION, DUANE DESISTO, PATRICK J. SULLIVAN, ALLISON DORVAL, and BRIAN ROBERTS, | ) ) ) ) |  |
| Defendants. | ) ) |  |


BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE


MOTION HEARING


March 16, 2017
2:06 p.m.



John J. Moakley United States Courthouse
Courtroom No. 10
One Courthouse Way
Boston, Massachusetts  02210




Kelly Mortellite, RMR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    On Behalf of the Plaintiffs:
      James A. Harrod
 3    Rebecca E. Boon
      Bernstein Litowitz Berger & Grossman LLP
 4    44th Floor
      1251 Avenue of the Americas
 5    New York, NY 10020
      212-554-1502
 6    jim.harrod@blbglaw.com
      rebecca.boon@blbglaw.com
 7
      William C. Fredericks
 8    Scott & Scott, LLP
      The Helmsley Building
 9    230 Park Avenue, 17th Floor
      New York, NY 10169
10    212-223-6444
      wfredericks@scott-scott.com
11
      Glen DeValerio
12    Daryl DeValerio Andrews
      Berman DeValerio
13    One Liberty Square
      Boston, MA 02109
14    617-542-8300
      gdevalerio@bermandevalerio.com
15    ddevalerio@bermandevalerio.com

16    On Behalf of the Defendants:
      Deborah S. Birnbach
17    Caroline T. Bullerjahn
      Goodwin Procter, LLP
18    100 Northern Avenue
      Boston, MA 02210
19    617-570-1339
      dbirnbach@goodwinprocter.com
20    cbullerjahn@goodwinprocter.com

21

22

23

24

25
```

```
 1                     P R O C E E D I N G S
 2              THE COURT:  Good afternoon.  Would counsel please
 3      identify themselves for the court and for the record.
 4              MR. DEVALERIO:  Good afternoon.  Glen DeValerio,
 5      Berman DeValerio, for the plaintiffs.
 6              MS. ANDREWS:  Daryl Andrews with Berman DeValerio.
 7              MR. HARROD:  Good afternoon, Your Honor.  James Harrod
 8      from Bernstein Litowitz for the Plaintiffs.
 9              THE COURT:  Actually, could you be careful to speak up
10      into the microphone.  I've got the aftermath of a sinus
11      infection that blocks my ears a bit.
12              MR. HARROD:  Did you get that, or should I --
13              THE COURT:  Do it again.
14              MR. HARROD:  Okay.  James Harrod from Bernstein,
15      Litowitz, Berger & Grossman, also for the plaintiffs.
16              MS. BOON:  Good afternoon, Your Honor.  Rebecca Boon,
17      Bernstein Litowitz, for the plaintiff.
18              MR. FREDERICKS:  William C. Federicks, Scott & Scott
19      Attorneys at Law, LLP, also for the plaintiffs.  Good
20      afternoon, Your Honor.
21              MS. BULLERJAHN:  Good afternoon, Your Honor.  Caroline
22      Bullerjahn of Goodwin Procter on behalf of the defendants.
23              MS. BIRNBACH:  Good afternoon, Your Honor.  Deborah
24      Birnbach from Goodwin on behalf of defendants.
25              THE COURT:  They've got you out numbered.
```

```
 1        All right.  We're here today on the defendants' motion
 2   to dismiss this punitive securities class action.  I have to
 3   apply the standards -- well, the usual motion to dismiss
 4   standards supplemented significantly by Rule 9(b) and
 5   particularly the provisions of the PSLRA, Private Securities
 6   Litigation Reform Act of 1995.
 7        The PLSRA imposes a rigorous pleading standard for
 8   evaluating whether a statement is adequately alleged to be
 9   false and particularly for scienter.  There are an unusual, at
10   least in my experience, number of alleged false statements in
11   this case.  I think my law clerk counted 68.  The defendant may
12   have characterized it as 150.  And they do have to be carefully
13   scrutinized.
14        But let me see if there's a consensus or a controversy
15   on this.  If some of the alleged material misrepresentations or
16   omissions are actionable, if they meet the PSLRA standard, then
17   it's my present understanding, which could evolve, that the
18   motion to dismiss should be denied.  And if there's an issue
19    -- and there are common things to some of them, sometimes
20   reiterations of essentially the same statements or omissions.
21   But if there was some question about particular statements that
22   might affect the definition of a class or class period, they
23   might be dealt with on class certification, and in any event,
24   there could be further litigation in connection with summary
25   judgment or a trial.
```

```
 1            But are the parties agreed, or is there a disagreement
 2    as to whether the relevant question is whether any of the
 3    alleged misrepresentations or omissions meet the PSLRA
 4    standard?
 5            MS. BIRNBACH:  If I may, Your Honor?
 6            THE COURT:  Sure.
 7            MS. BIRNBACH:  Based on the First Circuit's recent
 8    decision in the Ariad Pharmaceuticals case where the First
 9    Circuit affirmed dismissal based on both scienter grounds and a
10    lack of particular false or misleading statements, all but one
11    statement were affirmed as dismissed.  So I guess I would
12    disagree with the sort of all-or-nothing concept, Your Honor,
13    because the First Circuit took care, as the court must -- it's
14    the recent Ariad First Circuit decision.
15            THE COURT:  Is it cited in the papers?
16            MS. BIRNBACH:  Yes.  It's cited in our reply.  It's
17    842 F. 3d 744, Your Honor, from, I think it was end of 2016.
18    But the point --
19            THE COURT:  Hold on just one second.
20            (Discussion off the record.)
21            THE COURT:  Could you give us the cite again, please?
22            MS. BIRNBACH:  Yes.  The cite is of 842 F. 3d 744.
23    It's from late 2016, First Circuit.
24            THE COURT:  I think the District Court case might have
25    been cited, possibly not the First Circuit, but that's unusual.
```

1          MS. BIRNBACH:  I believe it came out in -- I believe

2     it was --

3          THE COURT:  We'll find it.

4          MS. BIRNBACH:  I believe we did cite it in our reply.

5     It was probably right before -- but it does directly address

6     Your Honor's question because what the First Circuit said --

7     the District Court had I believe dismissed the entire

8     complaint.  On appeal, the First Circuit affirmed dismissal of

9     all but one statement.  And the First Circuit did so based on

10    particularized facts of a particular meeting on a specific date

11    with FDA where Ariad's management allegedly learned of a black

12    box label warning for their drug but subsequent to that meeting

13    made a statement to analysts about expecting a favorable label.

14    So the court found that as to that particular statement, the

15    First Circuit found there were sufficient facts to allege that

16    defendants knew the statement about a favorable label was

17    misleading.

18          THE COURT:  And so the dismissal was reversed?

19          MS. BIRNBACH:  So the dismissal was affirmed as to all

20    the other statements but reversed as to one statement.  And my

21    point being that scienter and whether the defendants had

22    knowledge of -- you know, pled with particularized facts that

23    anything they said was misleading at the time depended on the

24    precise analysis of the time of the knowledge alleged and the

25    statement.

1           THE COURT:  That principle is consistent with my

2    understanding.  I'll have to look at the case.  It sounds like

3    it's also consistent with not denying -- with denying the

4    motion to dismiss if there's at least one statement that's

5    actionable.  Part of the difficulty here is there are so many

6    statements.  I don't know how many there were in Ariad, but I

7    bet it was less than 60.

8           MS. BIRNBACH:  It was, Your Honor, but I don't

9    disagree with the court's ability to deny a motion to dismiss

10   as to particular statements if the court finds scienter.  Of

11   course our argument here is that even -- and this is First

12   Circuit law as well, Your Honor -- even a material misstatement

13   does not survive a motion to dismiss in the absence of extreme

14   conduct that defendants were aware of knowledge that their

15   statements were dangerously misleading.  The *Vertex*

16   recklessness standard that the First Circuit re-emphasized, I

17   think it's in Ariad as well --

18           THE COURT:  It could also be intentional, though.

19           MS. BIRNBACH:  It's conscious intention or

20   recklessness.  And our argument here primarily is that all of

21   these 90 pages of confidential witnesses -- it's very similar

22   actually to the *Biogen* case from 2016 that we cite, Judge

23   Saylor's opinion.  It's also very similar to the Metabolix case

24   where Jude Woodlock looked at confidential witness statements

25   all describing what they purport to be significant quality

1   issues in Metabolix; and in *Biogen*, significant issues of which

2   the defendants were aware for many, many pages.  Yet at the end

3   of the day, notably absent were any specific facts that showed

4   defendants would have been either intentional or recklessly

5   aware that they were in danger of misleading investors at the

6   time they spoke by making the generically positive

7   statements --

8           THE COURT:  Hold on just a second.

9           MS. BIRNBACH:  -- the generically positive statements

10  they made.  *Coyne v. Metabolix* was the Judge Woodlock case,

11  C-o-y-n-e, and it's 943 F. Supp. 2d 259.  It's a 2013 decision

12  from Judge Woodlock.  And the *Biogen* case is 193 --

13          THE COURT:  I have *Biogen*.

14          MS. BIRNBACH:  That was Judge Saylor from 2016.

15          THE COURT:  Hold on just one second.

16          I agree, and it makes it a little challenging to parse

17  the amended complaint in this case.  The briefing doesn't go,

18  at least the plaintiffs', statement by statement.  But with

19  regard to scienter, it is my understanding that it is a mental

20  state embracing intent to deceive, manipulate or defraud.  To

21  survive a motion to dismiss, a complaint must state with

22  particularity facts giving rise to a strong inference that

23  defendants acted with conscious intent to deceive or defraud

24  investors or acted with a high degree of recklessness.  That's

25  *Fire Employees Pension Association*.

1          MS. BIRNBACH:  And the recklessness standard of course

2     in the First Circuit is an extreme departure from the standards

3     of ordinary care and which presents a danger of misleading

4     buyers or sellers that is either known to the defendants or is

5     so obvious the actor must have been aware of it.  And that's

6     exactly what happens with the confidential witness allegations.

7          THE COURT:  I'm just trying to define the questions

8     here, not get to the argument.

9          What's the plaintiffs' view on whether this is the

10    time when I need to try to sculpt the case if I find that any

11    of the statements are adequately alleged to survive a motion to

12    dismiss?

13         MR. HARROD:  I don't think that the plaintiffs

14    disagree with the principle that Your Honor absolutely has the

15    discretion to look at the statements that are alleged in a

16    complaint and parse out the ones that are not actionable.  I

17    think our position on the substance of the --

18         THE COURT:  My question -- I must be asking it

19    inartfully -- is different.  Do I really have to decide with

20    regard to the 68 or 150, or for present purposes, the purposes

21    of the motion to dismiss, if I find one or more are actionable

22    is it proper and permissible, appropriate to deny the motion to

23    dismiss and deal with statements that haven't been specifically

24    analyzed and addressed by me later in the case?

25         MR. HARROD:  I certainly think there will be

1    opportunities for the court to make determinations about that

2    later in the case on an evidentiary record, like at summary

3    judgment.  I think our view is if you find in particular on the

4    question of scienter that the individual defendants or the

5    corporate defendants bear the state of mind of recklessness or

6    intentional conduct to hold them into the case, then you could

7    say all the statements go forward.

8              THE COURT:  I think I have to find at least one

9    specifically meets all the standards.

10             MR. HARROD:  Yes, correct.

11             THE COURT:  And some of them were repeated or some of

12   the omissions --

13             MR. HARROD:  I --

14             THE COURT:  -- involve different occasions.  But

15   anyway.

16             MS. BIRNBACH:  Your Honor, if it is helpful, scienter,

17   each of our arguments are an independent basis for dismissal.

18   So if the court would find scienter, there's no First Circuit

19   case of which I'm aware that says scienter has to be examined

20   as to each of 168 statements.  Scienter is an element of the

21   claim.  And if there's nothing supporting scienter, then it's

22   an independent basis for a dismissal.  And indeed there are

23   many decisions in this circuit that are based on scienter that

24   don't bother to get to the element of whether or not it was a

25   false or misleading statement and vice versa.

```
 1            THE COURT:  It seems to me there might be scienter at

 2    one point in time and not at another.  Although the issue that

 3    I've looked at most closely myself to see whether the elements

 4    are met is the very first one, the Q1 2013 earnings call.  And

 5    I think it's Mr. DeSisto's statements particularly at issue.

 6            MS. BIRNBACH:  Your Honor, so what we did in Exhibit

 7    A, because the complaint was so lacking sometimes in dates of

 8    allegations, identity of confidential witnesses, we've numbered

 9    the confidential witnesses in Exhibit B.  But in Exhibit A,

10    what we do -- and our brief does mention all the statements.

11    We have a footnote.  We've bucketed the statements into each of

12    three categories, Your Honor.  And in each category in our

13    moving brief we do have a footnote that lists in the footnote

14    the paragraphs of statements that fall into that bucket.

15            Obviously, given the court's page limitations, we

16    could not possibly address every statement, but we did say in

17    the brief which statements and which amended complaint

18    paragraphs we were putting in a bucket.  And then for the

19    court's convenience, we categorized them and Exhibit A --

20            THE COURT:  That's the exhibit to your declaration?

21            MS. BIRNBACH:  Exhibit A.

22            THE COURT:  I found it helpful.

23            MS. BIRNBACH:  It simply references the arguments made

24    in the brief and tells you which statements, again in sort of a

25    cross-reference to the footnotes but gives the court full
```

1    statements.

2          But, Your Honor, as to what you said in terms of there

3    may very well be scienter at a particular point in time, I

4    don't disagree with that.  I think that's what the First

5    Circuit said in *Ariad*.  What I'm saying is our argument here is

6    that despite the heft of repeating customer complaints, if you

7    see in the *Biogen* and *Metabolix* case, it's exactly the same

8    thing, numerous confidential witnesses repeating over and over

9    and using words like "pervasive" and "severe" and so forth.

10   But when you boil it down, what it comes to is the same problem

11   with scienter in those two cases, which is not --

12         THE COURT:  Well, we'll get to it.  I'm trying to

13   define the questions, not hear the argument yet.

14         MR. DAY:  I'm sorry, Your Honor.

15         MR. HARROD:  Your Honor, I think certainly it's common

16   in these cases for statements -- I've had the experience where

17   statements are either dismissed or left into a case.  And in

18   particular instance where statements get dismissed, the judge

19   does what you're contemplating doing.

20         THE COURT:  I'm actually contemplating not doing that

21   in part because the plaintiff hasn't briefed it that way, and

22   I'm contemplating or just wondering whether I have the

23   discretion, and I think I do, that if I find some of these

24   statements meet all of the standards of the PSLRA, whether I

25   would deny the motion to dismiss and, you know, if we were ever

1   to get to trial in this case, you're not going to have a

2   special verdict form with 150 questions to the jury.  You'd

3   have to sort of take your best shots at some of a more limited

4   number.

5          MR. HARROD:  I'm going to sit down because I don't

6   want to belabor a point on which we agree with the court.  I'm

7   just saying if there's something that we can do like what the

8   defendants have done to parse out the statements that would

9   assist Your Honor in this process, we would be --

10          THE COURT:  We may do some of that at this hearing.

11   Okay.  It is the defendants' motion to dismiss, so I think I'll

12   hear from the defendants first.

13          MS. BIRNBACH:  Your Honor, just by way of background,

14   Insulet's medical device product is a wearable compact insulin

15   delivery system whereby the patients wear the pod --

16   insulin-dependent diabetic patients wear the pod on their body

17   for three days and it supplies continuously insulin without

18   tubes or pumps.  So it's a convenient and innovative medical

19   technology that serves those patients.

20          It was approved and Insulet started selling the

21   OmniPod in 2005.  So by 2010, Insulet had an international

22   distributor agreement with Ypsomed, and then going into 2013,

23   the beginning of the class period in this case, Ypsomed was

24   coming out with the next generation with the pod Eros.  What

25   Insulet did was decide to replace the pods of all the existing

 1    patients by mid-2013, it was approximately 65 or 70,000

 2    patients, at the same time over the same quarter.  They

 3    experienced some delays, and that may be what the court is

 4    referring to in the Q1 2013 timeframe.

 5         THE COURT:  Actually, it wasn't the delays.  It was

 6    primarily the statements in paragraphs 105, 106 and 107.

 7         MS. BIRNBACH:  Right.

 8         THE COURT:  The component issue resulting in lower

 9    production than planned.  It was remedied.  In paragraph 107,

10    no defective product left the building.  I mean, those are the

11    things I've honed in on.

12         MS. BIRNBACH:  Absolutely, Your Honor.  In fact, that

13    was a delay issue, which is why it was disclosed.  In other

14    words, plaintiffs don't allege anywhere in the complaint --

15    they try to pigeonhole their other quality issues to say we

16    made a representation about all quality issues, but they

17    actually don't have a single allegation that the component

18    issue that Duane DeSisto, the former CEO, was referring to in

19    Q1 wasn't remedied.

20         THE COURT:  What do you mean, "the component issue"?

21         MS. BIRNBACH:  So in other words, there wasn't a

22    representation on this Q1 call.  Even if you look at paragraph

23    105 and you look at the source documents, which of course the

24    court must, the unexpected component issue --

25         THE COURT:  Do I have the source documents?

1          MS. BIRNBACH:  You do have the source documents.

2     Exhibit K is the Q1 2013 earnings call.  And what Mr. DeSisto

3     was referring to is referring to, I think he described it in

4     the Q and A section as a 2/10,000ths of an inch component issue

5     from a new manufacturer.  And the reason he was describing it

6     was that it delayed production of the new next generation Eros

7     pod.

8          THE COURT:  Where is that in Exhibit K?  Actually,

9     hold on just one second.

10          MS. BIRNBACH:  It's on page 9 of Exhibit A, Your

11     Honor, towards -- about three-quarters of the way down the page

12     where he describes in detail the issue to --

13          THE COURT:  Let's see, page 9.

14          MS. BIRNBACH:  Of Exhibit K.

15          THE COURT:  The docketed page 9 says page 8 in the

16     lower right.  Is it page 9 on the bottom of the page?

17          MS. BIRNBACH:  Page 9 is on the bottom of the page to

18     the right, and then Duane DeSisto's response about

19     three-quarters of the way down the page, when asked about the

20     component issue being fully resolved and how it didn't leave

21     and so forth, he described it, and he described how they found

22     it and how they then corrected it in the manufacturing phase.

23     And he describes it as this 2/10,000ths basically off the spec,

24     which gives you an indication of the precision and that the

25     company found it and corrected it before they were shipped.

```
 1    And so what plaintiffs do --
 2            THE COURT:  Hold on a second.
 3            MS. BIRNBACH:  I'm sorry, Your Honor.  I don't mean to
 4    get ahead of you.
 5            THE COURT:  I'm just trying to compare this.
 6            MS. BIRNBACH:  The complaint obviously had excerpts.
 7            THE COURT:  Where is it where it said --
 8            MS. BIRNBACH:  Page 4 of that same exhibit is I think
 9    where they took the excerpt from paragraph 105, and page 9 is
10    the portion where Mr. DeSisto elaborates on it being remedied.
11            THE COURT:  So it's on page 4.
12            MS. BIRNBACH:  Their portion is on page 4.  They have
13    ellipses where Mr. DeSisto mentioned where it was identified
14    with Flextronics, the manufacturer, and remedied.
15            Then page 9, the reason I referred the court to page 9
16    is that that's where the analyst asks him about it and he
17    describes, you know, the stage, what it was, and, you know, how
18    it was caught in that section of the Q and A.  And the reason
19    this is important, Your Honor, is that this issue was disclosed
20    because it caused a delay.  So what Mr. DeSisto describes in
21    that call surrounding those two paragraphs in his prepared
22    remarks in the Q and A is that it's pushing the launch back
23    from Q1, and that's why he describes it.  He also describes how
24    they did it at this phase with Flextronics, who was the
25    manufacturer in China.  So it wasn't on shipped product.  They
```

1    hadn't started the conversion at that point, and this was

2    delaying the conversion.  So none of the pods were being

3    shipped to patients at that time.

4         But the reason that's so important, and I'm glad the

5    court focussed on that Q1 disclosure is what plaintiffs then do

6    is, throughout their 90 pages of employees whose sole purpose

7    it was to take customer complaints all day and quality issues

8    all day, is they say that this statement about that particular

9    component issue, which Mr. DeSisto was informing the analyst

10   because it was causing a delay in the launch, was somehow

11   translated into a representation that the manufacturing process

12   during the launch had no problems.

13        And repeatedly throughout the class period

14   disclosures, Insulet made disclosures of its growth, which

15   plaintiffs don't contend was a problem.  In fact, in every

16   quarter for 2013 through 2015, 12 quarters, the only quarter

17   where they did not grow over the prior period last year was the

18   Q1 '15 quarter.  The other 11, they all grew.  They grew at 19

19   percent for the fiscal year 2013; 17 percent for the fiscal

20   year 2014.  So we're talking about almost 20 percent growth.

21        But what plaintiffs do is have no dates and no

22   quantities, and this is exactly the issue that Judge Saylor

23   identified in *Biogen*, and in fact in *Metabolix* that Judge

24   Woodlock referred to, there's no magnitude.  And employees

25   whose job it is, if you went to any manufacturer of a complex

1    medical device today, they have quality and customer complaint

2    departments.  They take thousands of calls a year, Your Honor.

3    You can write 90 pages about it.  But in the end, when you link

4    it back to what the defendant said, such as this statement,

5    that a particular component issue caught at Flextronics in

6    China before the launch delayed the launch, that is not a

7    representation that we will never have quality issues.

8           What's missing from all of the CW allegations, and

9    it's the same issue in those two cases, is any magnitude --

10   other than plaintiffs' characterizations of serious and

11   pervasive repeated, any magnitude that defendants were aware

12   would cause seven quarters later in Q4 2014 or in Q1 2015 to

13   fall from expected revenues, because that's what we're talking

14   about here.  Plaintiffs have to, in order --

15          THE COURT:  I don't --

16          MS. BIRNBACH:  Sorry, Your Honor.

17          THE COURT:  I don't -- let me parse that out.  I

18   think -- I have interpreted -- maybe misinterpreted the

19   plaintiffs' argument as essentially one that there were

20   intentional misrepresentations, material misrepresentations or

21   omissions that were made with intent to deceive, to hide

22   material facts, rather than recklessness.  They point to three

23   specific types of defects, needle mechanism failure, leaking

24   pods, and alarm defects?

25          MS. BIRNBACH:  Right.

1          THE COURT:  And I thought it was their theory that

2    essentially large numbers of Insulet product were falling below

3    its quality standards; that Mr. DeSisto and Mr. Liamos, among

4    others, knew that and nevertheless they were sometimes

5    overruling the quality control people and ordering that those

6    be distributed because they wanted to make money and were not

7    disclosing those major quality issues to the market, either

8    intentionally mischaracterizing them or failing to say what

9    they should have said.  Do you understand that to be at least

10   part of the plaintiffs' argument?

11         MS. BIRNBACH:  Absolutely, Your Honor.  And in

12   addition they say "intentionally" or "recklessly."  What I'm

13   saying is the way they allege that is not sufficiently

14   particularized to meet the PSLRA's strong inference of scienter

15   heightened pleading requirement for the same reason it was not

16   sufficient when they talked about pervasive problems.  In the

17   Metabolix case it was quality problems.  Everybody talked about

18   them at the meeting.  Senior management was at the meeting.

19   There were pervasive quality problems that were not disclosed.

20   That was the argument in *Metabolix*.

21         And Judge Woodlock said but there's nothing at the end

22   of the day to show that there was any magnitude attached.  In

23   fact, I think the quote was, "They do not state the actual

24   sales figures, why the existing figures would have been

25   impossible to meet out of these alleged quality issues in the

1   face of positive statements of strong demand."  It's very

2   similar.

3        In *Biogen*, the same issue.  Notably absent from those

4   allegations are any specific facts about the sales, such as a

5   measurement of the decline, why the decline, whether the

6   decline was due to lower new patient starts, they called it new

7   starts in that case, or switches or higher discontinuations.

8   It's the same issue.

9        Here, what actually happened in Q4, and the company

10  disclosed in its Q4 pre-release -- on January 7, 2015, they

11  were still six weeks away of having to release their Q4 2014

12  numbers, but they came out with a pre-release saying we're

13  updating and reducing our expected guidance.  They don't have

14  final audited numbers a week after the year, but we're updating

15  our expected guidance and lowering it, and they gave the

16  reasons.  And the reasons have zero to do with any of these

17  issues, and nothing in the confidential witness allegations --

18        THE COURT:  Well, wait a minute.  Here, so this is

19  after Mr. DeSisto and Mr. Liamos have left the company, right?

20        MS. BIRNBACH:  It's after Mr. DeSisto left.  I believe

21  it's after Mr. Liamos left.  That's when the bad news came out.

22        MR. HARROD:  Liamos hadn't left yet --

23        MS. BIRNBACH:  Mr. Liamos was still there.

24        THE COURT:  What's that?

25        MS. BIRNBACH:  I believe someone was correcting me

```
 1    saying Mr. Liamos was still there.

 2              THE COURT:  He was still there.

 3              MS. BIRNBACH:  What I'm discussing is the bad news.

 4              THE COURT:  But the bad news was disclosed by

 5    Mr. Sullivan?

 6              MS. BIRNBACH:  The bad news was disclosed when

 7    Defendant Dorval was still there and Mr. Sullivan and Mr.

 8    Liamos --

 9              THE COURT:  We're talking about the statement by

10    Mr. Sullivan.

11              MS. BIRNBACH:  Correct, who is not a defendant.

12              THE COURT:  He succeeded Mr. DeSisto?

13              MS. BIRNBACH:  Correct.

14              THE COURT:  Okay.  Now, where is the statement in the

15    record?

16              MS. BIRNBACH:  It's Exhibit G.  It's also referred to

17    in the amended complaint I think in many places.  That's the

18    earnings press release.  They refer to the January 7, 2015

19    announcement of the first alleged corrective disclosures, which

20    was the pre-release of Q4.

21              THE COURT:  Here, I just want to --

22              MS. BIRNBACH:  Yeah.

23              THE COURT:  -- read what it says.  Do we have the full

24    press release here in the record?  It's attached Exhibit 99 --

25              MS. BIRNBACH:  Yes.  That's the full press release in
```

1    Exhibit G.  It's the next page.  The 8K is the cover sheet.

2              THE COURT:  Okay.  Here it is.

3              MS. BIRNBACH:  So the explanation for the revising

4    downward of Q4 2014 and thus full year 2014 revenue guidance,

5    Your Honor, was because primarily the non-insulin business,

6    which is their product, it's in the record, to Amgen, but

7    plaintiffs don't discuss it as a part of their case.  So the

8    non-insulin drug delivery shipment was the primary reason for

9    the Q4 2014 lowering of guidance.  It's a chemotherapy

10   protection against infection drug that Insulet sells through

11   Amgen, and so that's the drug delivery non-insulin part.

12             THE COURT:  Okay.

13             MS. BIRNBACH:  What I'm trying to give the court a

14   sense of is yes, they have maybe 168 allegedly false or

15   misleading statements or omissions, Your Honor, but they all

16   come back to the same thing, which is the bad news emerged,

17   plaintiffs say, in that Q4 2014 failing to meet expected

18   revenues and in the Q1 2015, same thing, failing to meet

19   expected revenues.

20             THE COURT:  The Q1.

21             MS. BIRNBACH:  There were two in a row.

22             THE COURT:  What's that?

23             MS. BIRNBACH:  Two in a row, Q4 2014 and Q1 2015, that

24   is their "The truth emerges" section.

25             THE COURT:  Didn't Mr. Sullivan have a call or meeting

 1  with analysts as part of all of this?

 2        MS. BIRNBACH:  Yes.  It's in the same timeframe.  So

 3  the negative news, if you will, the chronology is January 7,

 4  that pre-release of Q4 and fiscal year '14, at which point

 5  Insulet says we're updating our Q4 guidance primarily because

 6  of this non-insulin delivery miss, there's an Amgen amount that

 7  got pushed that was significant.  And then on January 14, a

 8  week later, Mr. Sullivan speaks at the annual JP Morgan Health

 9  Care Conference and reiterates the same reasoning and says in

10  addition, to a lesser extent, some U.S. distributor

11  de-stocking.  And what's really important about the distributor

12  de-stocking, Your Honor, and they do make it challenging in

13  their complaint to see this -- but can I just give you the two

14  minutes without referring to documents on the timeline?

15        THE COURT:  Go ahead.

16        MS. BIRNBACH:  So Q1 they say there's a slight delay,

17  we're trying to launch the Eros, the next generation, smaller

18  lighter pod.  By Q2 they're hoping to launch and transition the

19  65,000 patients all in one quarter by replacing it for free

20  with the new design.  It really pushes into Q3 2013.  And at

21  each of those junctures, not only doll revenues grow

22  significantly over a prior period -- as I said, 19 percent for

23  the full year of fiscal 2013 over '12 and 17 percent for fiscal

24  '14 over '13, each quarter they're updating on the status.  And

25  throughout those disclosures they candidly disclose the

1  challenges they're facing getting manufacturing up and running.

2  You can imagine the enormity of the task of replacing, for

3  free, 65,000 or so patients in the same quarter at the same

4  time.  They didn't -- for whatever reason, they didn't chose

5  choose to phase it.  And the problems that came up were

6  primarily one of not enough supply.

7       So there was this component issue that they described

8  that delayed, but really it was getting the third and then

9  subsequently the fourth manufacturing lines up and running to

10 the satisfaction of Insulet so they could make this big product

11 transition.  And they were updating on the market on that in

12 Q1.  Q2 they mentioned that they're living hand to mouth,

13 there's not enough supply.  And in Q3, which was the main

14 quarter that all of the 65, 70,000 patients were transitioned,

15 they talk about supply constraint as the big issue.

16      And we have, you know, quote after quote in the

17 earnings calls about that, talking about the difficulties,

18 saying it's a process, things are improving but we are of short

19 supply.  We're pushing back on distributor orders because we

20 need to.  We don't have enough supply.

21      By August 2013 and going into the fourth quarter, they

22 finally get the third manufacturing line up and running, but

23 the questions from analysts persist about the supply

24 challenges.  What then happens is the distributors are

25 concerned there may continue to be supply challenges, quantity

1  problems, which are fully disclosed and discussed, and the

2  distributors start stockpiling inventory in 2014.  Hard to say

3  because you don't have all the information about how much they

4  need, and Insulet disclosed that international growth was

5  outpacing U.S.

6         THE COURT:  When did it do that?

7         MS. BIRNBACH:  I'm sorry?

8         THE COURT:  When did it first do that?

9         MS. BIRNBACH:  Throughout 2014.  We have quotes in the

10  brief, I believe, Your Honor, but they talked about

11  international growth outpacing and they warned analysts that

12  because the margins on the international sales were lower --

13  they don't make as much money on the international -- that that

14  increasing mix of more international would hurt margins and

15  they warned that in -- it's on page 6 of our moving brief, that

16  discussion.

17         But they have this discussion, and everybody knows

18  supply is the issue, and distributors start to stockpile

19  inventory.  They do that beginning in 2014 and throughout 2014

20  to different levels such that as the fourth manufacturing line

21  comes up and running in 2014 and Insulet keeps assuring people

22  now we have, I think it was a million pods a month they were

23  aiming to be producing so they would have sufficient supply for

24  everyone, towards the end of Q4 2014 and to a greater extent Q1

25  2015, the distributors started de-stocking, and that's what

1    that word "de-stocking" refers to in all those disclosures,

2    selling off what they called their safety inventory that they

3    had built up because of supply constraint concerns.  So this is

4    the story --

5            THE COURT:  It's the plaintiffs' allegation that they

6    built it up because such a high percentage of the pods were

7    defective.

8            MS. BIRNBACH:  Absolutely correct, except it's missing

9    the fact, the very important particularized fact of what

10   percentage.  What percentage didn't meet quality standards and

11   went out the door?  What volume?  What sale?  A single dollar

12   of distributor failing to order, they have zero facts, Your

13   Honor.  So not only -- we do say that these confidential

14   witnesses do not have alleged they ever interacted with the

15   individual defendants except for one on one occasion with

16   Defendant Liamos signing off on one lot.  They've never

17   interacted with defendants.  They have no knowledge of

18   defendants' state of mind.  And that's the critical component

19   that you will see.  Even in the First Circuit cases, Your

20   Honor, it's very important to understand the First Circuit's

21   view I think in -- I don't want to say the wrong case -- in

22   *Genzyme.*

23           THE COURT:  Hold on a second.  Let me get it out.

24           MS. BIRNBACH:  Yes, and *Abiomed,* really.  I don't want

25   to make you do this twice.

1           THE COURT:  What page would you like me to look at?

2           MS. BIRNBACH:  In the First Circuit *Genzyme* decision?

3           THE COURT:  754 at 30-31.

4           MS. BIRNBACH:  31, exactly.  The scienter portion --

5     they were talking about the 140-page complaint on page 40 and

6     down to page 42 discussing why defendants' knowledge of issues

7     did not mean there was anything -- as to the bottom of page

8     42 -- anything indicative of scienter.  And they say that it

9     was not disclosed at an earlier time that plaintiffs would

10    prefer does not give rise to a duty to disclose it, but then

11    they continue on about scienter and on to the rest of page 42.

12          THE COURT:  All right.  Actually, let me read that.

13          I'm sorry, what is it --

14          MS. BIRNBACH:  I'm not pointing you to the best quote

15    in the *Genzyme* case.  In the *Genzyme* case, the issue that I

16    meant to point the court to was that plaintiffs claimed

17    detailed knowledge of the problems, and the court said, even

18    assuming all those knowledge of the problems --

19          THE COURT:  What page are you reading from?

20          MS. BIRNBACH:  I'm not reading a quote, Your Honor.

21    There are good quotes.

22          THE COURT:  What's that?

23          MS. BIRNBACH:  There are good quotes.  This wasn't the

24    one I was looking for.  I was looking at the *Biogen* case.  I

25    apologize.

1          THE COURT:  You want me to look at *Biogen*, not

2     *Genzyme*?

3          MS. BIRNBACH:  Yes, Your Honor.  I apologize.

4          THE COURT:  I think I have the *Biogen*.

5          MS. BIRNBACH:  *Biogen* 2016 Judge Saylor decision at

6     page 33.  It's the second paragraph on page 33.

7          THE COURT:  Okay.  What does it say?  What do you want

8     me to look at?

9          MS. BIRNBACH:  It says, "Notably absent from those

10    allegations," and this is the, "Many CWs."

11         THE COURT:  Hold on a second.  193 F. Supp. 3d at 5?

12         MS. BIRNBACH:  Correct, at page -- in my copy it says

13    page 33, and it's the second paragraph.

14         THE COURT:  I'm not finding it.

15         MS. BIRNBACH:  Double star 33.  I don't know what that

16    means.  There are two different reporters here.  Is it page 46?

17    I apologize, Your Honor.  I'm staring at it.  I'm happy to read

18    it to the court.

19         THE COURT:  Want to put it up on the document

20    presenter?  Then we can all see what you're looking at.

21         MS. BIRNBACH:  It's actually highlighted.  Can you go

22    put it up?  Mine has a lot of circles and handwriting, so my

23    partner is putting hers up.

24         THE COURT:  Hold on a second.  Ours printed out

25    differently, and I should be finding something that says, "The

1    analysis begins," and I don't.  Is that 193 F. Supp. 3d 5?

2         MS. BIRNBACH:  Yes, Your Honor.  My Westlaw printout

3    gives me six different references for the page.  It's either

4    page 33 or page 46 on the two numbering systems I have.

5         THE COURT:  What's that, 46?

6         MS. BIRNBACH:  Either 33 or 46, depending on which

7    reporter.

8         THE COURT:  Hold on a second.  Let me see if I can

9    find page 46.  This is an intolerable way to print out these

10   cases.  I've been doing this for 32 years.  I don't have a page

11   46.

12        MS. BIRNBACH:  It's up on the presenter, and I'm happy

13   to read it, Your Honor.

14        THE COURT:  Okay.  Go ahead.

15        MS. BIRNBACH:  "Notably absent from those allegations

16   are any specific facts about the sales, such as a measurement

17   of the sales decline, why sales were declining, whether the

18   decline was due to lower new-starts or switches or higher

19   discontinuation or how the sales decline affected the company's

20   financial guidance."  And then continuing on to the next page,

21   the conclusion is, "In other words, absent more particularized

22   details and stripped of their generalities, the confidential

23   witness allegations about Tecfidera sales are not clearly

24   inconsistent with what defendants were publicly disclosing to

25   the market."  And it continues down that page, "Missing from

1    those allegations are any details about the magnitude of the

2    impact on sales, a change in the discontinuation rate," et

3    cetera.

4         So Your Honor was just describing plaintiffs'

5    allegations with those generalities that they plead, that it

6    was material, that it was significant.  But yet there are no

7    facts in any of those confidential witnesses that mention new

8    patient starts, for example.  There are no facts about

9    magnitude that would -- and this goes to scienter -- that would

10   have put the defendants on notice at any quarter prior to Q4

11   2014, when the miss from guidance happened, that their guidance

12   was wrong.

13        There's no allegation that the confidential witnesses,

14   as there are in many cases, interacted with defendants and said

15   your numbers are wrong, your guidance is wrong.  In fact, none

16   of the confidential witnesses had any role in guidance setting.

17   They don't know how it was set, and they didn't interact.

18        So to say that plaintiffs' numerous allegations --

19   frankly because of their numerosity, they had specific facts

20   about those peoples' jobs and quality issues or complaints,

21   what that does not translate into -- and this is the *Biogen*

22   case and the *Metabolix* case -- is to defendants being either

23   intentionally fraudulent for saying the things they said

24   throughout 2013, which were these general puffery statements

25   of, Things are going well, now people can start to build

1     inventory, we're pleased with the rollout so far, coupled with

2     the cautious statements they made that supply interruptions

3     might, you know, occur and have a material impact, and this

4     wasn't a breeze.  There are numerous statements saying quality

5     is improving.  There are numerous statements saying demand is

6     strong.  But these are not rendered intentionally fraudulent by

7     junior customer service or quality employees talking about

8     unquantified and not necessarily placed in time problems that

9     they don't tie to any loss of sales, not a single dollar.

10          And so that's my point about the magnitude cases, Your

11     Honor.  There's no particularized facts here to say, as the

12     First Circuit says, what defendants knew and when they knew it

13     that rendered their statements materially misleading.

14          THE COURT:  Well, let me go back to the -- I just took

15     the first one and tried to prepare for this argument.  As I

16     said, the Q --

17          MS. BIRNBACH:  The component issue from Q1 2013.

18          THE COURT:  So component -- is your argue that

19     component is different than the needle mechanism failure, the

20     leaking pods and the alarm defects?

21          MS. BIRNBACH:  Yes, but it's not my argument.  It's

22     their allegations.  In other words, the amended complaint

23     describes their alleged quality issues, none of which is this

24     component issue.

25          THE COURT:  That's what I --

1           MS. BIRNBACH:  It's my argument, yes, Your Honor, but

2     their own allegations do not say that this component issue in

3     Q1 2013 that had popped up and caused the launch to be delayed

4     before they ever shipped pods until they fixed it, they don't

5     plead that that's the same issue.  They say it in a conclusory

6     statement that distributors built up stock because of quality

7     issues.

8           However, that non-defective part that they insert is

9     not anywhere in the facts, and indeed it doesn't even make

10    sense, Your Honor.  The quality was so terrible that

11    distributors wanted to stockpile and buy more.  There are no

12    facts to link those two other than plaintiff putting it in

13    there in generic terms.  The one thing they point to is

14    Mr. Sullivan -- you mentioned the investor conference.  He

15    spoke at the annual JP Morgan conference after the bad news of

16    Q4 was announced, and he listed many facts.  We don't have a

17    transcript of his Q and A remarks that plaintiffs quote from.

18    Plaintiffs quote from a JP Morgan analyst report that lists

19    several factors, including that there were alarm and occlusion

20    issues, that's the one place other than the confidential

21    witnesses, and it also mentions that physicians scaled back on

22    prescriptions in Q4 of 2013 -- I'm sorry -- yeah, Q4 of 2013.

23    This is paragraph 83 of the amended complaint, Your Honor.

24          So from that one Mr. Sullivan looking back at what

25    went wrong and what could have gone better with the launch in

1   hindsight, plaintiffs say, Aha, it must have been that because

2   some doctors cut back on prescriptions in Q4 2013 and because

3   of one of the many other factors Mr. Sullivan mentioned was of

4   course there were quality issues, that the defendants -- and

5   this is important -- knew that their statements in Q1, Q2, Q3,

6   Q4, all those quarters before Q4 of '14, knew that Q4 of '14, a

7   year after these doctors supposedly cut back on prescriptions,

8   doesn't have a magnitude, a year later they knew that their

9   quarterly forecast would be missed at the revenue level.

10  There's nothing to tie it to that revenue, Your Honor.

11          THE COURT:  Well, maybe I ought to -- I don't know.  I

12  have some questions, but maybe we ought to hear from

13  Mr. Harrod, and I may give you an another opportunity.

14          MS. BIRNBACH:  Thank you very much, Your Honor.  I

15  could go on all day.

16          MR. HARROD:  Thank you, Your Honor.  Paragraph 83,

17  what counsel was just reading, it actually doesn't say

18  "during."  She intimated it was during.

19          THE COURT:  Hold on.

20          MR. HARROD:  It's the bottom the second paragraph.

21  The last sentence of that paragraph that starts, "What wasn't

22  clear."

23          MS. BIRNBACH:  It's "before."  Sorry.

24          MR. HARROD:  It says, "By the fourth quarter of 2013,"

25  so it suggests that --

1          THE COURT:  You want to keep your voice up, please.

2          MR. HARROD:  Sorry.  It suggests that it had been

3  something that had been in process and in progress about the

4  acceptance in the market.  But I want to start back where Your

5  Honor started, which is at paragraph 105 and 106 of the

6  complaint.

7          Counsel did a good job of saying this refers to a

8  component.  And there's two things I want to say about that.

9  One is, the needle mechanism that we allege to be defective and

10  which the EPA found to be subject to a recall was one of the

11  components that we allege to be defective.  That is a

12  component.  Sorry, Your Honor.  I said "EPA."  I have another

13  case involving EPA.  I meant the FDA.  And I'm very sorry.  If

14  I do that again, I'm just going to apologize in advance.  I

15  mean FDA at all times.

16          THE COURT:  So you say the FDA --

17          MR. HARROD:  There was a recall.  If you look at

18  paragraph 100 of our complaint, it identifies the problem that

19  was subject to the recall as the needle cannula and the alarm

20  system, which are the two things that the CWs, as the

21  defendants refer to them in the complaint, identified.  It's

22  the same two things that Mr. Sullivan identified in the

23  quotations that are contained in the JP Morgan analyst report

24  in paragraph 83.  It's hard to understand how there's not,

25  based on those statements, an admission by the defendants here

1  that those problems existed.

2          THE COURT:  Hold on a second.  Let me look at that.

3          Actually, I probably should do this.  We should make

4  part of the record -- although I'll need another copy because I

5  marked mine up -- is it the June 2 -- June 5, 2005 letter from

6  the FDA?

7          MR. HARROD:  Right.

8          MS. BOON:  2006.

9          THE COURT:  We'll make that Exhibit 1 of today's date.

10 It was referenced in the complaint.  It can be properly

11 considered on the motion to dismiss, but I didn't find it in

12 the record, so I asked for it, and the parties provided it

13 earlier today.  It will be docketed as an exhibit.

14         MR. HARROD:  So Your Honor, you've seen that.

15         THE COURT:  So what's the pertinent part of this?

16         MR. HARROD:  Well, the pertinent part of paragraph 100

17 is -- and these are -- this is part of an earnings release.

18 And there was -- I think during the conference call, either

19 that day or the following day, but it's quoted in paragraph 100

20 of the complaint.  It said, "These quality issues, which are

21 the subject of the recall, relate to the product issues

22 associated primarily with the launch of the new OmniPod insulin

23 delivery system back in 2013 and 2014.  Those issues remain.

24 They were product performance issues during - in 2013 and 2014.

25 Those issues have been largely" -- this is now -- granted, this

 1   is after the class period is over -- "largely remediated."

 2           So we know that, and we know that people inside the

 3   company were saying that these problems existed from the time

 4   the product was launched.

 5           THE COURT:  Well, that's what Mr. Sullivan says in

 6   2015.

 7           MR. HARROD:  But they're saying they existed from the

 8   point of the launch and that these products that were recalled

 9   were in the stream of distribution out into the public from the

10   time they were launched so the problems existed at that time.

11           THE COURT:  And that would make -- so that would

12   make --

13           MR. HARROD:  I think you want to go back to paragraphs

14   105 and 106.  I'm trying to infer what your next step is.  In

15   particular, I think the commentary between "the analysts" and

16   "Defendant DeSisto" in paragraph 106 is telling.

17           THE COURT:  Well, what I'm trying to do is put

18   these -- compare the allegations to the prongs of the PLSRA

19   test.  So first, there has to be a statement or omission, and I

20   thought that for the Q1 2013 earnings call Mr. DeSisto said the

21   component issue resulting in lower production than planned was

22   remedied.  And you're saying that the FDA letter, among other

23   things -- how do I know that the needle --

24           MR. HARROD:  I don't know that.  I can't say that.  I

25   can't say that.  But what she says is they're saying that this

1    component is something else, but they never say what the

2    component is.  There's a problem with the component that causes

3    the launch of the product that represents 81 percent of the

4    company's revenue -- this is the whole company for all intents

5    and purposes.  Without the OmniPod Eros, the company is

6    basically dead.

7            So we have a product, 81 percent of the company's

8    revenue.  They're launching it.  It's an important launch.

9    They have a component problem.  The defense says, Well, the

10   plaintiffs are saying that there's a component problem, and

11   that's not what they're alleging.  First of all, I don't know

12   what the component is.  They haven't said what the component

13   is.  I'm sure that a needle and an alarm and the seal on the

14   pod where it attaches to the person's body are components of

15   this product.  Without something in the record showing the

16   component he's talking about is something other than one of

17   those three things, which I haven't heard yet, I have to assume

18   that it could be one of them.

19           THE COURT:  Well, I think you want to rephrase that

20   and say it's a reasonable inference.  It's a motion to dismiss.

21   I have to take the allegations in the complaint as true.  I

22   have to draw reasonable inferences in favor of the plaintiff

23   and then see if they meet the PSLRA requirements.  Is that an

24   appropriate way to --

25           MR. HARROD:  I totally agree with everything you just

```
 1    said, Your Honor.  So let's take the alternate assumption.
 2    Let's take the component -- that there's some other component.
 3    We now know from people inside the company and from subsequent
 4    events that there were problems with the needle, the alarm, and
 5    the seal that allowed the pods to leak, which, by the way,
 6    diabetes is a chronic illness and if you don't get enough
 7    insulin, you could have serious health problems.  So it's
 8    important for the products to be reliable.  And you would
 9    assume people have connected -- paragraph 83 of the
10    complaint -- the reliability of the product and problems with
11    demand.
12            Let's just say in Defendant DeSisto's statements that
13    it's some other component.  But now he's created the
14    impression, notwithstanding the internal facts the company
15    alleged in the complaint, that everything is fine.  None of the
16    bad products left the building.  The product is being
17    manufactured up to snuff.  It's going into the market and being
18    well received by customers.
19            So to me, if you know that you have problems with your
20    product and you know -- and I'll talk about some of the more
21    detailed allegations related to the former employees in a
22    second.  That statement is misleading.  Because when you're
23    talking about the product that comprises the entire future
24    livelihood of this business, you better be sure if you say
25    there's no problems and no defective products left the building
```

```
 1  that that's the case.
 2         THE COURT:  So I understand your argument on
 3  component.  And perhaps a reasonable inference would be that
 4  the needle mechanism failure, the leaking pods, the alleged
 5  alarm defects discussed in paragraphs 35, 36 and 37 are the
 6  component problems.  Mr. DeSisto said in that Q1 2013 earning
 7  call allegedly -- alleged in 107, no defective product left the
 8  building, so none was distributed.  Do I have a transcript of
 9  that call in the record?
10         MR. HARROD:  I think so.
11         THE COURT:  Okay.  We'll keep going.
12         MR. HARROD:  I think it's one of the exhibits to
13  counsel's --
14         MS. BIRNBACH:  Exhibit K.
15         THE COURT:  Exhibit A?
16         MS. BIRNBACH:  K.
17         THE COURT:  K.  So then the next thing is -- so what
18  in the complaint, you know, is sufficient for present
19  purposes -- you have to explain why an alleged false statement
20  is false or misleading.  And what paragraphs should I go to for
21  that?  At the moment I've got 35, 36, 37.
22         MR. HARROD:  Well, we summarized the reasons for that
23  as it relates to paragraphs 105, 106 and 107 and paragraph 111.
24         THE COURT:  111?
25         MR. HARROD:  Yeah.  If you look at 111, part a, it
```

1  says, "Contrary to defendants' statements above and as

2  reflected in the 2015 FDA warning letter" --

3        THE COURT:  Don't go too fast.  I have to hear it, and

4  the stenographer has to type it.

5        MR. HARROD:  Sure.  I'll start from the beginning.

6  This is paragraph 111 subpart a.  "Contrary to defendants'

7  statements above and as reflected in the 2015 FDA warning

8  letter, the OmniPod Eros units being produced had a high degree

9  of defects in violation of cGMT and Insulet's own manufacturing

10  standards, including pods with defective needle mechanisms,

11  leakage problems and faulty alarm systems as described in

12  paragraphs 34 through 37 above."

13        THE COURT:  But I don't think that helps you for these

14  purposes.  That's a conclusory statement, but it doesn't

15  explain why representations made were false.  That's why I went

16  to 35, 36 and 37.

17        MR. HARROD:  Well, the next sentence says, "Those

18  defects had not been remedied."  That's the statement.

19        THE COURT:  That's your argument, but it doesn't

20  explain --

21        MR. HARROD:  Well, we know --

22        THE COURT:  I'm sorry.  Go ahead.

23        MR. HARROD:  We know from the people inside the

24  company who were telling us that their products existed that

25  the defects in the products existed.  Excuse me.  And we know

1   from what the company disclosed that we talk about in paragraph

2   100 that the products with the defects that the FDA had

3   identified were in existence from the time the product was

4   launched.  So for Mr. DeSisto to come out and say all of the

5   problems had been remedied, at worst for the plaintiffs creates

6   a very misleading impression as to what the condition of the

7   quality of the products was.

8            THE COURT:  I'm trying to do what I think the PLSRA

9   instructs me to do, to look at the specific allegations of the

10  complaint.  And I'm actually not trying to help you win, but

11  I'm trying to tell you what I focused in on in addressing this

12  issue.  So paragraph 35 is on needle mechanism failures.  The

13  needle is part of the component, you want me to infer, right?

14           MR. HARROD:  Yes, from 35, 36 and 37.

15           THE COURT:  We'll get to that.  So 35 -- let's see, in

16  35, what allegation explains that it was false to say problems

17  had been remedied at the time of the Q1 2013 call?

18           MR. HARROD:  Well, we can see from paragraph a that a

19  senior quality engineer, somebody who is involved in the

20  quality control part of the business and who was responsible in

21  other paragraphs that describes their role, it says that she

22  was aware that there was a specific problem.  And I'm going to

23  read from the middle of that paragraph 35a.  "As she explained,

24  a patient would have to first attach the Eros pod to his or her

25  body and then have to fire the unit's needle into their skin to

1  receive their dosage of insulin.  As she added, the needle

2  mechanism failures were a major issue for insulin.  But even

3  though Insulet's most senior executives, including Defendant

4  DeSisto, the CEO, and Defendant Liamos, the COO, were aware

5  they were giving product to patients that we know may not

6  work" --

7       THE COURT:  Keep going.  Because I think the end of

8  that sentence goes to whether it was false to say that no

9  defective product left the building.

10       MR. HARROD:  Okay.  Okay.  I left off, I think, "were

11  aware that the company was giving product to patients that we

12  know may not work, in the end, the decision was always made to

13  ship the product because getting product shipments out the door

14  was critical to Insulet's survival."

15       Your Honor, I don't -- I mean, I don't want to

16  shortcut this.  I'm happy to spend as much time going through

17  this as you'd like, but I don't think -- the defendants'

18  arguments are primarily about the fact that there's some

19  question as to the magnitude of these problems.  And I think

20  that the -- I think that the combination of factors between the

21  internal employees' statements to us, the disclosure by

22  Mr. Sullivan --

23       THE COURT:  This is just too high a level of

24  generality.  I have to see if the allegations are explained to

25  decide whether you adequately allege that they're false.  I

 1 | think 35a helps you.

 2 |       MR. HARROD:  Let me talk to you about something called

 3 | blended lots.

 4 |       THE COURT:  Something called what?

 5 |       MR. HARROD:  Blended lots.

 6 |       THE COURT:  Well, I know about blended lots.  What

 7 | about -- Look, we're talking about components now.  I don't

 8 | know -- leaking pods.  What tells me -- and then we're going to

 9 | get to scienter, knowledge.  What tells me that that explains

10 | that the pods were leaking at the time of the Q1 2013 earnings

11 | call and therefore the statement that everything was remedied

12 | was false?

13 |       MR. HARROD:  Okay.  Can I go back to the needles?

14 | Because I think Your Honor is looking for detail.  One of the

15 | things that's described in paragraph 35b, this is a senior

16 | manufacturing operations officer.  That person describes

17 | exactly what the problem was with the needle.  So this is

18 | somebody who is involved in the manufacturing process.  They

19 | say, "The way the needle was firing and the way the device was

20 | put together, the needle was getting hung up in the sheath,

21 | also what's referred to as the cannula."  That same problem is

22 | echoed in the subsequent FDA warning letter and the recall

23 | statements that I read to you from paragraph 100.  So the

24 | company has acknowledged that that's an issue.  In paragraph 35

25 | part d, I believe this person was a pump trainer, so somebody

1   who helped patients learn how to use the device, and they used

2   it themselves, and she said that, "The product defect aspects

3   of the pod, including the frequent alarm problems discussed

4   below, were life-threatening, especially for children."

5         She described above that that "she personally tested

6   the OmniPod system for a time and personally experienced pods

7   with needles that did not properly fire or insert.  She further

8   stated that as far as she knew, Insulet never addressed this

9   problem with its patients.  She added that although the

10  tubeless nature of the OmniPod product was great, the product

11  defect aspects of the pod, including the frequent alarm, were

12  life threatening."  That's somebody's own personal experience

13  who uses the device and identifying a potentially

14  life-threatening flaw.

15        THE COURT:  Well, this person was a consultant from

16  mid-2013, I see, at the beginning of d.  And the date of the

17  earnings call, do you have that?

18        MR. HARROD:  May of 2013.  I think it's May 7.  May 6.

19  I'm sorry.  May 6.

20        THE COURT:  May 6, 2013.

21        MR. HARROD:  I just point out --

22        THE COURT:  So she may or may not have had knowledge

23  as of that date, May 6, 2013.

24        If you go to the leaking pods, the first cooperating

25  witness was a senior quality engineer who worked at Insulet

1  from 2012 to mid-2014, so that person would have been there at

2  the time of the Q1 call.  And he or she -- this is a person who

3  was responsible for corrective and preventive actions.  It

4  says, "Eros suffered from leakage problems for more than a year

5  prior to the start of the class period through the day he or

6  she left Insulet in mid-2014."  So that's a person in a

7  position to know who said there were leakage problems in 2013

8  until at least mid-2014 when the person left, and the regional

9  sales manager who was there in early in May of 2013 recalls

10  leaking problems with the pods.  All right.  So that's evidence

11  that that was false.

12          Then defective alarms, paragraph 37.

13          MR. HARROD:  So is it helpful if I read it, or Your

14  Honor seems to be --

15          THE COURT:  Well, you can point out the most pertinent

16  parts.

17          MR. HARROD:  Okay.  So this person who started in 2010

18  and left in the first quarter of 2014 said, "We had a lot of

19  alarming pods.  Pods would alarm for no reason, and the

20  problems increased during the Eros launch.  Patients would call

21  customer support, and there would be screaming patients calling

22  to complain that they couldn't get past 12 or 48 hours without

23  a false alarm.  Pods were meant to last up to 80 hours or three

24  days before an alarm was meant to sound for things such as a

25  low battery or a deactivated pod.  This regional sales manager

1   stated that when there was an increase in alarms" --

2        THE COURT:  You're going to have to keep your voice

3   up.

4        MR. HARROD:  -- "that when there was an increase in

5   alarms, Defendant Liamos, Insulet's COO, would travel to

6   Insulet's production plant in China, where the Eros was

7   manufactured" -- that's the Flextronics plant that counsel was

8   talking about earlier -- "in an effort to fix the quality

9   problems.  She further recalled thinking at the time, 'If we

10  continue to have this amount of pod problems, how can we

11  continue to sell the product?'"

12       The same former senior quality engineer at Insulet we

13  talked about with respect to the needles who was at the company

14  from 2012 to the middle of 2014 said that, "The OmniPod Eros

15  suffered from a software defect that caused unnecessary alarms

16  for occlusion which indicated that the pump was occluded when

17  it in fact was not."

18       Go to the next one, this is a senior Insulet officer

19  responsible for manufacturing who I believe joined the company

20  in 2010, said that the -- oh, no.  This is C.  Sorry.

21  "Insulet's problems with improperly alarming pods began prior

22  to the class period as the OmniPod two system software was

23  very, very sensitive.  As she further explained, the system's

24  high sensitivity could cause the system's alarm to go off based

25  on its detection of an occlusion, i.e. a blockage, even when

1  there is no such problem which in turn caused Insulet to get a

2  lot of complaints from patients."

3          THE COURT:  Okay.  I think that's a good sample.  Then

4  what's the evidence that Mr. DeSisto knew those statements were

5  false?  In other words, where are the allegations, relevant

6  allegations concerning scienter, and I think I have some of

7  them but maybe not all of them, and then we can see if they're

8  sufficient.

9          MR. HARROD:  Okay.  So I'm just going to give you what

10 I understand to be an overview based on my understanding of

11 these facts.

12         THE COURT:  Well, and then you're going to do it my

13 way?

14         MR. HARROD:  Yeah, I'm going to do it your way.

15         THE COURT:  All right.  Go ahead.

16         MR. HARROD:  I'm hoping this will help.  Maybe it

17 won't.

18         There is a process by which different people in the

19 manufacturing and quality control organization were required to

20 sign off on a shipment and approve it before it was sent out

21 into the market.  And so what we're going to talk about now are

22 these two people, the senior quality engineer and the senior

23 officer of manufacturing and operations, who were responsible

24 for parts of that process, okay?  So what they're experiencing

25 are, if there are defect rates detected in the quality

1  assurance process, someone would have to approve that for

2  shipment, okay?

3        So the first thing that I would point you to is we

4  talked earlier about this person in paragraph 35a, and she was

5  responsible for corrective, preventative action and dealing

6  with non-conforming product.  So I'd like, Your Honor, if you

7  could turn to paragraph 40, part b.

8        THE COURT:  Part b?

9        MR. HARROD:  Yeah.  It's on page 19 of the complaint.

10 So what this says is, "Insulet's former senior quality engineer

11 further confirmed that it was her responsibility to clear lots

12 that were flagged as defective, which meant having to go to

13 Defendant DeSisto, the CEO, Defendant Liamos, the COO,

14 DePietro" -- in this paragraph "DePietro" is Ruthann

15 DePietro -- "and Tracey Wielenski," who are the VP's for global

16 regulatory clinical affairs and quality assurance.  So I think

17 the way it works is Wielenski replaced DePietro.  Then it says,

18 "to get signatures to approve such lots for shipment.

19        "She recalled that she took issue with Insulet

20 shipping lots out to the public that they knew were going to

21 fail, which included lots that were tagged with an orange paper

22 indicating that it was a non-conforming lot.  As she put it, it

23 was an issue when the statement 'ship it' became pretty

24 popular.  'No matter what, we're going to ship it.'"  As she

25 recalled, others would look at a lot typically valued around

1    $250,000 and ask, 'How can we throw that away?'  Indeed, she

2    confirmed, there was never a lot rejected."

3            THE COURT:  But for scienter purposes --

4            MR. HARROD:  I'm sorry.  I'm getting there.

5            THE COURT:  Is the key part of this paragraph that

6    when lots were flagged as defective, it would be necessary to

7    go to DeSisto or Liamos or Wielenski to get signatures to

8    approve the shipments and they were always signed off on?

9            MR. HARROD:  Right.  And they always shipped it.  That

10   was her allegation.

11           THE COURT:  "They always shipped it" I think doesn't,

12   in my current conception, relate to scienter.  It relates to

13   whether it's false to say no defective product went out of the

14   building.

15           MR. HARROD:  I'm trying to compare my notes to the

16   complaints because I have some excerpts from my notes.  But in

17   40a, the same senior quality engineer says -- I'm just going to

18   try to find where I took this from.  About two-thirds of the

19   way down from the paragraph 40a on page 18 where it says, "She

20   further noted."  Do you see that, Your Honor?

21           THE COURT:  Yes.

22           MR. HARROD:  Okay.  "She further noted that defendants

23   CEO DeSisto and CEO Liamos had signature authority to release

24   product and Liamos was the biggest push there.  Specifically

25   products with Severity A failures, such as the needle mechanism

1    and leaking pod issues discussed above, required senior

2    management, typically Liamos or DeSisto, to sign off in

3    addition to a quality and regulatory signature from Ruthann

4    DePietro."

5         The same person said -- and this is in paragraph 40c,

6    which is on the next page.  I'm sorry I'm jumping around.

7         THE COURT:  Well, wait a minute.  Again, I think you

8    stopped before something that I thought was helpful to your

9    argument.

10        MR. HARROD:  Yes.  And my colleague, Ms. Boon, said

11   the same thing.  "Specifically products with Severity A

12   failures such as the needle mechanism typically required Liamos

13   or DeSisto to sign off in addition to a quality and regulatory

14   signature from Ruthann DePietro.  She confirmed if DePietro

15   wouldn't sign, Liamos would sign for her."

16        THE COURT:  So let's just pause.  This is a person who

17   is a senior quality engineer, I may have to infer some personal

18   knowledge of the process, says there were defective products.

19   DeSisto and Liamos as well as -- well, ordinarily, if I

20   understand the complaint right, DePietro would authorize

21   shipments, but if there were defects, and this says if she

22   refused to sign because of the defects -- that's the inference

23   I draw -- somebody would go to Liamos, and he would sign.  And

24   the reasonable inference is he knew they were defective.

25   That's why she refused to sign.

1          MR. HARROD:  Correct.

2          THE COURT:  That's some evidence of scienter with

3     regard to Liamos, who is an agent of the corporation, right?

4          MR. HARROD:  Yes, Your Honor.

5          If we look at paragraph 40c, this is the same person

6     the allegations are attributed to.  "One popular solution to

7     the quality problems was to deliberately blend defective with

8     non-defective lots.  She explained the process as follows.  If

9     a lot did not meet the requisite outgoing quality level,

10    Insulet had to go through what was meant to be a rigorous

11    process to determine that patients would be better off with the

12    defective devices than not before it would ship them.  If a lot

13    was at 70 or 74 percent, for example" -- and this is the

14    critical point for Your Honor's question -- "for example, even

15    if DePietro or Wielenski might not sign off on releasing the

16    lot, Duane DeSisto and Charlie Liamos" -- those are the two

17    defendants, the CEO and COO -- "would, and there was never a

18    case that they scrapped non-conforming product no matter what

19    the quality level."

20         THE COURT:  Okay.  One of the arguments I heard was

21    that this person never dealt directly with Mr. DeSisto or

22    Mr. Liamos, in essence.  I think the argument is this person

23    didn't have personal knowledge.

24         MR. HARROD:  In paragraph 40b, which I think I read

25    earlier, it says, "It was her responsibility to clear lots that

1    were flagged as defective, which meant having to go to

2    Defendant DeSisto, the CEO, or Defendant Liamos, the COO, to do

3    that."  I don't know why the defendants -- they say that

4    repeatedly.  I don't think it's supported by what the

5    allegations in the complaint are.  I think this person had

6    direct interaction.

7         THE COURT:  Okay.  The one other thing -- here, take a

8    look at paragraph 172 because it relates to this.  This says,

9    "According to a former senior quality engineer at Insulet who

10   was responsible for the corrective assistance" -- so is this

11   the same person as the person in paragraph 40?

12        MR. HARROD:  Yes.  Yes.  There's two people.  It's the

13   person we've just been talking about.  And I was going to talk

14   about the other person that's mentioned in this paragraph, the

15   former senior officer responsible for manufacturing issues.

16        THE COURT:  We'll go back to that, okay?

17        MR. HARROD:  Sure.

18        THE COURT:  So this is the 40 -- what are we looking

19   at, 40b person?

20        MR. HARROD:  It's the same person as 40a, b and c.

21        THE COURT:  And this seems to be saying essentially

22   the same thing in different ways.  "Defendants Liamos and

23   DeSisto would routinely override Insulet's head of quality

24   control and sign off on product with Severity A failures, such

25   as needle mechanisms and leaking pod issues, so the product

 1 | could be shipped."
 2 |    So that's evidence that each of them knew that it
 3 | would be false to say that defective products never went out of
 4 | the building.
 5 |    MR. HARROD:  Agreed.  Should we go back to what I view
 6 | as the other witness who corroborates these statements?
 7 |    THE COURT:  Well, actually, while we're on this page,
 8 | what about paragraph 173?
 9 |    MR. HARROD:  This is the allegation that Liamos
10 | frequently traveled to China to address the manufacturing
11 | issues, and it just in our view reflects Liamos's intimate
12 | knowledge of the manufacturing process.
13 |    THE COURT:  It doesn't tell me specifically whether he
14 | went before the May 2013 statement was made.
15 |    MR. HARROD:  Your Honor, I think that is true.  I
16 | don't know that we know the exact dates, but I think -- he
17 | went -- it says in paragraph 37a, with respect to Liamos's
18 | trip --
19 |    THE COURT:  What page is that on?
20 |    MR. HARROD:  37a.
21 |    THE COURT:  It's going to be 16.
22 |    MR. HARROD:  37a is on page 16, yes.
23 |    "This regional sales manager stated that when there
24 | was an increase in alarms, Defendant Liamos, Insulet COO, would
25 | travel to Insulet's production plant in China where the Eros

1    was manufactured in an effort to fix the quality problems.  She

2    further recalled thinking at the time, 'If we continue to have

3    this amount of pod problems, how can we continue to sell the

4    product?'"  I think we read this earlier.

5         What I would say from that is it's clear they're

6    referring to the Eros.  This person was there from the

7    beginning of 2010 to the first quarter of 2014.  So they would

8    have been there for the Eros launch.  She's referring to the

9    Eros launch, which occurred I believe in the first or second

10   quarter of 2013.  And so it seems to me to be referring to

11   frequent trips by the COO to China to address these issues.

12        THE COURT:  All right.  Then you wanted to --

13        MR. HARROD:  I wanted to talk about paragraph 35c.

14   This is a different person.  This is a person who works in

15   manufacturing operations.  They were -- let me get dates of

16   employment, which are from 2009 to the first half of 2014.  So

17   they were there at the launch of the product.  "Insulet's

18   former officer responsible for manufacturing operations further

19   stated that she was pretty sure that there were times when

20   Insulet's head of quality control, Ruthann DePietro or Tracey

21   Wielenski" -- these are the same people the other witness

22   involved in quality control mentioned -- "would refuse to sign

23   off on the shipment of product, but when that happened,

24   Defendant Liamos would sign off.  The manufacturing operations

25   officer was familiar with the sign-off process because she was

 1  the person who would sign off on behalf of engineering

 2  operations."

 3          THE COURT:  And I think there may be some others that

 4  support you.  But then is the issue of materiality, any false

 5  statement or omission has to be material, which I understand to

 6  mean that there's a substantial likelihood that a reasonable

 7  investor would consider the information important in deciding

 8  whether to invest or stay invested.

 9          MR. HARROD:  So Your Honor, first of all, the

10  materiality question is, I think, most of the cases that talk

11  about this -- and I don't know if I can give you a case off the

12  top of my head, but I'm sure that we cited one in our brief or

13  I can get you one.

14          Materiality is a fact-intensive question, the courts

15  have generally said.  So it's difficult to resolve on a motion

16  to dismiss, but I don't think it's difficult here.  What we see

17  in this case is -- and I'll talk about the characterization of

18  some of what counsel for the defendants said about the

19  corrective disclosures.  But just to look in the aggregate,

20  okay, on the day before -- I want to make sure I get the

21  numbers right.  On the day before the first corrective

22  disclosure, which was January 7 of 2015, Insulet's stock price

23  was trading at $44.53 per share.  On the day after the last

24  corrective disclosure, which occurred on April 30 and affected

25  the market price of the stock on May 1, Insulet's shares closed

1   at $26.97.  That's a decline of 39 percent.  In the same time

2   period, if you look at just the broad market indices, the S & P

3   500 increased by 4 percent, and the NASDAQ increased by 7.5

4   percent.

5        So what you're seeing with Insulet is -- and I'll get

6   into the particulars of the exact disclosures.  That's how we

7   would really do it.  But just to give you an overview,

8   Insulet's shares fall by nearly 40 percent.  Broad market

9   indices are up.  To lose 40 percent of your stock market value

10  over the course of January 7 to May 1 is a pretty significant

11  drop.

12       So we allege on January 7 there's a corrective

13  disclosure, and the defendants say that was merely about sales,

14  that we're not doing quite as well as we had hoped.  If you

15  look at -- just want to make sure I'm getting the date right --

16  paragraph 73 of the complaint.

17            THE COURT:  Which paragraph?

18            MR. HARROD:  73.  This is the discussion of the

19  January 7 disclosure that counsel was talking about earlier.

20  It's the first disclosure, first corrective disclosure in the

21  class period.  The analysts who are looking at this -- and the

22  analysts played a significant role in this case.  And I would

23  submit to you that they know the company better than anyone.

24  Their job day in and day out is to follow the company,

25  understand its business, understand its financial performance,

1    understand what the market's expectations are.  And I would say

2    generally my experience -- and this is sort of just an

3    editorial comment -- analysts are relatively speaking

4    toothless.  And I was surprised when I read the analysts'

5    reports in this case because they were rather critical of the

6    company and its management and particularly of the company's

7    transparency.

8            So what we're saying here in paragraph 73 is that

9    analysts -- and this is about four lines down.  It's the

10   sentence that begins with "Instead."  "Instead, and apparently

11   based on additional guidance provided to them by the company,

12   analysts quickly attributed a material portion of the reduced

13   guidance to reduce demand by distributors who had" --

14           THE COURT:  Actually, where are you reading?

15           MR. HARROD:  Paragraph 73, second sentence.  So if you

16   look at the quote, there's some bolded text in the third

17   paragraph.

18           THE COURT:  Go back to the second paragraph, though.

19   It says, "Management blamed the fourth quarter revenue miss on

20   a delay of non-Insulet drug delivery products."  So that's not

21   the Eros product.

22           MR. HARROD:  No.  But if you look -- I'm going to take

23   you back to what I said earlier, Your Honor, which is that

24   notwithstanding what the company said, Eros was by and large

25   the majority of the company's revenue, and that remained true

1    at this point.

2          And the analyst for JP Morgan says, "In our view, this

3    brings two major questions to the forefront.  One, is the

4    fourth quarter U.S. OmniPod weakness reflective of a more

5    endemic problem with underlying growth trends; and two, how

6    much will 2015 numbers have to come down."  Talking about the

7    guidance for the company's 2015 numbers.

8          What I would point to you, Your Honor, is the First

9    Circuit's decision in the *Massachusetts Retirement System v.*

10   *CVS* case.

11         THE COURT:  Let me get it.

12         MR. HARROD:  It's 716 F. 3d.

13         THE COURT:  What page, please?

14         MR. HARROD:  We cite it.  What page of the case?

15         THE COURT:  Yes.

16         MR. HARROD:  Page 240.  I don't have the language of

17   the case in front of me.  But basically what's happening in the

18   *CVS* case is, the First Circuit is being pressed with the

19   question of when is something on corrective disclosure.  And

20   the issue in the *CVS* case was a merger with Caremark, that the

21   plaintiffs alleged the integration of the two businesses was

22   not going well, and the failure to properly integrate those two

23   companies resulted in some loss of customers.

24         But when the CEO came out and announced the loss of

25   customers, he didn't directly attribute it to the failure of

 1   the integration.  The defendants moved to dismiss.  The case

 2   was dismissed.  It went up to the First Circuit.  The First

 3   Circuit says, Well, we don't need -- the corrective disclosure

 4   and the false statement do not need to be mirror images of each

 5   other.

 6           And I remember back after the Supreme Court's.

 7   Boren (phonetic) decision, Professor Coffee from Columbia wrote

 8   an article about allowing defendants to have pleadings where

 9   the corrective disclosures were exactly the same as the alleged

10   false statements would empower defendants to hide their frauds

11   forever.  And we see this, where there's mixed information

12   used.

13       But in any event, we view and the market views -- and

14   Mr. Will Fredericks has pointed out to me in the paragraph

15   preceding what I just read from the quote in paragraph 73,

16   which is the second paragraph in the block quote, the analysts

17   are expressing skepticism of the company's explanation for

18   their reduced guidance.  It says, "However, such an order was

19   never" --

20           THE COURT:  What paragraph are you reading?

21           MR. HARROD:  Paragraph 73, in the quote, second

22   paragraph of the quote.

23           THE COURT:  Second paragraph that starts, "Management

24   blamed"?

25           MR. HARROD:  Correct.  "Management blamed the fourth

1    quarter revenue miss on a delay in non-insulin drug delivery

2    products which we interpret as an initial Amgen stocking order,

3    however, such an order was never publicly contemplated in the

4    guidance."  What they're saying is they're using as an excuse

5    something they never told us to expect in the first place, and

6    they're expressing skepticism as to that explanation.

7            And the next paragraph is talking about what's really

8    going on with the trend in the OmniPod business.  And seven

9    days later, that's when Mr. Sullivan, the current CEO of the

10   company, met with the analysts.  And counsel said we don't have

11   a transcript.  As far as I know, and we scoured all four

12   corners of the publicly available universe, there is no

13   transcript of Mr. Sullivan's comment.  So what we know from his

14   comments is from the analysts' reports that quoted in the

15   complaint.

16           So what he said on January 14 was that there was a

17   problem -- this is in 83, there's a problem with the rollout.

18   There were some issues with the product, including the needle

19   and the alarm, and that caused doctors to not prescribe the

20   product as much.

21           So we think that there is a direct line between

22   beginning with the rollout of the product, what the people

23   inside the company are telling us about problems with needles,

24   alarms and leaking pods, going through to what Mr. Sullivan

25   said on January 14 to the analysts, and going to later to what

1    the FDA found and what the company itself disclosed as product

2    with the same issues in the components of the pod dating back

3    to the rollout and introduction of the product.

4           MS. BIRNBACH:  Your Honor, may I?

5           THE COURT:  You will, but not yet.

6           MR. HARROD:  I would say to you the most critical

7    aspect are the comments on January 14, and what is completely

8    absent from any of the company's prior disclosures and

9    completely absent from any impression one would take from those

10   disclosures is that the COO of the company, the current COO of

11   the company who took over for Defendant DeSisto said that

12   instead of having growth in U.S. patients, which have a much

13   greater margin than patients outside of the United States, he

14   said, Oh, there's actually a decline of 9 percent in U.S.

15   patient adoption.  And so that's a very significant fact.  And

16   on that day, when that information reached the market, the

17   stock fell by 17 percent on that day alone.

18          THE COURT:  And I think it's the defendant's argument,

19   though, that wasn't a disclosure of the defective needles or

20   leaking pods or alarm problem.  How do you respond to that?

21          MR. HARROD:  I respond that we don't disagree.  On

22   that day he said -- there was a series of events.  So there's

23   the JP Morgan analyst report, that's in paragraph, I think, 79,

24   quoted.  And then on January 27 -- and this is in 83.  This is

25   the disclosure that I'm talking about.  They add on from that

 1   conversation.  And he says -- the analyst from JP Morgan says

 2   in paragraph 83, page 39 of the complaint -- it's the second

 3   paragraph of the quotation:  "What wasn't clear to financial

 4   markets at the time was the reputational damage that resulted

 5   from the troubled Eros launch.  We on the street saw Insulet

 6   grow new patient starts by approximately 30 percent in 2013 and

 7   U.S. OmniPod sales by approximately 20 percent on the back of

 8   the Eros launch.  But what wasn't apparent was the mounting

 9   patient and physician frustration with the product.  According

10   to new CEO, Pat Sullivan, the Eros launch progressed" --

11   sorry -- "as the Eros launch progressed, quality issues came to

12   light, including occlusions" -- that's the problem with the

13   needle that the witnesses talked about -- "and increased

14   alarms," another problem with the witnesses and the FDA talked

15   about.

16        "This was compounded by significant pick-up at call

17   center volumes that left patients for hours to get help.  By

18   the fourth quarter of 2013, many physicians pulled back on the

19   Eros prescriptions, which led to a sharp decline in new patient

20   starts."

21        I would also point out one other thing from the *CVS*

22   case, which is that when you have a large magnitude decline in

23   the stock -- and this is a quote from page 241.

24             THE COURT:  Of which decision?

25             MR. HARROD:  *Mass. Retirement v. CVS*, at page 241.

1    What it says is, "The magnitude of the drop reflected that

2    something systemic had gone wrong."  So what the court there is

3    saying is, if there's a really big drop, you can infer that

4    something systemic, something very serious had gone wrong.  We

5    would submit to Your Honor that a 17 percent drop on this kind

6    of information is certainly sufficient to infer that there was

7    news that was correct.

8            THE COURT:  Basically a large drop in the stock price

9    is evidence of materiality if it's linked to disclosure of

10   the -- you know, correction of the misrepresentation or

11   material omission.

12           MR. HARROD:  Right.  What could be a better evidence

13   of the materiality of the statement than the market punishing

14   the stock price by, you know, a magnitude of greater than 5 or

15   even 10 or 15 percent?

16           Your Honor, I would also point out that there's the

17   disclosure on the U.S. patients.  Throughout the class period

18   the defendants create an impression that U.S. patients are

19   growing.  And they talk repeatedly about that fact.  And the

20   analysts -- and I would point you back to those same analyst

21   reports that we talked about where they basically say the

22   market was misled as to the components of that metric.

23           THE COURT:  If I understand the chronology right, up

24   until 2013, foreign sales and U.S. sales were reported

25   separately, then they were combined, and Mr. DeSisto declined

1    in response to a question to separate them out?

2            MR. HARROD:  I think it was actually Mr. Roberts, the

3    chief financial officer.

4            THE COURT:  Mr. Roberts?

5            MR. HARROD:  Yes.  He declined to do that.  The

6    defendants say that that's exculpatory.  I would argue that

7    it's actually the opposite.  It's his denial to share the

8    reality, which was that U.S. new patient starts, which is what

9    the market was very interested in and worried about, were

10   declining.  So he's saying, I'm not going to break out the

11   number.  But then the analysts, who know the company best,

12   would certainly be tracking this.  They have these complicated

13   discounted cash flow models to measure the price of the stock

14   based on the many inputs, which I'm sure this was one of.  They

15   would have known exactly how that number was computed.

16           So I think that there's really no question that those

17   statements, based on the analysts' reports and the analysts'

18   understanding of that metric, were misstated.

19           I'm going to ask you if you had anything else you'd

20   like me to address.

21           THE COURT:  Not at this moment.

22           MR. HARROD:  Thank you, Your Honor.

23           MS. BIRNBACH:  Thank you, Your Honor.

24           Your Honor, I think we spent the better part of two

25   hours doing it your way with that first statement from Q1 of

1    2013.  And the statement morphed as we discussed it, and I

2    believe the court was saying it was "no defective product left

3    the building."  I urge the court to do two things.  In

4    paragraph 105 of the complaint, they quote from that Q1 analyst

5    call with ellipses, and the actual paragraph is on page 4 of

6    Exhibit K.

7             THE COURT:  Okay.  Let me get it.

8             MS. BIRNBACH:  So in the middle of the page, "With

9    this significant uptick in demand," that's the full paragraph.

10   The part that they deleted is the part that references the most

11   important thing.  "While this component issue was quickly

12   identified and remedied in conjunction with both Flextronics

13   and the supplier, we determined it most prudent to build

14   inventory," and so forth.  And then that transcript continues

15   on page 9 and page 11, which is where the "never left the

16   building" comment is, at the top of page 11.

17            THE COURT:  Okay.  Let me go to page 11.

18            MS. BIRNBACH:  The reason this is so significant, Your

19   Honor, while you're getting there, is that Q1 '13, I believe

20   plaintiffs' counsel misspoke.  The launch in the transition did

21   not happen until the end of Q2, beginning of Q3.  So this whole

22   discussion, including in response to questions on the top of

23   page 11, which is talking about whether it was shipped from

24   they component manufacturer to Insulet, because Insulet did not

25   ship any product until Q3.

 1             THE COURT:  Here, let me read this then.

 2             So let me see if I understand this.  So these

 3   automated stations are in the production facility in China?

 4             MS. BIRNBACH:  Yes, on the manufacturing line.

 5             THE COURT:  Which is manufactured by a separate

 6   company?

 7             MS. BIRNBACH:  Yes.  And there are different companies

 8   that do different components of the product, and that's why the

 9   part on page 4 with the ellipses about finding it with

10   Flextronics "and the supplier" refers to the component

11   manufacture.

12             My only point, Your Honor, is that at all of this

13   stage, no product left the building to patients.  So all of the

14   statements that plaintiffs read from confidential witnesses

15   about patients calling or needle issues, we of course say that

16   it's not the same issue.  It's not described anywhere in the

17   complaint that this component issue is the same issue.  But in

18   any event --

19             THE COURT:  What other -- here.  Have a seat until

20   it's your turn.

21             MR. HARROD:  Okay.  Thank you, Your Honor.

22             THE COURT:  Let's go to that.  I have to draw

23   reasonable inferences.  They say, you know, DeSisto called it a

24   component issue.  People who worked at the company at that time

25   said the device had a needle mechanism problem, a pod leaking

 1  problem and an alarm problem.  Aren't those components of the

 2  device?

 3          MS. BIRNBACH:  There's nothing in the amended

 4  complaint that says that this issue in Q1 is anything the

 5  confidential witnesses are talking about, Your Honor.

 6          THE COURT:  Well, I have to draw --

 7          MS. BIRNBACH:  Even if you draw reasonable inferences

 8  that the product had issues --

 9          THE COURT:  What's that?

10          MS. BIRNBACH:  Even if you draw reasonable inferences

11  to credit the confidential witnesses that the product had

12  issues, Mr. DeSisto's statement in Q1 is far from a statement

13  that post-launch product never left the building with defects.

14          THE COURT:  No.  It appears to me you've made a very

15  good point.

16          MS. BIRNBACH:  I'll move on then, Your Honor.

17          THE COURT:  And it's one of the reasons I sometimes

18  wish ellipses weren't used so much.

19          MS. BIRNBACH:  Your Honor, in any event, no product

20  left the building to patients until the end of Q2, so this

21  cannot be a materially misleading statement, notwithstanding

22  the fact that none of the CWs point to any quantity of product

23  that defendants knew made any statement misleading.

24          But the remainder of plaintiffs' complaint goes to two

25  things that they allegedly failed to disclose.  All of these

1   detailed quality issues, I could stipulate that they exist.   In

2   any company in sophisticated medical devices in this

3   Commonwealth or in life sciences, they have entire departments

4   devoted to dealing with quality issues.

5          My point is that in this circuit it is not securities

6   fraud for someone who cannot particularize facts to the

7   defendants' state of mind that what they said was materially

8   misleading.  If it's true, then any company in the Commonwealth

9   could have a plaintiff's investigator interview their quality

10  people about all the things and not point to statements that

11  rendered it false.

12         The reason they say the remainder of the post Q1

13  statements are false or misleading, Your Honor, for not

14  disclosing supposed quality issues is because they say the

15  quality issues ultimately led to the two blip quarters of Q4

16  '14 and Q1 '15.

17         THE COURT:  Well, you're skipping to the end.  I start

18  at the beginning.  And, you know, maybe we'll spend a week on

19  this, but they -- I don't know what you're laughing about.  If

20  the plaintiff had briefed this and alleged it in the way the

21  courts say you need to, I wouldn't have to be trying to put

22  this puzzle together.  And it seems to happen every time I have

23  one of these PLSRA cases.  There are certain standards and I

24  have to try to determine they're met.

25         Let me ask the plaintiffs.  Is the plaintiffs'

1    contention that after the distribution process began, if it did

2    begin in the second quarter of 2013, the defendants reiterated

3    that there were no defects or significant defects?

4         MR. HARROD:  Yes.  But can I just correct one thing

5    that counsel said?  If you look at Exhibit K, which is what she

6    was just reading from where she says we did something with an

7    ellipses, on page 5, this is the point when the new Omni

8    product was launched, in the paragraph third from the bottom,

9    it says, "With the launch of the new OmniPod in the first

10   quarter" --

11        THE COURT:  This is page 5 where?

12        MR. HARROD:  It depends.  It's page 5 of the ECF

13   stamped document.

14        THE COURT:  Okay.

15        MR. HARROD:  Page 4.

16        THE COURT:  Okay.  "With the launch."

17        MR. HARROD:  "With the launch of the new OmniPod."

18        THE COURT:  "In the first quarter."

19        MR. HARROD:  It was launched in the first quarter.

20        MS. BIRNBACH:  Well, it was broadcast to the market in

21   the first quarter.  Every earnings transcript --

22        THE COURT:  Stop, stop.  Let me do this.

23        MS. BIRNBACH:  It didn't ship.

24        THE COURT:  How do I know that from reading the

25   complaint?  I have to decide a motion to dismiss based on the

1   complaint.

2        MR. HARROD:  This is the company's CEO talking.

3   Launch, first quarter.

4        MS. BULLERJAHN:  What paragraph are you referring to?

5        THE COURT:  Let me just keep reading.

6        All right.  But were these statements reiterated after

7   that first call?

8        MR. HARROD:  Yes.  I'm looking for the right document,

9   Your Honor.  Okay.  In August of 2013, in paragraph 113, he

10  characterized any unspecified manufacturing problems as

11  immaterial hiccups.

12        THE COURT:  Hold on a second.

13        On August 7, 2013, Insulet announced its financial

14  results for the second quarter of 2013.  Defendant DeSisto

15  said, "As we accelerated the production, we've had to overcome

16  some minor hiccups over the last few months."  He said, "normal

17  little interruptions."  "It's not a big deal."

18        Okay.  Are there other reiterations of that?

19        MR. HARROD:  It's a slightly different take on it, but

20  on May 2014, in paragraph 137, the bolded language at the end

21  of the paragraph.

22        THE COURT:  Hold on a second.  What page?

23        MR. HARROD:  Page 63, Your Honor.

24        THE COURT:  Let's see.  138?

25        MR. HARROD:  137.

```
 1           THE COURT:  137.  What's the date of this?

 2           MR. HARROD:  It is I think May 7, 2014.  You see the

 3    bolded text at the end of the paragraph, "Quality levels have

 4    improved, and scrap costs, which remained higher than planned

 5    in the first quarter, have started to decrease."  I would also

 6    reiterate -- and we talked about this in the complaint and in

 7    the brief -- that the idea that the launch of the product had

 8    been successful and that the quality problems and all these

 9    other issues had been remediated was an omission of the

10    underlying problems.

11           I just want to read you one other thing, and I don't

12    have the exhibit number, but it's paragraph 104 of the

13    complaint, which is the first set of false statements in the

14    class period that we allege.  And it says, "After the close" --

15           THE COURT:  Wait.  Let me get it.  What page?

16           MR. HARROD:  It's page 46, Your Honor.  If you go to

17    page 47.

18           THE COURT:  This is paragraph 104?

19           MR. HARROD:  Yeah.  It says, "During the call,

20    Defendant DeSisto represented that 2013 is off to a great start

21    as we continue to make significant progress across all aspects

22    of the business, highlighted with the launch of our new OmniPod

23    Eros.  In late February we transitioned to all new customer

24    starts to the new OmniPod, and the initial feedback has been

25    excellent.  The results have been impressive.  In summary, we
```

1  are extremely pleased with the launch of the next generation

2  OmniPod, and initial feedback across the country has been

3  exceptional."

4          THE COURT:  It's your allegation that's false

5  because --

6          MR. HARROD:  Well, it's my allegation it's false

7  because the rollout was not successful.  But my allegation more

8  importantly is that there should be no factual contention that

9  the launch of the OmniPod didn't occur in the first quarter of

10 2013, as defense counsel is contending.

11         THE COURT:  Okay.

12         MS. BIRNBACH:  Your Honor, they announced the launch.

13 That's why they were talking in Q1 '13 about the delay.

14 There's no dispute in the plaintiffs' own complaint and these

15 earnings call transcripts that they didn't transition the

16 patients until Q3 of '13.

17         THE COURT:  That's not what it says here, I don't

18 think.

19         MR. HARROD:  It says, "All new patients were

20 transitioned."

21         THE COURT:  It says, "After the close of the market on

22 May 6, 2013, Insulet announced its financial results for the

23 first quarter of 2013 and held an earnings conference call.

24 During the call, Defendant DeSisto represented that '2013 is

25 off to a great start as we continue to make significant

1    progress across all as aspects of the business highlighted by

2    the launch of our new OmniPod (Eros).  In late February, we

3    transitioned all new customers' starts to the new OmniPod, and

4    initial feedback has been excellent.  The results have been

5    impressive.  In summary, we are extremely pleased with the

6    launch of the next generation OmniPod, and initial feedback

7    across the country has been exceptional."

8           So this indicates that in the first quarter they

9    started new customers on the new OmniPod.

10          MS. BIRNBACH:  They didn't transition the entire base

11   until Q3.  They started new patient starts --

12          THE COURT:  I understand that, but you're having

13   problems with your new patients.

14          MR. HARROD:  Your Honor, counsel's contention earlier

15   was that none of the products shipped.  That's why the

16   statement about the components couldn't relate to this one.

17   It's obvious from this statement that the product was launched

18   and they transitioned new customers --

19          THE COURT:  Well, they didn't transition them.  They

20   started them.

21          MR. HARROD:  Started them.  All new patients got this

22   new product.  I don't know what else those words could mean.

23          MS. BIRNBACH:  The words I was talking about was where

24   they said the component manufacturer from the ellipses --

25          THE COURT:  You want to address me.

1          MS. BIRNBACH:  I'm sorry, Your Honor.  The component

2     manufacturer was where they found the problem.  And it didn't

3     ship.  It didn't leave the building.  That's what they're

4     referring to.

5          THE COURT:  That's helpful to understand.

6          MS. BIRNBACH:  Your Honor, what I wanted to address,

7     however, is plaintiffs' argument that for scienter purposes the

8     confidential witness description of quality problems is

9     sufficient when the thrust of their false or misleading

10    statements contend that what defendants mislead the market

11    about was, as they say, the success of the launch as evidenced

12    by the supposedly corrective disclosure of Q4 2014 guidance

13    being lowered and Q1 2015, both revenue guidance not being as

14    expected.

15         However, the new patient growth continued, and there

16    was nothing in those disclosures -- new patient starts, by the

17    way, are 10 percent.  90 percent of the revenues are the

18    existing patients.  It's like the razors and the blades and the

19    disposables.  But there's nothing in the confidential witness

20    disclosures that says they interacted with any defendants that

21    would put defendants on notice that Q4 2014 and Q1 2015 --

22         THE COURT:  Why is that the relevant period?  That's

23    when this came out.  In my tentative conception, very

24    tentative -- well, my current thinking would be if, as the

25    plaintiffs allege, sort of material information, that is

1    information that would be important to an investor, is

2    mischaracterized or not disclosed in 2013 and then it comes out

3    at the end of 2014, at the beginning of -- at the end of 2014,

4    and the market plunges, how does that protect the earlier

5    misstatement or omission from being actionable?

6          MS. BIRNBACH:  Because the market plunged on the

7    announcement of sales not meeting expectations.

8          THE COURT:  Well, the sales were not meeting

9    expectations, the inference would be from the allegations

10    because the devices were defective.  And in fact, the FDA later

11    required they be recalled, right?

12          MS. BIRNBACH:  Well, that's not actually what

13    happened.  And the FDA letter that the court requested and in

14    Q2 2015, the transcript is in the exhibits, what happened was

15    there were five lots identified in this June 2015 letter, and

16    nothing in here says that there were massive, severe, pervasive

17    quality issues.  There were five lots identified from the

18    timeframe of 2013 to 2014.  However, the company -- and this is

19    in the Q2 earnings call transcript.  The company replaced or

20    voluntarily replaced those lots.  But nothing in there suggests

21    that any defendant knew in 2013 or 2014.

22          THE COURT:  This goes against the cooperating

23    witnesses.  Some of them say, you know, I was there in 2013,

24    2014 and before, but 2013, 2014, and these problems existed

25    throughout the period.

1          MS. BIRNBACH:  So did the witnesses in the *Genzyme*

2     case, and they got an FDA warning letter that said the problems

3     that the company didn't disclose and were identified in a form

4     483 deficiency letter prior to the warning letter were

5     pervasive.  The witnesses and the allegations said these

6     problems were going on.

7          THE COURT:  But here -- I've heard you say that.  But

8     let's test this.  This is why I've tried to drill down.  They

9     have cooperating witnesses, people in positions where, I think

10    it appears now to me, it's reasonable to infer they would know

11    the process of getting signatures that are necessary for the

12    product to leave the building -- not the China building -- be

13    distributed to consumers, at least indirectly, that, you know,

14    there were problems, you know, these particular quality

15    problems throughout this period, and in some instances

16    Mr. DeSisto or Mr. Liamos signed off on them, including

17    instances where the quality control manager who would usually

18    sign off, DePietro, declined or refused to do so.

19          So why isn't that sufficient to support an inference

20    that they knew there were problems throughout this period and

21    -- well, that they knew there were problems.  They were signing

22    off on this.

23          MS. BIRNBACH:  Paragraph 40a refers to one lot when

24    Defendant Liamos supposedly signed off.  Plaintiffs extrapolate

25    and put brackets "lots" all over the place after that.  That

1   doesn't speak to any of the other defendants.  And even as Your

2   Honor says they knew there were problems, what that doesn't do

3   under this circuit's law, back to the PLSRA and scienter, is

4   show that statements they said were materially misleading and

5   known at the time.  The problem with the FDA warning letter is

6   the same.

7           THE COURT:  No.  To me, the FDA warning letter goes to

8   materiality.  In other words --

9           MS. BIRNBACH:  Five lots.

10          THE COURT:  Okay.  I've heard it.  You can have a

11  seat.  You're just repeating.  Maybe I'm repeating.  We'll take

12  a break, and I'll let you know where we are.

13          Court is in recess.

14          Let me ask you this.  Is there anybody here from out

15  of town?  Where are you all from?

16          MR. HARROD:  New York.

17          THE COURT:  All from New York?

18          MR. HARROD:  Yes.

19          THE COURT:  Whoever was going to come from California

20  didn't come?

21          MR. HARROD:  That's correct.

22          Your Honor, I would also would just add one more

23  thing.  I know you had an interaction with our client,

24  Mr. Hopkins from the Arkansas Retirement System, last week.

25  And he or his colleague, Mr. Prongay, is trying to make it, but

1    due to the weather, getting from Boston to Little Rock in a

2    snowstorm, were not able to be here.  Thank you.

3            THE COURT:  Let me take a little time.  I expect it

4    will be at least 15 minutes.  I'll let you know where we are

5    and where we're going.  Court is in recess.

6            (Recess taken 4:24 p.m. to 5:07 p.m.)

7            THE COURT:  The argument today has been very helpful.

8    I'm tempted to say unusually helpful.  I wish I could take the

9    time to write a lengthy analysis as Judge Saylor did in *Biogen*,

10   or even a characteristically focused and pithy thoughtful

11   decision as Judge Woodlock did in *Metabolix,* but I'm immersed

12   in many other things.  And as I know how I'm going to decide

13   this matter and in part because this case was filed in 2015 and

14   needs to progress, I'm going to decide the matter orally.  The

15   transcript will be the record of the decision, and the parties

16   shall order it.

17           For the reasons I'll describe, the motion to dismiss

18   is hereby denied.  I think the alleged material misstatements

19   and omissions in this case number 150 by the defendants'

20   estimate in its brief, I think 68 by my law clerk's estimate.

21   Some of them are essentially continuations or reiterations of

22   the same points.  I'm not going to analyze all 68 or 150.  I

23   think the teaching of *Ariad,* 842 F. 3d 744, First Circuit's

24   2016 case is in effect.  "If there's any actionable alleged

25   material misstatement or omission made with scienter, a motion

1    to dismiss should be denied."  In *Ariad*, the District Judge had

2    granted the motion to dismiss.  The First Circuit found that

3    one of the allegations was sufficient to survive a motion to

4    dismiss, but I don't take that to mean that it's required at

5    this stage to decide if all of the motions survive as long as

6    some of them do.

7         My decision has to be understood in the context of

8    what I understand to be the range of applicable standards.

9    First, this is a motion to dismiss, and a motion to dismiss for

10   failure to state a claim under Rule 12(b)(6) is amplified by

11   Rule 9(b) and by the provisions of the PSLRA.  But for 12(b)(6)

12   purposes, the court must take all factual allegations as true

13   and draw all reasonable inferences in plaintiffs' favor.

14        The allegation here is that section 10(b) of the

15   Securities and Exchange Act of 1934 has been violated.  "To

16   state a claim for securities fraud under section 10(b), a

17   plaintiff must allege, one, a material misrepresentation or

18   omission; two, scienter or wrongful state of mind; three, a

19   connection with the purchase or sale of the security; four,

20   reliance; five, economic loss; and six, loss causation."  As

21   the First Circuit said *In Re: Genzyme Corp. Security*

22   *Litigation*, 754 F. 3d 31 at 40:  Because this case involved

23   claims of security fraud, plaintiffs must also satisfy the

24   requirements of Federal Rule of Civil Procedure 9(b), meaning

25   it must -- must allege fraud with particularity and comply with

1   the heightened pleading requirements imposed by the Private

2   Securities Litigation Reform Act of 1945, the PLSRA.

3        The PLSRA requires plaintiff's complaint to specify

4   each statement alleged to have been misleading and the reason

5   or reasons why the statement is misleading, as the First

6   Circuit explained in *ACA Financial Guaranty Corp.*, 512 F. 3d 46

7   at 58.  If plaintiff's allegation regarding the statement or

8   omission "is made based on information and belief, the

9   complaint must state with particularity all facts on which that

10  belief is formed."

11       The PLSRA also imposes a "rigorous pleading standard"

12  for allegations of scienter, which is a "mental state embracing

13  intent to deceive, manipulate or defraud," again *ACA* -- I'm

14  sorry, again *ACA*, quoting *Ernst & Ernst*.  To survive a motion

15  to dismiss, a complaint must state "with particularity facts

16  giving rise to a strong inference that defendants acted with

17  conscious intent to deceive or defraud investors by controlling

18  or artificially affecting the price of securities or acted with

19  a high degree of recklessness," as the First Circuit said in

20  *Fire and Police Pension Association of Colorado*, 778 F. 3d 228

21  at 240.

22       The facts alleged must make the inference of scienter

23  "more than merely plausible or reasonable -- it must be cogent

24  and at least as compelling as any proposing inference of

25  non-fraudulent intent," as the Supreme Court said in *Tellabs*

1   *Inc.,* 551 U.S. 308 at 314.  "When there are equally strong

2   inferences for and against scienter, the draw is awarded to the

3   plaintiffs," according to *City of Dearborn,* 632 F. 3d 751 at

4   757, 2011 First Circuit case.

5          With regard to materiality, a misstatement or omission

6   is material if there is a substantial likelihood that a

7   reasonable shareholder would consider it important in

8   deciding -- well, I'm sorry.  In this context a misstatement or

9   omission is material if there's a substantial likelihood that a

10  reasonable investor would consider it important in deciding

11  whether to invest or to end an investment already made.

12         Essentially the question is whether there's a

13  substantial likelihood that under all the circumstances the

14  omitted fact would have assumed actual significance in the

15  deliberations of a reasonable investor.  Or put a little

16  differently by the Supreme Court, "also whether disclosure of

17  the omitted information would have been viewed by the

18  reasonable investor as having significantly altered the total

19  mix of information made available."  That's the definition of

20  materiality in *TSC Industries*, 426 U.S. 438 at 449.

21         With regard to specific allegations in the complaint

22  that I'll address, the complaint alleges based on statements

23  made by defendant Insulet Corporation, through its agents, that

24  it launched sales of the device to provide insulin to diabetics

25  in the first quarter of 2013.  Among the paragraphs supporting

1   that conclusion are paragraphs 100 and 104.  I find that at

2   least by August 2013, the defendant through its agents --

3   corporate defendant through its agents made materially false

4   statements or omitted material information with scienter

5   concerning the quality of the product that was being

6   distributed for sale first to new customers in the first

7   quarter of 2013 and then to existing customers of Insulet who

8   were being transitioned to the new device.

9        In paragraph 105, after discussing the launch of the

10   new OmniPod or Eros product, the Defendant DeSisto on May 6,

11   2003 noted that "Insulet had experienced an unexpected

12   component issue that resulted in lower than expected production

13   in the latter few weeks of the first quarter," but stated that

14   the problems had been quickly identified and remedied.  Part of

15   that is quoted in paragraph 105.  The statement is more fully

16   in Exhibit K on pages 4 and 9.

17        In paragraph 106 Mr. DeSisto is quoted as saying in

18   response to a question that the component issue is fully

19   resolved, meaning having been fully resolved by the

20   manufacturer in China.

21        With regard to the component, drawing a reasonable

22   inference in favor of the plaintiff, there's ample evidence to

23   show, indicate that the component issue involved several

24   problems discussed in detail in the amended complaint.

25   Paragraph 35 addresses needle mechanism failure.  Paragraph 36

1   addresses leaking pods.  Paragraph 37 addresses alarm defects.

2   And I will return to those.

3           In paragraph 113, it's alleged that on August 7, 2013,

4   the Defendant DeSisto stated that with regard to manufacturing

5   problems, the company had to overcome some minor hiccups but it

6   was no big deal.  Paragraph 137, on May 7, 2014, Mr. DeSisto

7   stated, "We have made significant progress regarding

8   consistency of our manufacturing process for the new OmniPod.

9   Quality levels have improved."

10          With regard to false statements, as I hope I said

11  earlier but may not have -- I think I did -- the PLSRA requires

12  plaintiff's complaint to specify each statement alleged to have

13  been misleading and the reason or reasons why the statement is

14  misleading.  I find that standard is met with regard to the

15  statements concerning the quality of the Eros product.

16          In paragraph 35, for example, a senior quality

17  engineer at Insulet from August 2011 until 2014 reports that

18  there were needle mechanism failures.  In paragraph 35b,

19  another senior Insulet officer responsible for manufacturing

20  operations who left in the first half of 2014 after more than

21  five years with the company stated the way the needle was

22  firing, the way the device was put together, the needle was

23  getting hung up.  That individual stated, "Every single lot was

24  failing."

25          Similarly, 35a, a senior quality engineer

1   characterized the needle mechanism failures as a major issue.

2   Paragraph 35d says that, a pump trainer consultant from Insulet

3   from 2013 until the end of the class period in 2015 stated that

4   he or she personally tested the OmniPod system for a time and

5   personally experienced pods with needles that did not fire or

6   insert."  Paragraph 36, other confidential witnesses, perhaps

7   the same in some instances, described the leaking pod problem.

8          And during the break I read *Biogen* and *Metabolix* and

9   their most pertinent parts about the confidential witnesses.

10  Essentially, the allegations here are that the confidential

11  witnesses were in a position to have personal knowledge of the

12  matters they describe.  That contrasts, for example, to *Biogen,*

13  193 F. Supp. 3d at 17.  The first confidential witness was

14  characterized as being five reporting levels removed from the

15  individual as to whom he was giving information.

16         But with regard to the leaking pods, a senior quality

17  engineer who worked at Insulet from 2012 to mid-2014 said, the

18  Eros suffered from leakage problems for more than a year prior

19  to the start of the class period through the day he or she left

20  in 2014.  In paragraph 36b, it says, according to a regional

21  sales manager for Insulet from 2011 until late 2013, she

22  recalls in 2013 leaking pods around the infusion site.

23         In paragraph 37 there's discussion of alarm defects.

24  A regional sales manager who worked at Insulet for more than

25  four years until leaving during the first quarter of 2014 said

1    that, "We had a lot of alarming pods, pods that would alarm for

2    no reason."  Another former senior quality engineer from 2012

3    to mid-2014 said that the Eros suffered from a software defect

4    that caused unnecessary alarms, for example.

5            In paragraph 40b, a former senior quality engineer

6    stated that it was his or her responsibility to clear lots of

7    the Eros devices before they were shipped that were flagged as

8    defective, and they had to go to Defendant DeSisto, the CEO,

9    and Defendant Liamos, the COO, to get signatures to do that.

10           In paragraph 100, it's reported that in August 2015

11   the then CEO announced the financial results for the second

12   quarter of 2015 and indicated significant manufacturing quality

13   issues with the Eros had existed in 2013 and 2014.  He said in

14   part these quality issues relate to the product issues

15   associated primarily with the launch of the new OmniPod insulin

16   delivery system back in 2013 and 2014.  Those issues remained.

17   There were product performance issues during -- into 2013 and

18   2014.  Those issues have largely been remediated.

19           So I find that the defendants adequately alleged that

20   the statements on which I'm focusing were false.  I also find

21   that there's adequate -- that scienter is adequately alleged to

22   survive a motion to dismiss.  For scienter, as I said, the

23   plaintiff must state with particularity facts giving rise to a

24   strong inference that a defendant/defendants acted with

25   conscious intent to deceive or recklessly.

1          Here, the confidential witnesses report that the Eros

2     product, or it's alleged in paragraph 171 that the Eros product

3     was the core of the defendant's business.  There are several

4     allegations indicating that Liamos and DeSisto knew of the

5     product defects and routinely overruled the head of quality

6     control and directed that defective products be shipped.  For

7     example, in paragraph 172 it's alleged that the individual

8     defendants, including Liamos and DeSisto, knowingly signed off

9     on the OmniPod Eros product that was defective so the product

10    could be shipped for sale to patients.

11         According to a former senior quality engineer at

12    Insulet who was responsible for corrective actions and

13    therefore knowledgeable of these issues, a reasonable

14    factfinder could infer, preventive actions and dealing -- well,

15    he was responsible for corrective actions, preventive actions

16    and for dealing with non-conforming products.  And the

17    defendants Liamos and DeSisto would routinely overrride

18    Insulet's head of quality control and sign off on a product

19    with Severity A failures, serious failures, such as needle

20    mechanisms and leaking pod issues so the products would be

21    shipped for sale to patients."  It's alleged that a former

22    senior officer responsible for manufacturing confirmed these

23    allegations.  These allegations are made more specifically in

24    paragraphs 40a and b of the amended complaint.

25         Paragraph 40a states that a senior quality engineer at

1    Insulet from August 2011 until 2014 "noted that Defendants CEO

2    DeSisto and COO Liamos had signature authority to release

3    product and that Liamos was the biggest push there.

4    Specifically, products with Severity A failures such as the

5    needle mechanism, leaking pod issues discussed above," or

6    earlier, "required senior management, typically Liamos or

7    DeSisto, to sign off, in addition to quality and regulatory

8    signature from Ruthann DePietro.  She confirmed that if

9    DePietro wouldn't sign, Liamos would sign for her."

10         The "former senior quality engineer further stated" --

11   this is 40b -- "that it was his or her responsibility to clear

12   lots that were flagged as defective, which meant having to go

13   to Defendant DeSisto or Liamos or DePietro or vice president

14   Wielenski to get signatures to approve lots for shipments.  She

15   recalled that she took issue with shipping lots out to the

16   public that they knew were going to fail, which included lots

17   that were tagged with an orange paper indicating it was a

18   non-conforming lot."

19         In addition, it's alleged in paragraph 173 that Liamos

20   traveled to China -- well, in paragraph 173 it's alleged that

21   an "Insulet former regional sales manager for more than four

22   years through the first quarter of 2014 stated that Liamos

23   would personally travel to Insulet's production plant in China,

24   where Eros was manufactured, in an effort to fix problems."

25         In paragraph 20 it's alleged that Liamos -- it's not

1  20, but it's alleged that Liamos pushed to get defective

2  product out at the end of the quarter, each quarter.  In

3  paragraph 175, it's alleged that multiple former employees

4  confirmed that Insulet received many complaints concerning

5  quality problems with the OmniPod, and detail was given

6  concerning that from a regional sales manager, former regional

7  sales manager, for that contention.  In addition, Liamos and

8  DeSisto each had a motive to deceive during the relevant

9  period.  They were each selling shares of Insulet stock that

10  it's alleged reaped them about $10,000,000 each.

11        So with regard to scienter, it's my understanding that

12  it's necessary to look at the various allegations together to

13  determine whether they create the required strong inference.  I

14  find that they do.  I also find that materiality is adequately

15  alleged.  As I said, a matter is material if there's a

16  substantial likelihood that a reasonable investor would

17  consider it important in deciding whether to invest or keep an

18  investment.

19        The defects in the Eros product were sufficiently

20  serious for the FDA to send a warning letter to Insulet in June

21  2015 as alleged in paragraph 97.  And that letter is Exhibit 1

22  in these proceedings.

23        As alleged in paragraph 102, or it is alleged in

24  paragraph 102 -- well, as a result of that letter, the company

25  recalled a large number of the Eros OmniPods, and in an August

1   27, 2015 press release the company issued, it confirmed that it

2   had recalled 40,846 boxes of the OmniPod product in response to

3   the FDA's warning letter due to the possibility that some of

4   the pods from those lots may have a higher rate of failure than

5   Insulet's current manufacturer standards.  The lots recalled

6   were shipped in mid-2013 to the first half of 2014.  However,

7   as I indicated earlier, confidential witnesses reportedly said

8   that the situation and practices of the company, the defendant,

9   were the same throughout the class period.

10          Paragraph 83 indicates that stock analysts --

11   actually, I'll put that aside for a moment -- well, maybe not.

12   Paragraph 83 indicates that stock analysts reported that the

13   disappointing earnings revealed for the fourth quarter of 2014

14   due to delays, which can reasonably be inferred were due to the

15   defects in the product, was a serious problem and after those

16   disclosures were made allegedly in Paragraph 83 -- let me

17   see -- after the quality issues were implicitly disclosed, the

18   price of Insulet shares dropped substantially by about 39

19   percent.  It's not clear that loss causation has to be pled

20   with specificity.  It's a factual issue and I think an open

21   legal question, but I find for present purposes that it is.

22          So there are at least several adequately alleged

23   misrepresentations and omissions.  Therefore I've denied the

24   motion to dismiss.

25          It's now 5:40.  It's important to put this case on

```
 1    track.  I think the best way to do that is to give you a period
 2    of time to confer and give me a proposed schedule, ideally
 3    jointly but separate if necessary.  What would be a reasonable
 4    time for you to do that?  Just to help you, I'm going to be
 5    away the first week in April and so I won't be able to see you
 6    until mid-April.
 7              MR. HARROD:  Well, I think we can probably do it in
 8    less than 30 days.
 9              THE COURT:  Yes, less than 30 days.
10              MR. HARROD:  14 days.
11              THE COURT:  You want two weeks?
12              MR. HARROD:  Yeah.
13              MS. BIRNBACH:  Just to propose a schedule, Your Honor?
14              THE COURT:  Right.
15              MS. BIRNBACH:  Two weeks is fine for a schedule.
16              THE COURT:  Are there any other issues that you should
17    be discussing at this point?
18              MS. BIRNBACH:  Well, Your Honor, automatic disclosures
19    would be a much huger undertaking.
20              THE COURT:  That's what I want you to put in the
21    schedule.  That's what I want you to talk about.
22              MS. BIRNBACH:  So we'll confer and propose something
23    jointly, I'm sure.
24              THE COURT:  All right.  So today is March 16.  File
25    that by March 30.  Why don't we plan that I will -- I may just
```

1   adopt your schedule, but if I need to see you, I'll see you at

2   4:00 on April 17.  Okay.  But check with Ms. Bono the week

3   before.  I'll be back on the 10th.  And basically, if you've

4   agreed on a schedule, I'm likely to adopt it.  However, are you

5   contemplating suggesting that damages and liability be

6   bifurcated for trial?  Because I'm not inclined to do that.  Or

7   that's not something you would ordinarily propose?

8          MS. BIRNBACH:  No.  The ordinary proposal is

9   potentially class discovery before merits discovery, Your

10  Honor.

11         THE COURT:  Well, class --

12         MR. HARROD:  We would resist that.

13         THE COURT:  You would oppose that?

14         MR. HARROD:  Yes.

15         THE COURT:  I can help you.  There would have to be

16  some very good reason.  I mean, I have to do class

17  certification, but is there something about this case that

18  makes it unusual and not susceptible to class certification?

19         MS. BIRNBACH:  No, it's just the burden of merits

20  discovery is enormous, and class certification, if discovery

21  shows a significant defect, then sometimes a court has given us

22  the option to renew our motion to keep merits discovery off.

23  I'm not saying we have any information that plaintiff is a

24  felon, Your Honor.  I'm just saying sometimes issues come up in

25  class discovery that make us renew our issue that merits

1  discovery should be put off.  I have no facts at this point,

2  Your Honor.

3          THE COURT:  Whatever order I issue I can alter if

4  there's a good reason to alter it.  But the other thing is, Mr.

5  Harrod, you explained Arkansas Teachers' absence.  They're the

6  lead plaintiff.

7          MR. HARROD:  One of the three.

8          THE COURT:  One of the lead plaintiffs.  They have an

9  obligation to actively supervise this, including your fees.

10  There are five of you here today.  You can ask -- it may not be

11  necessary, but you can ask your client why I'm pointing that

12  out.  You want to make sure there are, if we ever get to it,

13  no -- I think we haven't yet -- any questions about the

14  reasonableness of the hours spent or the rates attributed to

15  lawyers.  Okay?

16          MR. HARROD:  I'm familiar with the issues, Your Honor.

17  Thank you.

18          THE COURT:  Court is in recess.

19          (Adjourned, 5:46 p.m.)

20

21

22

23

24

25

1                CERTIFICATE OF OFFICIAL REPORTER

2

3           I, Kelly Mortellite, Registered Merit Reporter

4  and Certified Realtime Reporter, in and for the United States

5  District Court for the District of Massachusetts, do hereby

6  certify that pursuant to Section 753, Title 28, United States

7  Code that the foregoing is a true and correct transcript of the

8  stenographically reported proceedings held in the

9  above-entitled matter and that the transcript page format is in

10  conformance with the regulations of the Judicial Conference of

11  the United States.

12                Dated this 26th day of March, 2017.

13

14                /s/ Kelly Mortellite

15                _____

16                Kelly Mortellite, RMR, CRR

17                Official Court Reporter

18

19

20

21

22

23

24

25