# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, THE CITY OF BRISTOL PENSION FUND, and THE CITY OF OMAHA POLICE AND FIRE RETIREMENT SYSTEM, on behalf of themselves and all others similarly situated, | Civ. A. No. 15-12345-MLW <br><br> CLASS ACTION |
| Plaintiffs, | |
| v. | ECF CASE |
| INSULET CORPORATION, DUANE DESISTO, ALLISON DORVAL, BRIAN ROBERTS, and CHARLES LIAMOS | |
| Defendants. | |

# LEAD PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ...................................................................................1

II. THE COMMON FACTS UNDERLYING PLAINTIFFS' CLAIMS ...............................4

III. ARGUMENT ...........................................................................................................8

    A.  The Class ........................................................................................................ 8

    B.  The Legal Standard for Class Certification ...................................................... 8

    C.  Each Requirement of Rule 23(a) Is Satisfied ................................................... 9

        1.  Numerosity ........................................................................................... 9

        2.  Commonality ...................................................................................... 10

        3.  Typicality ........................................................................................... 11

        4.  Adequacy ........................................................................................... 12

    D.  The Requirements of Rule 23(b)(3) Are Satisfied ............................................ 13

        1.  Predominance ...................................................................................... 13

            a.  Individualized Issues of Damages Do Not Defeat
                  Predominance ................................................................... 14

            b.  Because Insulet Shares Traded on an Efficient Market, There
                  Are No "Individual Issues" of Reliance that Defeat
                  Predominance in this Fraud-on-the-Market Case ............................ 15

        2.  Superiority .......................................................................................... 20

IV. CONCLUSION .......................................................................................................20

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*In re Alstom SA Sec. Litig.*
   253 F.R.D. 266 (S.D.N.Y. 2008) ...........................................................19

*Amchem Prods., Inc. v. Windsor*
   521 U.S. 591 (1997)...........................................................3, 9, 13, 14

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*
   568 U.S. 455 (2013)...........................................................9, 14

*Andrews v. Bechtel Power Corp.*
   780 F.2d 124 (1st. Cir. 1985)...........................................................12

*Basic Inc. v. Levinson*
   485 U.S. 224 (1988)...........................................................3

*Berenson v. Nat'l Fin. Servs. LLC*
   485 F.3d 35 (1st Cir. 2007)...........................................................9

*In re Bos. Scientific Corp. Sec. Litig.*
   604 F. Supp. 2d 275 (D. Mass. 2009) ...........................................9, 14, 16, 18

*Cammer v. Bloom*
   711 F. Supp. 1264 (D.N.J. 1989) ...........................................16, 17, 18

*Cheney v. Cyberguard Corp.*
   213 F.R.D. 484 (S.D. Fla. 2003)...........................................................19

*Coffin v. Bowater Inc.*
   228 F.R.D. 397 (D. Me. 2005)...........................................................10

*In re Credit Suisse-AOL Sec. Litig.*
   253 F.R.D. 17 (D. Mass. 2008)...........................................10, 11, 18

*In re DVI Inc. Sec. Litig.*
   249 F.R.D. 196 (E.D. Pa. 2008)...........................................17, 19, 20

*Erica P. John Fund, Inc. v. Halliburton Co.*
   563 U.S. 804 (2011)...........................................................9, 14, 18

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*
   275 F.R.D. 382 (D. Mass. 2011)...........................................................9

*García-Rubiera v. Calderón*
   570 F.3d 443 (1st Cir. 2009)...........................................................10

*Gorsey v. I.M. Simon & Co., Inc.*
    121 F.R.D. 135 (D. Mass. 1988).......................................................................10

*Griffin v. GK Intelligent Sys., Inc.,*
    196 F.R.D. 298 (S.D. Tex. 2000) ...................................................................17

*Krogman v. Sterritt*
    202 F.R.D. 467 (N.D. Tex. 2001) ...............................................................16, 19

*Lumen v. Anderson*
    280 F.R.D. 451 (W.D. Mo. 2012).....................................................................15

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*
    No. 04 Civ. 8144(CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009)...................12

*Menkes v. Stolt-Nielsen S.A.*
    270 F.R.D. 80 (D. Conn. 2010)........................................................................18

*In re Netbank, Inc. Sec. Litig.*
    259 F.R.D. 656 (N.D. Ga. 2009).......................................................................19

*In re New Motor Vehicles Can. Exp. Antitrust Litig.*
    522 F.3d 6 (1st Cir. 2008)........................................................................8, 10, 15

*In re Nexium Antitrust Litig.*
    777 F.3d 9 (1st Cir. 2015)..........................................................................14, 15

*In re NYSE Specialist Sec. Litig.*
    260 F.R.D. 55 (S.D.N.Y. 2009) ........................................................................14

*In re PolyMedica Corp. Sec. Litig.*
    432 F.3d 1 (1st Cir. 2005)...........................................................................14, 15

*In re PolyMedica Corp. Sec. Litig.*
    453 F. Supp. 2d 260 (D. Mass. 2006) .............................................................16, 17

*Priest v. Zayre Corp.*
    118 F.R.D. 552 (D. Mass. 1988)...............................................................9, 11, 20

*Smilow v. Sw. Bell Mobile Sys., Inc.*
    323 F.3d 32 (1st Cir. 2003).............................................................................8, 14

*Swack v. Credit Suisse First Bos.*
    230 F.R.D. 250 (D. Mass. 2005)..............................................................10, 14, 20

*Tardiff v. Knox Cty.*
    365 F.3d 1 (1st Cir. 2004).................................................................................13

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*
  No. 05 Civ. 1898(SAS), 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006) ...................................15

*Todd v. STAAR Surgical Co.*
  No. CV-14-05263-MWF-RZ, 2017 WL 821662 (C.D. Cal. Jan. 5, 2017)............................15

*Connor B. ex rel. Vigurs v. Patrick*
  272 F.R.D. 288 (D. Mass. 2011) ..............................................................................10, 11, 12

*Wise v. Patriot Resorts Corp.*
  No. 04-30091-MAP, 2006 WL 6110885 (D. Mass. Feb. 15, 2006) .......................................11

*In re Xcelera.com Sec. Litig.*
  430 F.3d 503 (1st Cir. 2005) ........................................................................15, 16, 17, 18

## Other Authorities

Fed. R. Civ. P. 23(a)(1)-(4) ...............................................................................................8, 9, 12

Fed. R. Civ. P. 23(a)(2) .........................................................................................................10

Fed. R. Civ. P. 23(a)(3) .........................................................................................................11

Fed. R. Civ. P. 23(a)(4) .......................................................................................................3, 12

Fed. R. Civ. P. 23(b)(3)..............................................................................................8, 13, 14, 20

Fed. R. Civ. P. 23(b)(3)(A) ...................................................................................................20

Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv) ......................................................................................12

Lead Plaintiffs Arkansas Teacher Retirement System ("ATRS"), City of Bristol Pension Fund ("Bristol"), and City of Omaha Police & Fire Retirement System ("Omaha P & F") (collectively, "Lead Plaintiffs") submit this brief in support of their motion under Rules 23(a), (b)(3), and (g) of the Federal Rules of Civil Procedure to: (1) certify a Class (as further defined at §III.A) of purchasers of Insulet Corporation ("Insulet" or the "Company") common stock during the period from May 7, 2013 through April 30, 2015 (the "Class Period"); (2) appoint Lead Plaintiffs as Class Representatives; and (3) appoint Bernstein Litowitz Berger & Grossmann LLP and Scott+Scott, Attorneys at Law, LLP as Co-Lead Class Counsel.

# I.   PRELIMINARY STATEMENT[1]

During the Class Period, Defendants[2] made repeated material misrepresentations and omissions concerning Insulet's business and performance, including the purportedly successful launch of the newest model of Insulet's insulin infusion pump, the OmniPod "Eros."

As admitted and confirmed by Insulet's product recall in August 2015, the Eros suffered from numerous quality defects that ultimately led to an FDA warning letter (which led to the recall). Defendants concealed the seriousness of these defects during the Class Period, and misled investors as to both their existence and their impact on Insulet's business. For example, while repeatedly touting the success of the Eros launch and the allegedly rapid growth in patient demand that accompanied it, Defendants failed to disclose that Eros was suffering from pervasive defects, including "Severity A" defects (*i.e.*, serious and potentially life threatening) at rates as high as 32%. The pervasive nature of these defects, which included faulty needle mechanisms, leaking

---

[1]     Unless otherwise stated, in quoted material all emphasis is added and all internal quotations and citations are omitted. Citations to "¶" or "¶¶" are to paragraphs of the operative June 1, 2016 Consolidated Complaint (ECF No. 44) (the "Complaint"). All capitalized terms not defined herein have the meanings assigned in the Complaint.

[2]     Defendants are Insulet, its former CEO Duane DeSisto, its former COO, Charles Liamos, and two of its former CFOs, Allison Dorval and Brian Roberts.

pods and defective alarms, adversely affected patients' (and their doctors') acceptance of the Eros, which in turn led to reduced end-user demand. However, knowing that 81% of Insulet's revenue came from its OmniPod business and that its future depended on a successful Eros launch and increasing growth in patient demand, rather than disclose the truth Defendants (on the few occasions when they even mentioned quality issues at all) falsely downplayed them as immaterial "hiccups" that had been fixed.

Defendants also failed to disclose how Insulet's reported increases in Eros demand and revenue growth were due to their deliberate manipulation of certain key metrics. For example, Defendants misled investors during the Class Period by altering the way Insulet reported "new patient starts" (which Insulet had historically reported as reflecting only new U.S. patients) by combining both U.S. (high margin) and foreign (low margin) new patient starts. In doing so, Defendants masked that U.S. new patient starts actually *declined* 9% in 2014. Indeed, when DeSisto's replacement as CEO belatedly disclosed this manipulation in early 2015, he admitted that prior management had hid the decline – and shocked analysts reported how Defendants had been "misleading investors as to the underlying health of the core OmniPod business." ¶¶13, 80.

This case is ideally suited for class certification under Rule 23. As detailed below, Rule 23(a)'s four prerequisites for class certification (numerosity, commonality, typicality and adequacy) are all readily satisfied. As to numerosity, Insulet shares traded on the NASDAQ, with a public float of 54 million shares and average daily trading volume of 568,000 shares during the Class Period, thereby evidencing a Class so numerous that joinder is impractical. *See* Prof. Steven P. Feinstein, Ph.D., CFA's Report on Market Efficiency ("Feinstein Report"), ¶¶27, 50, 77 (attached as Ex. A to the accompanying Declaration of James A. Harrod In Support of Lead Plaintiffs' Motion for Class Certification ("Harrod Decl.")). Commonality is also easily met, as

common issues of law and fact include whether Defendants made materially false or misleading statements (or omitted material facts they were required to disclose), whether Class members were damaged as a result, and the proper measure of damages.  Each Lead Plaintiff is also typical, as each shares with the Class a common and overriding interest in showing that Defendants violated the federal securities laws and engaged in the fraudulent scheme alleged.  Finally, the adequacy requirement is met as Lead Plaintiffs have no conflicts with other Class members and are free of any unique defenses, and proposed Class Counsel have extensive experience in litigating securities class actions and otherwise meet the requirements of Rules 23(a)(4) and 23(g).

In addition, Rule 23(b)(3)'s requirements of "predomina[nce]" and "superior[ity]" are also satisfied.  Indeed, as the Supreme Court has stated, "[p]redominance is a test ***readily met*** in certain cases alleging . . . securities fraud," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997), and this case is no exception.  In particular, Insulet shares traded on an efficient market, and thus Lead Plaintiffs and all Class members are entitled to a presumption of reliance under the "fraud on the market" doctrine.  *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988); *see also* Feinstein Report, ¶¶17-20 (market for Insulet shares meets the multi-factor tests for showing market efficiency that are routinely applied in this Circuit).  Moreover, proceeding as a class action is superior to having myriad individual actions asserting the same claims.

In sum, this action presents a prototypical example of a §10(b) securities case that is appropriate for class certification.  Accordingly, Lead Plaintiffs' Motion should be granted.

## II.   THE COMMON FACTS UNDERLYING PLAINTIFFS' CLAIMS[3]

Insulet is a public company whose common stock trades on the NASDAQ, a highly efficient market.  ¶193(A)-(G); *see also* §D.1.b below.  At all material times, Insulet's flagship product was its OmniPod infusion pump, which diabetics wear on their bodies and use to inject themselves with the insulin they need.  The Class Period begins on May 7, 2013, the first trading day after Defendant DeSisto (Insulet's former CEO) touted Insulet's launch of its new "Eros" OmniPod system by stating that initial customer feedback was excellent, that Insulet had transitioned all of its new customers to the new Eros, and that as a result Insulet's growth was surging both in the U.S. and overseas.  Thereafter, Defendants continued to make similarly positive statements to investors and analysts throughout the Class Period, including further statements that touted the purported growth in new Eros patients ("new patient starts") and underlying customer demand for the Eros.  ¶3.

However, Defendants' statements were materially false or misleading.  Defendants not only failed to disclose the true nature and extent of pervasive product defect problems with the Eros and resulting adverse impact on end-user demand, but they had also secretly switched the method Insulet used to calculate "new patient starts" to conceal or "mask" a serious ***decline*** in its critically important and high margin domestic (U.S.) Eros business.  Insulet also failed to disclose how it had used large (and lower margin) "stocking" orders from a large European distributor (Ypsomed) to conceal the decline in end-user patient demand for Eros.  And Defendants further concealed how Ypsomed had, ironically, made these stocking orders in the first place due to its

---

[3]       For a more detailed summary of the facts alleged, *see generally* ¶¶1-18 and Lead Plaintiffs' Memorandum of Law in Opposition to Defendants Motion to Dismiss (ECF No. 61) at 1-8.

concerns about Insulet's ability to maintain adequate supplies in the face of Insulet's pervasive product defect problems.  ¶43.

On May 7, 2013 – the start of the Class Period – Insulet announced that the Eros launch had been a success, with Defendant DeSisto claiming that "initial feedback has been excellent." ¶¶3, 46-47.  Over the next 18 months, Defendants continued to hype the demand for Eros and Insulet's related performance.  For example, on November 7, 2013, Insulet announced that Eros "continues to receive an extremely enthusiastic response" as demand "continues to exceed our expectations." ¶55.  On February 27, 2014, DeSisto heralded 2013 as a "monumental year for Insulet." ¶59.  Defendants also reported huge growth in "new patient starts" over the same period. *E.g.*, ¶55 ("new patient starts [up] more than 40%); ¶¶59, 62, 65, 68 (similar).

On the few occasions when Defendants referenced any product quality issues with the Eros during the Class Period, Defendants routinely assured investors that they "had quickly identified and remedied" them.  ¶47.  For example, Defendant DeSisto went so far as to declare that, as of May 2013, any quality problems had been fixed and no defective product had ever "left the building." *Id*.  Likewise, in August 2013 Defendants minimized unspecified manufacturing problems as nothing more than immaterial "hiccups." ¶113.

Unfortunately for investors, however, the rosy picture of Insulet's performance and Eros product demand that Defendants painted was materially false, misleading and incomplete because the Eros was plagued by pervasive product defects.  ¶¶35-40.  For example, as detailed in the Complaint, throughout the Class Period Eros product lots had defective needle mechanisms (¶35), defective alarms (¶37), and leaking pods (¶36).  Moreover, to avoid losing revenue, Defendants DeSisto and Liamos authorized the shipment of defective product during the Class Period,

including by improperly "blending" product from defective lots with product from better quality lots.  ¶¶40(a)-(f).

Unsurprisingly, these undisclosed quality problems and shipments of defective product resulted in unsatisfied patients and concerned distributors.  *See* ¶45.  Patients did not appreciate receiving defective product, and began to flood Insulet's call center with their complaints.  ¶37(d) ("the phone wouldn't stop ringing" and it was like "drinking out of a firehose"); *see also* ¶41(a)-(b).  At the same time, distributors' ***lack*** of confidence in Insulet's ability to supply quality product caused them initially to try to build up a stockpile of usable Eros product, which in turn allowed Defendants to report short-term increases in ***sales*** and revenue – while ***simultaneously*** concealing from unwitting investors (a) that Insulet's end-user demand and new patient starts in the high margin U.S. market were actually ***declining***; and (b) the role that temporarily inflated levels of distributor stocking orders played in masking the botched Eros launch and the underlying deterioration in Insulet's business.  ¶¶4, 41-45.

The nature and pervasiveness of Insulet's product quality problems, the troubled Eros launch, and the resulting impact on sales and U.S. demand could not, however, be concealed forever.  On January 7, 2015, Insulet disclosed that its 4Q 2014 revenue would fall far short (by $5 to $8 million) of its prior guidance, and that its new CEO, Patrick Sullivan, was undertaking a wholesale replacement of Insulet's prior senior management by hiring six outsiders to fill top executive posts.  ¶¶9, 67, 70, 72.  In response, Insulet shares fell by almost 9%.  ¶75.

Only seven days later, on January 14, 2015, CEO Sullivan made additional disclosures concerning the true state of Insulet's business when he represented that previous analyst estimates of Insulet's 2015 performance were "a tad bit high," and that the Eros launch had not been nearly as successful as Insulet had previously reported.  ¶¶10, 77-78.  Indeed, as one shocked J.P. Morgan

analyst wrote: "According to new CEO Pat Sullivan, as the Eros launch progressed, quality issues came to light, including occlusions and increased alarms."  ¶83.  The same analyst then went on to describe how, unbeknownst to investors, this "troubled [Eros] launch" had actually resulted in "mounting patient and physician frustration" and "reputational damage" to Insulet.  *Id*.  On January 14, 2015, Sullivan further admitted that Insulet's new U.S. patient growth had not been increasing over the past year as previously claimed, but had instead actually been declining by 9%, and that Insulet had effectively concealed these materially adverse facts by: (a) changing the way it had reported "new patient" starts to include both U.S. and non-U.S. patients; and (b) using certain large distributor "stocking orders" to mask deterioration in its underlying end-user demand in the U.S. ¶¶11, 78-80.  In sum, as J.P. Morgan reported:

> *Insulet CEO Sullivan made a number of new disclosures around the health of the US OmniPod business, ultimately revealing that it's in worse shape than . . . prior management disclosure*. . . . The heart of the matter lies in the old management team's disclosures around the business, in particular new patient growth; new patients in the US were actually down 9% in 2014 compared to the +15-29% that investors believed as a result of previous management commentary. . . . *There's a credibility issue here*[.]

> Part of what we learned is that . . . new patient starts began to slow in the US in early 2014, but this was masked . . . by a large OUS [outside-the-US] stocking order from Ypsomed. . . . Our read is early in 2014 management switched "new patient starts" from being a US metric to a global one. . . . *The Street was never told of this switch*.

¶79.  Similarly, analysts at William Blair & Co. sharply criticized Insulet's prior reporting:

> *Management disclosures have been incomplete, at best.* . . . The ways in which the company discussed revenue targets, patient starts, and crucially, the components of guidance shifted over the course of 2014, *misleading investors as to the health of the core OmniPod business*. We now know US patient starts *were down 9%* in 2014.

¶80.  In response, Insulet shares fell from $38.50 to $31.86, a decline of roughly 17%.  ¶81.

Insulet's January disclosures, however, were incomplete.  For example, on February 26, the Company reported its earnings and related commentary for the 4Q 2014, which a William Blair analyst promptly reported showed that Insulet's U.S. business was even "worse than we thought."

¶88.  On March 30, 2015, Insulet announced that its CFO, Defendant Dorval (who had served as CFO for just four months after replacing Defendant Robert in November 2014) was resigning.

¶95.  Finally, on the Class Period's last day (April 30, 2015), Insulet revealed that its 1Q 2015 earnings had *declined* 11% compared to 1Q 2014, and that its U.S. OmniPod revenue had also *declined* 4% over the same period.  Accordingly, by the end of the Class Period, Insulet shares fell a further 15%, to only $26.97.  ¶¶16, 96; *see also* ¶¶156-69.

## III.   ARGUMENT

### A.   The Class

Lead Plaintiffs respectfully request that the Court appoint them as Class Representatives and certify a class pursuant to Fed. R. Civ. P. 23(a) and (b)(3), defined as follows:

> All persons who purchased the common stock of Insulet Corporation ("Insulet") during the period May 7, 2013 through April 30, 2015, inclusive (the "Class Period").  Excluded from the Class are Defendants and their families, the directors and officers of Insulet and its affiliates, and the immediate family members, successors and/or assigns of any such excluded person or entity.

### B.   The Legal Standard for Class Certification

"To obtain class certification, the plaintiff must establish the four elements of Rule 23(a) and one of several elements of Rule 23(b)."  *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003).  The four elements of Rule 23(a) are numerosity, commonality, typicality, and adequacy.  Fed. R. Civ. P. 23(a)(1)-(4).  Where, as here, plaintiffs seek to certify a class under Rule 23(b)(3), a plaintiff must also show predominance (*i.e.*, that common questions predominate over ones requiring individual proof) and superiority (*i.e.*, that class treatment is superior to, *e.g.*, multiple individual actions).  *See, e.g.*, *In re New Motor Vehicles Can. Exp. Antitrust Litig.*, 522 F.3d 6, 18 (1st Cir. 2008).

In the First Circuit, "class certification prerequisites should be construed in light of the underlying objective[] of class actions[,]" *Smilow*, 323 F.3d at 41, which include fostering

"economies of time, effort, and expense, and promot[ing] . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods.*, 521 U.S. at 615 (citing Fed. R. Civ. P. 23(b) advisory committee notes to 1966 amendment).  Moreover, in securities fraud cases, courts in this District regularly find that class certification favors "enforcement of the federal securities laws," given that "class actions may be the only practicable means of enforcing investors' rights[.]" *Priest v. Zayre Corp.*, 118 F.R.D. 552, 553-54 (D. Mass. 1988); *see also, e.g.*, *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 275 F.R.D. 382, 393 (D. Mass. 2011) ("other judges of this Court have stressed that class actions are particularly appropriate for securities litigation"); *In re Bos. Scientific Corp. Sec. Litig.*, 604 F. Supp. 2d 275, 280 (D. Mass. 2009) (same).

The Supreme Court has made clear that Rule 23 does not grant courts "license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011)).  "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* Moreover, the Supreme Court has held that proof of materiality and loss causation are not required at the class certification stage. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) (plaintiff is not required to "show loss causation as a condition of obtaining class certification"); *Amgen*, 568 U.S. at 470 (proof of materiality not required at class certification as "the question of materiality is common to the class").

### C.      Each Requirement of Rule 23(a) Is Satisfied

#### 1.      Numerosity

Rule 23(a)(1) requires that the class merely be "so numerous the joinder of all members is ***impracticable***." *Berenson v. Nat'l Fin. Servs. LLC*, 485 F.3d 35, 38 (1st Cir. 2007).  This test does

not mean that joinder must be "impossible," but merely difficult or inconvenient.  *Gorsey v. I.M. Simon & Co., Inc.*, 121 F.R.D. 135, 138 (D. Mass. 1988).  Satisfying "numerosity" therefore involves meeting only a "relatively low threshold."  *Connor B. ex rel. Vigurs v. Patrick*, 272 F.R.D. 288, 292 (D. Mass. 2011) (citing *García-Rubiera v. Calderón*, 570 F.3d 443, 460 (1st Cir. 2009)).  Precise quantification of class members is also not required.  Instead, in securities actions, "courts may draw reasonable inferences from the facts presented to find the requisite numerosity," and courts have routinely found the numerosity requirement satisfied based on the number of shares that were outstanding and the average trading volume during the class period.  *See, e.g., Swack v. Credit Suisse First Bos.*, 230 F.R.D. 250, 258, 260 (D. Mass. 2005).

Here, there were roughly 54 million publicly traded Insulet shares, and an average of roughly 568,000 Insulet common shares traded ***daily*** during the Class Period.  Feinstein Report, ¶50.  Moreover, during the Class Period, at least 402 institutional investors owned Insulet common stock, which further supports a finding of numerosity.  *See id.*, ¶59.  In such circumstances, it can be readily presumed that the proposed Class vastly exceeds the minimum number required to satisfy numerosity under Rule 23.  *See, e.g., In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 22 (D. Mass. 2008); *see also Coffin v. Bowater Inc.*, 228 F.R.D. 397, 402 (D. Me. 2005) (noting that class of as few as 40 members satisfies numerosity).

### 2.    Commonality

Commonality is satisfied where "there are questions of law or fact common to the class[.]" Fed. R. Civ. P. 23(a)(2).  Rule 23(a)'s commonality requirement "is a low bar," and courts give it a "permissive application."  *New Motor Vehicles*, 522 F.3d at 19; *García-Rubiera*, 570 F.3d at 460-61.  When questions regarding a defendant's conduct toward members of the proposed class "underlie and are essential to the claims of all members of the proposed class[,]" the requisite commonality exists.  *Swack*, 230 F.R.D. at 260.  This element is clearly met here.

This case will require the Court and jury to address a series of identical questions with respect to the Class that will affect all Class members.  For example, common questions of law and fact susceptible to resolution with common evidence include:

- whether the federal securities laws were violated by Defendants' acts and omissions as alleged;

- whether Defendants participated in and pursued the illegal course of conduct complained of herein with scienter;

- whether statements disseminated to the investing public during the Class Period contained misrepresentations or misleading omissions of material information;

- whether the price of Insulet common stock was artificially inflated due to Defendants' material misrepresentations and misleading omissions; and

- to what extent the members of the Class have sustained damages, and the proper measure of damages.

Moreover, and arguably most important, the proof of the existence and nature of Defendants' scheme to mislead investors will be common to all members of the Class.  For example, Defendants' alleged false and misleading statements and omissions were made uniformly to members of the Class via press releases, SEC filings, and during conference calls with investors.[4]

### 3.   Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class[.]"  *Connor B.*, 272 F.R.D. at 292.  The claims of the entire class need not be identical; rather, the class representatives need only "generally possess the same interests and suffer the same injury as the unnamed class members."  *Id.* at 296; *see also Credit Suisse-AOL*, 253 F.R.D. at 23.  "[P]laintiffs need *not* show substantial identity between their claims and those of absent class members" (*Wise v. Patriot Resorts Corp.*, No. 04-30091-MAP, 2006 WL 6110885, at *3 (D. Mass. Feb. 15, 2006) (quoting *Priest*, 118 F.R.D. at 555)); instead, they "need

---

[4]       In addition, Plaintiffs' §20(a) claims also rest on the common legal and factual questions of whether there has been an underlying violation of §10(b), and of whether certain Defendants exercised "control" over Insulet.

only show that their claims ***arise from the same course of conduct*** that gave rise to the claims of the absent members." *Id.* Accordingly, differences in facts involving the date of acquisition or manner by which an investor acquired the securities do not defeat typicality where, as here, each Class member is the victim of the same fraudulent course of conduct, namely, Defendants' dissemination of false and misleading statements and omissions regarding the OmniPod Eros to Insulet investors during the Class Period. *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144(CM), 2009 WL 5178546, at *10 (S.D.N.Y. Dec. 23, 2009). Typicality is readily satisfied.

### 4.    Adequacy

The fourth requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To meet this requirement, Plaintiffs must satisfy two criteria: (1) the attorneys representing the class must be qualified and competent; and (2) the class representatives must not have interests antagonistic to or in conflict with the unnamed members of the class. *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st. Cir. 1985); *accord Connor B.*, 272 F.R.D. at 297.

First, Lead Plaintiffs have retained attorneys capable of vigorously prosecuting this action, with extensive experience in the successful prosecution of securities class actions, to sue on behalf of those who purchased Insulet common stock during the Class Period. *See* Firm Résumés of Bernstein Litowitz Berger & Grossmann LLP ("BLBG") and Scott+Scott, Attorneys at Law, LLP ("Scott+Scott") (Harrod Decl., Exs. B & C, respectively). Lead Plaintiffs' attorneys are fully committed to devoting the skills, time, and funding necessary to bring this litigation to a successful conclusion, as they have in numerous other securities class actions.[5]

---

[5]    For the same reasons, Lead Plaintiffs request that BLBG and Scott+Scott be appointed Co-Lead Class Counsel pursuant to Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

Second, each of the three proposed class representatives here is an institutional investor who understands that it has a fiduciary obligation to represent the Class, and each is also committed to bringing this case to a successful conclusion by, among other things, supervising counsel, and participating in strategic decisions.  Although class discovery is still ongoing, each proposed Class representative is committed to participating in required discovery, to producing a designated representative for deposition, and to taking such other steps as may be necessary or appropriate to protect the interests of the Class in this action.  *See* Harrod Decl. Exs. D-F (attaching, respectively, the Declarations of Rod Graves of ATRS, of Diane Waldron of Bristol, and of Lt. James Sklenar of Omaha P&F, in Support of the Motion for Class Certification).

Third, Lead Plaintiffs' interests and those of the rest of the proposed Class are completely aligned because they all purchased Insulet common shares at inflated prices, which had resulted from Defendants' materially false and misleading statements and omissions of material fact during the Class Period.  Thus, adequacy is satisfied.

### D.     The Requirements of Rule 23(b)(3) Are Satisfied

Under Rule 23(b)(3), the Court should certify a class where it finds that: (1) the questions of law or fact common to the members of the class predominate over any questions affecting only individual members; and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Both requirements are readily met here.

### 1.     Predominance

"Predominance is a test readily met in certain cases alleging . . . securities fraud." *Amchem Prods.*, 521 U.S. at 625; *see also Tardiff v. Knox Cty.*, 365 F.3d 1, 5 (1st Cir. 2004) (predominance met where plaintiffs alleged common unlawful course of conduct by defendants).  *Amchem* also confirms that "predominance" does ***not*** require proof of the absence of any individual issues, but simply a showing that the proposed class is "***sufficiently*** cohesive" to warrant certification.  521

U.S. at 623; *see also In re Nexium Antitrust Litig.*, 777 F.3d 9, 21 (1st Cir. 2015) (*Amgen* "ma[kes] clear that the need for *some* individualized determinations at the liability and damages stage does not defeat class certification.").

Here, each of the liability elements in this §10(b) action – namely, material omissions or misrepresentations, Defendants' scienter, reliance, and loss causation (*see In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 7 (1st Cir. 2005)) – will be established through common proof and presumptions. *Bos. Scientific*, 604 F. Supp. 2d at 283 ("Most [§10(b)] elements are generally amenable to common proof[.]").  In this fraud-on-the-market case, proof of materially false or misleading statements and omissions will involve scrutiny of *common* statements (and *common* omissions), and the test of materiality (which is an objective standard) will be the *same* for all members of the Class.  *See Amgen*, 568 U.S. 466-69.  Similarly, whether Defendants acted with *scienter* will be established through evidence common to the whole Class, rather than on any evidence that relates only to particular Class members.  Moreover, the question of whether Class members suffered damages as a result of Defendants' fraudulent conduct is another common question that will be decided by common evidence applicable to all Class members.[6]

a.    **Individualized Issues of Damages Do Not Defeat Predominance**

Courts uniformly hold that differences in individual class members' damages do not defeat predominance.  *See Swack*, 230 F.R.D. at 272-73 (finding predominance "even if individual issues may take center stage when it comes to damages") (citing *Smilow*, 323 F.3d at 40); *see also In re NYSE Specialist Sec. Litig.*, 260 F.R.D. 55, 74 (S.D.N.Y. 2009) ("Conflicts over damages, at this

---

[6]     Of course, at class certification a district court is not concerned with whether issues of liability (such as material falsity, scienter, and loss causation) have yet been proven, but only whether such issues are likely to involve common proof. *See, e.g.*, *Amgen*, 568 U.S. at 460 ("the office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the metho[d] best suited to adjudication of the controversy" (alteration in original)); *Erica P. John Fund*, 563 U.S. at 813 (error to require plaintiff "to show loss causation as a condition of obtaining class certification").

early stage in the litigation, need not defeat a motion for certification.").  In addition, although each Class member's individual damages will vary depending on, *inter alia*, the timing of their transactions in Insulet stock and the number of shares involved, their individual damages can be calculated (as is customary in §10(b) actions) based on a **common** methodology and **common** damages formulas that will be further developed by Lead Plaintiffs' expert, Dr. Feinstein, as discovery proceeds.  *See* Feinstein Report, ¶¶189-194; *see also, e.g.*, *Nexium*, 777 F.3d at 19 (looking at whether "***prior to judgment***, it will be possible to establish a mechanism for distinguishing the injured from the uninjured class members").

        b.      **Because Insulet Shares Traded on an Efficient Market, There Are No "Individual Issues" of Reliance that Defeat Predominance in this Fraud-on-the-Market Case**

Lead Plaintiffs have properly invoked the fraud-on-the-market doctrine, under which all Class members are entitled to a presumption of reliance, thus negating any arguments concerning individual issues of reliance.

To invoke the fraud-on-the-market presumption, plaintiffs must show that the market for the security at issue was "efficient" during the class period.  *See PolyMedica*, 432 F.3d at 16, 19. Moreover, at the class certification stage, a plaintiff need only "present basic facts that the fraud-on-the-market presumption could be invoked, even though its actual applicability [is] to be resolved at trial."  *New Motor Vehicles*, 522 F.3d at 25; *see also In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 517 (1st Cir. 2005) (plaintiffs need only "establish the basic facts that permit a court to apply the fraud-on-the-market presumption") (quoting *PolyMedica*, 432 F.3d at 17).[7]  As shown

---

[7]     As an initial matter, because the NASDAQ is such a large, open and developed market, a number of courts have concluded that if a stock is listed there, as Insulet is, then there is a rebuttable presumption that the stock trades in an efficient market.  *See, e.g.*, *Todd v. STAAR Surgical Co.*, No. CV-14-05263-MWF-RZ, 2017 WL 821662, at *10 (C.D. Cal. Jan. 5, 2017) ("there [is] a presumption that stocks traded on the NASDAQ are efficient[]"); *Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012) (same and noting that "[i]t would be remarkable for a court to conclude NASDAQ is ***not*** an efficient market"); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05 Civ. 1898(SAS), 2006 WL 2161887, at *8 (S.D.N.Y. Aug. 1, 2006) (same).

below and in the Feinstein Report, Lead Plaintiffs easily meet their burden of establishing "basic facts" showing that Insulet common stock traded in an efficient market throughout the Class Period, and that all Class members are entitled to a common presumption of reliance.

Courts in the First Circuit rely on five primary factors, enumerated in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), to evaluate whether the market for a security is efficient:

> (1) the stock's average trading volume; (2) the number of securities analysts that followed and reported on the stock; (3) the presence of market makers and arbitrageurs; (4) the company's eligibility to file a Form S–3 Registration Statement; and (5) a cause-and-effect relationship, over time, between unexpected corporate events or financial releases and an immediate response in stock price.

*Bos. Scientific*, 604 F. Supp. 2d at 284 (citing *Cammer*, 711 F. Supp. at 1286-87).

In addition, the First Circuit has noted that, in considering market efficiency, courts have also considered other factors, including: (6) "total market capitalization"; (7) the magnitude of the security's "bid-ask spread"; and (8) the "percentage of stock ***not*** held by insiders (the [public] 'float')." *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 266 n.2 (D. Mass. 2006) (citing *Krogman v. Sterritt,* 202 F.R.D. 467, 474 (N.D. Tex. 2001)).  Here, as explained more fully in the accompanying Feinstein Report, each of these factors (let alone the collective weight of them) confirms that Insulet common stock traded on an efficient market.

**Average Trading Volume.**  During the Class Period, Insulet common shares had an average daily trading volume of approximately 568,415 million shares, which was roughly 5.13% of Insulet's total common shares outstanding.  Feinstein Report, ¶¶50-51.  Such high average weekly trading volume supports a finding of market efficiency "since it implies significant investor interest in the company and a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information."  *Xcelera.com*, 430 F.3d at 514 (average daily trading volume equal to 4% of total shares outstanding was well above the "1% or 2%" benchmark that supports market efficiency).

**Analyst Coverage**.  The presence of meaningful analyst coverage also supports a finding that the market for a given security was efficient.  Here, Insulet was extensively covered by at least 23 financial analysts – including from such well-known firms as J.P. Morgan, Jefferies, William A. Blair & Co., and Piper Jaffrey – who issued at least 225 analyst reports on Insulet during the Class Period.  Feinstein Report, ¶¶53-57.  Such coverage further supports a market efficiency finding.  *See, e.g.*, *Xcelera.com*, 430 F.3d at 514-16 (noting that "the presence of only one securities analyst[]" did not defeat determination that efficient market existed); *PolyMedica*, 453 F. Supp. 2d at 267 (presence of just seven analysts weighs in favor of efficiency).

**Presence of Market-Makers**.  Insulet common shares traded on the NASDAQ, which is widely recognized as one of the world's premier "market-maker[]" based securities exchanges. *See, e.g.*, *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 210 (E.D. Pa. 2008).  There were **151** market-makers for Insulet's common shares during the Class Period, far more than needed for a finding of efficiency.  Feinstein Report, ¶64; *cf. Cammer*, 711 F. Supp. at 1293 (presence of 10 market-makers supported efficiency); *Xcelera.com*, 430 F.3d at 516 (20 market-makers suffice).

**Eligibility to File Form S-3 Registration Statement.**  Insulet was eligible to file an S-3 Registration statement with the SEC and did so on June 3, 2014.  Feinstein Report, ¶71.  "Courts generally consider this factor to be extremely important in market efficiency determinations." *PolyMedica*, 453 F. Supp. 2d at 268 (citing *Griffin v. GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 304 (S.D. Tex. 2000)).[8]

**Cause and Effect Analysis (Event Study).**  Courts often focus on a plaintiff's ability to proffer "empirical facts showing a cause and effect relationship between unexpected corporate

---

[8]      SEC Form S-3 allows certain public companies that have met SEC reporting requirements for more than a year to incorporate prior SEC filings by reference without repeating the information.  *See* U.S. SEC. & EXCH. COMM'N, FORM S-3 REGISTRATION STATEMENT (2017), www.sec.gov/about/forms-3.pdf.

events or financial releases and an immediate response in the stock price."[9] *Cammer*, 711 F. Supp. at 1287; *Xcelera.com*, 430 F.3d at 512. The most widely accepted statistical method to determine the existence of such a relationship is to conduct an "event study," which measures the effect of new information on the market prices of a company's publicly traded securities. *See, e.g.*, Feinstein Report, ¶90. Here, Lead Plaintiffs' expert's event study included a review of Insulet-specific news, and used a customary regression model to control for the reaction of Insulet's common shares to general market and industry-wide factors and overall market volatility. *Id.*, ¶¶97-101, 110. Lead Plaintiffs' event study ***confirms*** that disclosures of new, material information concerning Insulet were indeed associated with statistically significant changes in Insulet's stock price, thereby providing further strong evidence of market efficiency. *Id.*, ¶175; *see also, e.g.*, *Credit Suisse-AOL*, 253 F.R.D. at 27 (finding market efficient where a company's "stock price adapted quickly to new information"); *Bos. Scientific*, 604 F. Supp. 2d at 284 (market efficiency found where a company's "stock price changed quickly in response to new information, such as company announcements").

**Market Capitalization.** As some courts have noted, "Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may [also] be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 97 n.19 (D. Conn. 2010). Here, during the Class Period, Insulet had an average market capitalization of $2.05 billion, placing the Company in the third-highest decile of all publicly traded companies in the U.S. Feinstein

---

[9]      The cause-and-effect *Cammer* factor should not be confused with any argument that a plaintiff must prove at class certification the substantive §10(b) element of ***loss causation*** (*i.e.*, that the revelation of defendant's fraud proximately caused plaintiffs to suffer loss), a contention that the Supreme Court has squarely rejected. "Loss causation has no logical connection to the facts necessary to establish the efficient market predicate to the fraud-on-the-market theory[,]" *Eric P. John Fund*, 563 U.S. at 813, and "[whether] a subsequent loss may have been caused by factors other than the revelation of a misrepresentation has nothing to do with whether an investor relied on the misrepresentation in the first place, either directly or presumptively through the fraud-on-the-market theory." *Id.*

Report, ¶74.  A market capitalization of this size plainly weighs in favor of market efficiency.  *See DVI Inc.*, 249 F.R.D. at 212 (market capitalization of $300 million to as little as $12 million by end of class period supported finding market efficiency).

**Bid-Ask Spread.**  The bid-ask spread is "the difference between the price at which current stockholders are willing to buy the stock and the price at which current stockholders are willing to sell their shares."  *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003) (quoting *Krogman*, 202 F.R.D. at 478).  Here, during the Class Period, the average bid-ask spread for Insulet common stock over the Class Period was 0.05%, compared to a much higher 0.57% spread for all CRSP stocks (which includes all stocks traded on, *inter alia*, the NYSE and the NASDAQ). Feinstein Report, ¶81.  Such a relatively low bid-ask spread likewise weighs in favor of market efficiency.  *See id.*, ¶83; *In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 672 (N.D. Ga. 2009).

**Insider Holdings/Public Float.**  In addition, courts consider the percentage of stock held by insiders versus other investors as a consideration in determining efficiency.  *Cheney*, 213 F.R.D. at 502.  Having a large public "float" weighs in favor of finding market efficiency, because insiders may have inside information that is not yet reflected in stock prices, and thus "prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information."  *Id.* (quoting *Krogman*, 202 F.R.D. at 478).  Here, during the Class Period, Insulet's "float" – *i.e.*, the number of shares available for trading by the public – was roughly 54.2 million shares, with insiders holding less than 2% of shares outstanding.  Feinstein Report, ¶77.  Thus, Insulet's "float" also supports a finding of market efficiency.

**Institutional Investor Holdings.**  Courts also consider how many institutional investors held the security at issue during the class period.  *See In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008) ("because these investors could easily buy and sell [the] securities . . . they

have likely acted as arbitrageurs and facilitated the efficiency of the market"); *DVI Inc.*, 249 F.R.D. at 212 n.26 ("pricing inefficiencies are more likely to be found where a company's stock is not widely held by institutional investors").  Here, as noted above, during the Class Period, at least 400 institutional investors owned Insulet common shares, which again further supports a finding of market efficiency.  Feinstein Report, ¶59.

In sum, the market for Insulet common shares was efficient, a presumption of reliance applies, and there are no individualized reliance issues that defeat predominance.

### 2.    Superiority

Finally, Rule 23(b) also requires the court to determine that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Courts routinely hold in the securities context that a class action is superior to the inherent inefficiencies of adjudicating myriad small claims in separate actions.  *Swack*, 230 F.R.D. at 273; *Priest*, 118 F.R.D. at 556.  Nor is this a case where class members have strong "interests in individually controlling the prosecution . . . of separate actions[,]" Fed. R. Civ. P. 23(b)(3)(A), as few if any putative Class members are likely to have a sufficient stake in this controversy to pursue separate actions.  Moreover, Lead Plaintiffs foresee no undue difficulties in managing this case, and courts in this District have ample experience in managing §10(b) litigations such as this one.

## IV.    CONCLUSION

For the reasons stated herein and in the accompanying supporting papers, Lead Plaintiffs respectfully submit that the Court should certify the proposed Class, appoint the Lead Plaintiffs as Class Representatives, and appoint the undersigned lead counsel firms as Class Counsel.

DATED:  August 25, 2017

Respectfully submitted,

By*:   /s/ James A. Harrod          *
**BERNSTEIN LITOWITZ BERGER &**
  **GROSSMANN LLP**
James A. Harrod (admitted *pro hac vice*)
Rebecca E. Boon (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 554-1400
Facsimile:  (212) 554-1444
jim.harrod@blbglaw.com
rebecca.boon@blbglaw.com

**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
William C. Fredericks (admitted *pro hac vice*)
Sean T. Masson (admitted *pro hac vice*)
The Helmsley Building
230 Park Ave., 17th Floor
New York, NY 10169
Telephone:  (212) 223-6444
Facsimile:  (212) 223-6334
wfredericks@scott-scott.com
smasson@scott-scott.com

*Co-Lead Counsel for Lead Plaintiffs and Proposed*
*Co-Lead Class Counsel for the Proposed Class*

**BERMAN TABACCO**
Steven J. Buttacavoli (BBO #651440)
One Liberty Square
Boston, MA 02109
Tel: (617) 542-8300
Fax: (617) 542-1194
sbuttacavoli@bermantabacco.com

*Local Counsel for Lead Plaintiffs*

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Joshua L. Crowell (admitted *pro hac vice*)
Alexa Mullarky (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160
jcrowell@glancylaw.com
amullarky@glancylaw.com

*Additional Counsel for Lead Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 25, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ James A. Harrod*
James A. Harrod